UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        - v. -<br><br>LINDA SUN,<br>   a/k/a "Wen Sun," "Ling Da Sun," and<br>   "Linda Hu," and<br><br>CHRIS HU,<br><br>             *Defendants*. | 24 Cr. 346 (BMC) (TAM) |

**MEMORANDUM OF LAW IN SUPPORT**
**OF LINDA SUN'S MOTION TO DISMISS THE INDICTMENT**

ABELL ESKEW LANDAU LLP

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman
256 Fifth Avenue, 5th Floor
New York, NY 10001

*Counsel for Linda Sun*

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.     LEGAL STANDARD ............................................................................................. 2

II.    THE INDICTMENT ............................................................................................... 5

III.   THE COUNTS PREDICATED ON FARA MUST BE DISMISSED ............................ 10

      A.    Statutory History, Text, and Subsequent Interpretation of FARA ....................... 10

      B.    The Indictment Fails to State Offenses Under FARA ........................................... 13

           i.    The Indictment does not adequately allege the agency relationship required under FARA ............................................................................................. 15

           ii.   The Indictment does not allege legally sufficient efforts to exert "influence" under FARA ............................................................................................. 24

           iii.  The Indictment does not allege an essential component of the willfulness required to violate FARA ............................................................................ 26

      C.    Expanding FARA to Include the Conduct Alleged in This Case Raises Grave Constitutional Questions .................................................................................... 30

           i.    Using FARA to regulate permissible relations between states and foreign nations violates the separation of powers ...................................................... 31

           ii.   Stretching FARA to criminalize political and policy determinations by state officials impermissibly infringes on protected state activity ........................ 33

      D.    Even Accepting the Government's Novel Application of FARA in This Case, the Lack of Fair Notice and the Rule of Lenity Require Dismissal ........................... 38

      E.    The Indictment Separately Fails to Allege a Conspiracy to Violate FARA .......... 41

IV.   THE VISA FRAUD AND ALIEN SMUGGLING COUNTS MUST BE DISMISSED .. 46

      A.    The Indictment Fails to Sufficiently Allege Falsity and Materiality in Connection with Visa Fraud ...................................................................................................... 48

      B.    The Indictment Fails to Allege a Violation of Law in Connection with the Alleged Alien Smuggling ................................................................................................... 51

V.    THE MONEY LAUNDERING CONSPIRACY COUNT MUST BE DISMISSED ....... 52

      A.    The Indictment Fails to Allege Any Facts Establishing a Money Laundering Scheme Involving Ms. Sun .................................................................................. 53

CONCLUSION ................................................................................................................. 56

## Table of Authorities

**Cases**

*Att'y Gen. of United States v. Irish N. Aid Comm.*,
668 F.2d 159 (2d Cir. 1982) ............................................................ 16, 17, 18, 19, 27

*Barclays Bank PLC v. Franchise Tax Bd. of California*,
512 U.S. 298 (1994) ............................................................................... 31, 32

*Bond v. United States*,
572 U.S. 844 (2014) ...................................................................................... 37

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ...................................................................................... 33

*Bryan v. United States*,
524 U.S. 184 (1998) ...................................................................................... 28

*Carroll v. Blinken*,
957 F.2d 991 (2d Cir. 1992) .......................................................................... 35

*Cheek v. United States*,
498 U.S. 192 (1991) ............................................................................ 26, 40, 42

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .................................................................................. 20, 25

*Connick v. Myers*,
461 U.S. 138 (1983) ...................................................................................... 34

*Dep't of Revenue of State of Washington v. Ass'n of Washington Stevedoring Companies*,
435 U.S. 734 (1978) .................................................................................. 31, 32

*Dowling v. United States*,
473 U.S. 207 (1985) .................................................................................... 5, 15

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006) .......................................................................... 33

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ...................................................................................... 33

*Garrison v. State of Louisiana*,
379 U.S. 64 (1964) ................................................................................... 33, 34

*Gebardi v. United States*,
287 U.S. 112 (1932) .................................................................................. 43, 44

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ...................................................................................... 34

*Hamling v. United States*,
418 U.S. 87 (1974) ....................................................................... 3, 18, 23, 54

*Jesner v. Arab Bank, PLC,*
    584 U.S. 241 (2018) ............................................................................................ 30

*Jones v. United States,*
    529 U.S. 848 (2000) ............................................................................. 30, 32, 37

*Kiobel v. Royal Dutch Petroleum Co.,*
    569 U.S. 108 (2013) ............................................................................................ 30

*Lambert v. People of the State of California,*
    355 U.S. 225 (1957) ..................................................................................... 29, 39

*Liparota v. United States,*
    471 U.S. 419 (1985) ............................................................................................ 27

*McDonnell v. United States,*
    579 U.S. 550 (2016) .......................................................................... 20, 23, 36

*Meese v. Keene,*
    481 U.S. 465 (1987) ............................................................................................ 10

*Miami Herald Pub. Co. v. Tornillo,*
    418 U.S. 241 (1974) ............................................................................................ 35

*Ocasio v. United States,*
    578 U.S. 282 (2016) ..................................................................................... 42, 45

*Papasan v. Allain,*
    478 U.S. 265 (1986) ............................................................................................ 21

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009) ..................................................................................... 33, 34

*Ratzlaf v. United States,*
    510 U.S. 135 (1994) ..................................................................................... 26, 28

*Reed v. Town of Gilbert, Arizona,*
    576 U.S. 155 (2015) ............................................................................................ 34

*Rehaif v. United States,*
    588 U.S. 225 (2019) ..................................................................................... 26, 27

*Rewis v. United States,*
    401 U.S. 808 (1971) ....................................................................................... 5, 38

*Ruan v. United States,*
    597 U.S. 450 (2022) ............................................................................................ 26

*Russell v. United States,*
    369 U.S. 749 (1962) ................................................................................... passim

*Salinas v. United States,*
    522 U.S. 52 (1997) ....................................................................................... 41, 43

*Snyder v. United States,*
    144 S. Ct. 1947 (2024) ............................................................... 20, 35, 36, 37

*Spies v. United States*,
  317 U.S. 492 (1943) ............................................................................................ 26

*U.S. ex rel. Longhi v. United States*,
  575 F.3d 458 (5th Cir. 2009) .............................................................................. 25

*United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*,
  213 U.S. 366 (1909) ............................................................................................ 30

*United States v. Aleynikov*,
  676 F.3d 71 (2d Cir. 2012) ....................................................................... 5, 13, 15

*United States v. Alfisi*,
  308 F.3d 144 (2d Cir. 2002) ................................................................................ 20

*United States v. Alshahhi*,
  No. 21-CR-371 (BMC), 2022 WL 2239624 (E.D.N.Y. June 22, 2022),
  *recons. denied*, 2022 WL 3595056 (E.D.N.Y. Aug. 23, 2022) .............. 15, 17, 21, 34

*United States v. Aracri*,
  968 F.2d 1512 (2d Cir. 1992) .............................................................................. 46

*United States v. Bass*,
  404 U.S. 336 (1971) ............................................................................................ 37

*United States v. Benjamin*,
  95 F.4th 60 (2d Cir. 2024) .................................................................................... 3

*United States v. Berlin*,
  472 F.2d 1002 (2d Cir. 1973) ........................................................................ 30, 51

*United States v. Craig*,
  401 F. Supp. 3d 49 (D.D.C. 2019) ...................................................................... 41

*United States v. D'Alessio*,
  822 F. Supp. 1134 (D.N.J. 1993) ........................................................................ 55

*United States v. Dauray*,
  215 F.3d 257 (2d Cir. 2000) ................................................................................ 24

*United States v. Davis*,
  588 U.S. 445 (2019) .................................................................................. 5, 38, 40

*United States v. Eppolito*,
  543 F.3d 25 (2d Cir. 2008) .................................................................................. 46

*United States v. Farhane*,
  634 F.3d 127 (2d Cir. 2011) ................................................................................ 34

*United States v. Finn*,
  919 F. Supp. 1305 (D. Minn. 1995) .................................................................... 55

*United States v. Gabriel*,
  920 F. Supp. 498 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) ................ 21

*United States v. Galestro*,
  No. 06-CR-285 (ARR), 2008 WL 2783360 (E.D.N.Y. July 15, 2008) ............ 22, 55

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007) ............................................................................ 17

*United States v. Geibel*,
    369 F.3d 682 (2d Cir. 2004) ............................................................................ 46

*United States v. Gonzalez*,
    686 F.3d 122 (2d Cir. 2012) ...................................................................... 22, 41

*United States v. Hansen*,
    599 U.S. 762 (2023) ......................................................................................... 52

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012) ........................................................... 4, 15

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020) ............................................................................... 21

*United States v. Hoskins*,
    902 F.3d 69 (2d Cir. 2018) ........................................................................ 43, 44

*United States v. Howard*,
    No. CR H-03-0093, 2005 WL 8157704 (S.D. Tex. Apr. 7, 2005) ...................... 55

*United States v. Kerik*,
    615 F. Supp. 2d 256 (S.D.N.Y. 2009) .............................................................. 15

*United States v. Konstantakakos*,
    121 F. App'x 902 (2d Cir. 2005) ...................................................................... 48

*United States v. Lanier*,
    520 U.S. 259 (1997) ................................................................................... 38, 39

*United States v. Manafort*,
    318 F. Supp. 3d 1 (D.D.C. 2018) ................................................................ 39, 40

*United States v. Mancuso*,
    420 F.2d 556 (2d Cir. 1970) .................................................................. 27, 28, 40

*United States v. Marsalis*,
    314 F. Supp. 3d 462 (E.D.N.Y. 2018) ............................................................... 8

*United States v. McGoff*,
    831 F.2d 1071 (D.C. Cir. 1987) ........................................................... 11, 14, 27

*United States v. Michel*,
    No. CR 19-148-1 (CKK), 2024 WL 1603362 (D.D.C. Apr. 12, 2024)............... 39, 40

*United States v. Muzii*,
    676 F.2d 919 (2d Cir. 1982) ............................................................................ 40

*United States v. Norberto*,
    373 F. Supp. 2d 150 (E.D.N.Y. 2005) ............................................................. 24

*United States v. Nordlicht*,
    No. 16-CR-00640 (BMC), 2019 WL 286895 (E.D.N.Y. Jan. 22, 2019) ................. 5

*United States v. Parmelee*,
   42 F.3d 387 (7th Cir. 1994) ........................................................................ 52

*United States v. Patnaik*,
   No. 22-CR-00014-BLF, 2023 WL 1111829 (N.D. Cal. Jan. 30, 2023) ................... 48

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ................................................................. passim

*United States v. Rafiekian*,
   991 F.3d 529 (4th Cir. 2021) ...................................................................... 15

*United States v. Santos*,
   553 U.S. 507 (2008) ........................................................................ 5, 38, 40

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020) .................................................................. 18, 20

*United States v. Smith*,
   46 F.3d 1223 (1st Cir. 1995) ................................................................ 55, 56

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992) ............................................................... passim

*United States v. Stringer*,
   730 F.3d 120 (2d Cir. 2013) ...................................................................... 49

*United States v. Sun-Diamond Growers of California*,
   526 U.S. 398 (1999) ................................................................................ 20

*United States v. Svoboda*,
   347 F.3d 471 (2d Cir. 2003) ...................................................................... 41

*United States v. Tonelli*,
   577 F.2d 194 (3d Cir. 1978) ...................................................................... 50

*United States v. Tydingco*,
   909 F.3d 297 (9th Cir. 2018) ..................................................................... 52

*United States v. Urso*,
   369 F. Supp. 2d 254 (E.D.N.Y. 2005) ........................................................... 4

*United States v. Valle*,
   807 F.3d 508 (2d Cir. 2015) .................................................................. 39, 40

*United States v. Zakhem, et al.*,
   No. 92-CR-228 (RPM) (D. Co.) ................................................................. 12

*Viereck v. United States*,
   318 U.S. 236 (1943) ........................................................................ 20, 27, 39

*Wandering Dago, Inc. v. Destito*,
   879 F.3d 20 (2d Cir. 2018) ....................................................................... 33

*Wardair Canada, Inc. v. Florida Dept. of Revenue*,
   477 U.S. 1 (1986) .................................................................................. 31

**Statutes**

18 U.S.C. § 1028 ................................................................................................ 9, 54

18 U.S.C. § 1344 .................................................................................................... 54

18 U.S.C. § 1546 ................................................................................................ 9, 48

18 U.S.C. § 1956 ......................................................................................... 9, 53, 56

22 U.S.C. § 611 ................................................................................................ passim

22 U.S.C. § 612 ........................................................................................... 9, 12, 39

22 U.S.C. § 613 ............................................................................. 13, 19, 36, 39, 43

22 U.S.C. § 618 ......................................................................................... 12, 26, 29

22 U.S.C. § 619 ....................................................................................................... 13

28 C.F.R. § 5.100 .................................................................................................... 16

28 U.S.C. § 547 ....................................................................................................... 20

8 U.S.C. § 1324 ........................................................................................... 9, 51, 52

**Legislative Materials**

79 Cong. Rec. 2668 (1935) ..................................................................................... 10

83 Cong. Rec. 8021 (1938) ..................................................................................... 10

H. Rep. No. 77-1547 (1941) ................................................................................... 11

H. Rep. No. 89-1470 (1966) ....................................................................... 11, 14, 39

**Rules**

Fed. R. Crim. P. 12 .................................................................................................. 4

Fed. R. Crim. P. 7 ............................................................................................. 18, 23

**Constitutional Provisions**

U.S. CONST. amend. VI ............................................................................................ 3

U.S. CONST., art. I, § 8 ........................................................................................... 31

**Government Policies and Guidance**

Audit of the Nat'l Sec. Div.'s Enforcement & Admin. of the Foreign Agents Registration Act,
OFF. OF THE INSPECTOR GEN., U.S. DEP'T OF JUST. (Sept. 7, 2016), *available at*
https://oig.justice.gov/reports/audit-national-security-divisions-enforcement-and-
administration-foreign-agents ................................................................ 11, 28, 29, 40

Criminal Resource Manual, *U.S. Att'y's Manual*, DEP'T OF JUST., *available at*
https://www.justice.gov/archives/usam/criminal-resource-manual-2062-foreign-agents-
registration-act-enforcement ...................................................................... 27, 28, 29

Scope of Agency, DEP'T OF JUST. (May 2020), *available at* https://www.justice.gov/nsd-fara/page/file/1279836/dl .................................................................................. passim

**Secondary Sources**

BLACK'S L. DICTIONARY (12th ed. 2024) ................................................................... 25

LaFave, et al., 5 CRIM. PROC. § 19.3(b) (4th ed.) (2021) ........................................ 4, 24

## PRELIMINARY STATEMENT

The indictment in this case tells a story that is fueled by ample imagination but unmoored from the essential elements of the offenses charged. Jumbling dates and events to concoct a narrative that sounds good (or rather, bad), the indictment uses insinuation and rhetorical sleight-of-hand to disguise grave legal deficiencies and factual omissions. While it says a great deal, saying a lot is not the same as saying what the law requires; and ultimately, the indictment is more notable for what it does not allege than what it does. Counts One and Two fail to allege any "requests" or "political activities" within the meaning of FARA, or the willfulness required under the statute. Counts Three through Seven fail to allege material falsity and violations of law. And Count Ten largely fails to allege anything against Ms. Sun at all.

In some sense, the indictment's fuzziness and misdirection is unsurprising, because despite the instant charges it really is not about foreign influence—this indictment is about money. In the government's view, Ms. Sun and her family simply have too much and so there must be a nefarious reason. Sputtering about state ethics rules and undisclosed gifts, the government eventually reached the conclusion that when a woman of Chinese heritage allegedly receives unreported gifts from other Chinese individuals, she must be bought and paid for by China. No matter that nothing Ms. Sun is accused of doing conflicted with any federal or state foreign policy, that alleged violations of state conflict-of-interest rules do not constitute federal felonies, or that Ms. Sun is not charged with any bribery offense. But the government's fixation on money and cultural ties has blinded it to the legal requirements of the offenses it *actually* charged—and the serious concerns that this novel prosecution raises for state officials tasked with advising on political and policy matters related to foreign nations.

No doubt the government believes these charges pursue a worthy aim.  Federal prosecutors in Brooklyn, however, are not empowered to second-guess political and policy judgments by a state official that even the indictment admits comported with relevant foreign policies.  Congress permits states to engage in foreign relations and the Executive Branch cannot use the criminal law to punish state officials for permissible political and policy advocacy in connection with those efforts.  Nor can the government transform cooperative efforts involving other countries into the machinations of a foreign agent through oblique intimations about a shared cultural heritage, allegations of affluence, or by denigrating decisions that failed to antagonize a foreign counterparty.

In this case, the government went fishing for corruption but, finding none, settled for branding Ms. Sun as disloyal.  That was and is wrong.  We have trials to determine facts, but we have rules governing indictments to police the bounds of prosecutorial whims.  Permitting these flawed charges to stand would not only prejudice Ms. Sun, but also endanger any state official working to encourage international cooperation.  Because the law requires much more than the government's weak fiction, the charges against Ms. Sun must be dismissed.

## **ARGUMENT**

## I.    **LEGAL STANDARD**

"An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments."  *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 760–61 (1962)).[1]  "The Sixth Amendment guarantees that 'in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and

---

[1]    Unless otherwise indicated, case text quotations omit all internal alterations, citations, footnotes, and quotation marks.

cause of the accusation.'" *United States v. Benjamin*, 95 F.4th 60, 66 (2d Cir. 2024) (quoting U.S. CONST. amend. VI). The Federal Rules of Criminal Procedure "implement[] that constitutional guarantee by requiring that the indictment 'be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* (quoting Fed. R. Crim. P. 7(c)(1)).

"The Fifth Amendment guarantees that '[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . .'" *Pirro*, 212 F.3d at 92 (quoting U.S. CONST., amend. V). It therefore "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Id.* (quoting *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999)). "Because the requirement of a sufficient indictment serves these important purposes, [an] indictment must be considered as it was actually drawn, not as it might have been drawn." *Id.* (citing *Sanabria v. United States*, 437 U.S. 54, 65–66 (1978)) (noting that "[t]he precise manner in which an indictment is drawn cannot be ignored").

An indictment is sufficient if it (*i*) "contains the elements of the offense charged," (*ii*) "fairly informs a defendant of the charge against which [s]he must defend," and (*iii*) "enables h[er] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). To meet those requirements, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," but only if "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)); *accord Russell*, 369 U.S. at 765 (explaining that "[a]n indictment not framed to apprise the defendant 'with reasonable certainty, of the nature of the accusation against h[er] is defective, although it may follow the language of the statute"); *United*

*States v. Urso*, 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005) (requiring "sufficient factual particularity such that the defendant is able to prepare to meet the government's charges, and . . . all concerned parties, including the court, can be confident that the government's case at trial will reflect the evidence presented to the grand jury").

Indictments are assessed with the benefit of "common sense" and are "read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)). But "when the definition of an offense includes 'generic terms,'" an indictment "must descend to particulars" because "it is not sufficient" to "charge the offence in the same generic terms as in the definition." *Id.* at 693 (quoting *Russell,* 369 U.S. at 765). Likewise, "when one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *Pirro*, 212 F.3d at 93 (quoting *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996)). Implicit elements may include significant judicial refinements that do not appear in a statute's text. *See, e.g.*, LaFave, et al., 5 CRIM. PROC. § 19.3(b) (4th ed.) (2021) (observing that "[i]f courts have added a significant refinement in the interpretation of a particular statutory element, that element often must be pleaded as interpreted rather than as stated in the statutory language, especially if the judicial interpretation substantially limits [its] scope").

Whether an indictment contains "sufficient specificity" does not answer the separate question of whether the particular facts alleged actually "constitute an offense as a matter of law." *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012); *accord* Fed. R. Crim. P. 12(b)(3)(B)(iii), (v) (distinguishing between "lack of specificity" and a "failure to state an offense"). "Since federal crimes are solely creatures of statute," an indictment is separately

deficient where "it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (citing *Dowling v. United States*, 473 U.S. 207, 213 (1985)). When analyzing such terms, courts "[a]pply[] constitutional avoidance to narrow a criminal statute" rather than "construe a criminal statute to penalize conduct it does not clearly proscribe." *United States v. Davis*, 588 U.S. 445, 464–65 (2019); *Dowling,* 473 U.S. at 213 ("Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate."). Any uncertainty is resolved against the government, as "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008); *Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.").

## II.    THE INDICTMENT

The indictment in this case was returned on August 26, 2024. (*See* Dkt. 4 ("Indictment" or "Ind.")). As alleged,[2] Ms. Sun is a naturalized citizen of the United States who originally was born in the People's Republic of China ("PRC"). (Ind. ¶ 1.) She is not alleged to have been a member of the Chinese Communist Party ("CCP") at any point. As the Indictment acknowledges, Ms. Sun is a long-time public servant who has served New Yorkers in various state government capacities for approximately eleven years. (*Id.*) From 2012 to 2015, she was the Director of Asian American Affairs and the Queens Regional Representative for Politician-1; from 2015 to 2018, she served

---

[2]      "A court accepts as true all of the allegations of the indictment when deciding a motion to dismiss the indictment." *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2019 WL 286895, at *1 (E.D.N.Y. Jan. 22, 2019) (quoting *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985)). To be clear, Ms. Sun disputes the truth and accuracy of the Indictment's allegations; indeed, some allegations appear contrary to sworn statements that the government previously provided to magistrate judges in order to obtain search warrants. Purely for purposes of this motion, however, Ms. Sun addresses the allegations that the Court must assume.

as the Director of External Affairs of Global NY for Empire State Development, which is the economic development arm of the New York State ("NYS") government; from 2018 to 2020, she was Politician-1's Deputy Chief Diversity Officer; from 2020 to 2021, she served as Superintendent for Intergovernmental Affairs and the Chief Diversity Officer of the NYS Department of Financial Services; from 2021 to 2022, she was a Deputy Chief of Staff for Politician-2 in the NYS Executive Chamber; and from 2022 to March 2023, she served as a Deputy Commissioner for Strategic Business Development at the NYS Department of Labor. (*Id.*) During the relevant period, Ms. Sun's duties consisted of, among other things, "liais[ing] with the Asian-American community on behalf of" the governor, including "the Chinese and Taiwanese communities" (*id.* ¶ 100); promoting and facilitating economic development benefiting New York, including foreign commerce (*see, e.g.*, *id.* ¶¶ 25, 91–92); and providing political and policy advice as a senior political appointee (*see, e.g.*, *id.* ¶¶ 23, 33).

The Indictment broadly accuses Ms. Sun of "engag[ing] in numerous political activities in the interests of the PRC and the CCP" while serving in those positions, such as "blocking representatives of the Taiwanese government from having access to the NYS governor's office"; "changing . . . messaging regarding issues of importance to the PRC and the CCP"; "obtaining official NYS governor proclamations for PRC government representatives without proper authorization"; "attempting to facilitate a trip to the PRC" for Politician-2; and "arranging meetings for visiting delegations from the PRC government with NYS government officials." (Ind. ¶ 9.) It further alleges that Ms. Sun "violated internal rules and protocols within the NYS governor's office to provide improper benefits to PRC and CCP representatives," specifically "by providing unauthorized invitation letters . . . that were used to facilitate travel by PRC government officials into the United States for meetings with NYS government officials." (*Id.* ¶ 10.) And although no

factual particularity is provided, the Indictment also alleges that Ms. Sun was somehow involved in a scheme to launder the proceeds of bank fraud and some misuse of identification.  (*Id.* ¶ 128.)

The Indictment claims that Ms. Sun was "[a]cting at the request of PRC government officials and CCP representatives" in the course of those alleged political activities (*id.* ¶ 9), though it does not allege any facts regarding most of the purported requests.  Instead, it shuffles dates and occurrences to gin up a narrative,[3] however flawed, that "[i]n return" for various actions, Ms. Sun "received substantial economic and other benefits from representatives of the PRC government and the CCP," including event tickets, "the facilitation of millions of dollars in transactions for the PRC-based business activities" of her husband, "travel benefits," employment for a cousin in the PRC, and "Nanjing-style salted ducks" delivered to Ms. Sun's parents.  (*Id.* ¶ 11.)  Content with merely mentioning those supposed benefits, the Indictment never links them to any particular activities allegedly undertaken by Ms. Sun.  Nevertheless, it also insists that any monetary benefits she received were "laundered" through purchases of various items, including the family's home, a condominium in Hawai'i, and several vehicles.  (*Id.*)

A few topics in particular dominate the Indictment, all of which are inextricably intertwined with state politics and policies.  First, it focuses on alleged efforts "to prevent representatives of the Taiwanese government from meeting with high-ranking NYS officials."  (Ind. ¶ 20; *see also id.* ¶¶ 21–23.)  Second, the Indictment fixates on "visits by Henan provincial officials to the United States to meet with NYS officials."  (*Id.* ¶ 20.)  And third, it decries supposed efforts "to shape the public statements" of the NYS Executive Chamber "to align with the PRC government's political

---

[3]  For example, the Indictment alleges that "[i]n return for . . . political activities on behalf of Henan Province, CC-1 and CC-2 rewarded [Ms. Sun] by aiding" her husband's "PRC-based commercial activities."  (Ind. ¶ 74.)  But the so-called "rewards" that Ms. Sun purportedly received actually predate any of the "political activities" that she allegedly undertook for CC-1 and CC-2.  (*Compare id.* ¶¶ 75–81, *with id.* ¶¶ 39–71.)

priorities." (*Id.*)  The Indictment's allegations do not fairly address those matters and frequently are rendered misleading by the omission of important context known to the government.  For instance, the Indictment never mentions that the United States actively "seeks a constructive, results-oriented relationship with China," and "[i]n addition to regular discussions between senior U.S. officials and their Chinese counterparts, . . . uses a range of exchanges, dialogues, and people-to-people ties to pursue its goals."[4]  Conversely, as the Indictment does concede, the official policy of the United States is to "not have formal official diplomatic relations with Taiwan."  (Ind. ¶ 22.) The United States also "do[es] not support Taiwan independence" and "oppose[s] any unilateral changes to the status quo from either side."[5]

Similarly, the Indictment alleges that neither governor under whom Ms. Sun served "had a policy regarding whether to formally recognize Taiwan" and, "accordingly, neither . . . had a policy or practice regarding whether to communicate or meet with Taiwanese representatives."  (Ind. ¶ 23.)  Whether or not that is accurate, the Indictment never alleges that New York pursued a course that departed from federal policy or that closer relations with Taiwan was in the interest of the state, Politician-1, or Politician-2.[6]  It certainly never alleges that Ms. Sun took or advocated for

---

[4]     "U.S-China Relations," U.S. DEP'T OF STATE, *available at* https://www.state.gov/countries-areas/china/ (last accessed Nov. 1, 2024).  Even on a motion to dismiss, the Court may take judicial notice of unquestioned positions published to the general public by the U.S. Department of State.  *Cf. United States v. Marsalis*, 314 F. Supp. 3d 462, 464 (E.D.N.Y. 2018) (collecting cases and taking judicial notice of prior convictions while deciding motion to dismiss an indictment).

[5]     "U.S-Taiwan Relations," U.S. DEP'T OF STATE, *available at* https://www.state.gov/u-s-relations-with-taiwan/ (last accessed Nov. 1, 2024).

[6]     .  Despite making much of Ms. Sun's supposed influence on state policy, at no point does the Indictment ever allege that New York's approach changed after her tenure.  Notably, in January 2024—years after Ms. Sun had left the governor's office—the current governor issued a proclamation and video message commemorating the Lunar New Year, which likewise did not mention Uyghurs.  *See* "Governor Hochul Issues Proclamation Celebrating Lunar New Year," N.Y. GOVERNOR (Jan. 31, 2024), *available at* https://www.governor.ny.gov/news/governor-hochul-issues-proclamation-celebrating-lunar-new-year (last accessed Nov. 1, 2024).

any positions that were contrary to the foreign policy interests of New York or the United States. Indeed, the Indictment never alleges that any New York governor has met with Taiwanese representatives either before or after Ms. Sun's tenure in state government.[7]   Nonetheless, the Indictment castigates—and seeks to criminalize—her alleged political and policy advice on that subject, which was well within the scope of Ms. Sun's role, despite no such foreign policy conflicts.

Ultimately, the Indictment charges Ms. Sun in eight counts:  (*i*) conspiracy to violate the Foreign Agents Registration Act ("FARA"), in violation of 18 U.S.C. § 371 ("Count One"); (*ii*) failure to register under FARA, in violation of 22 U.S.C. §§ 612(a) and 618(a)(1) ("Count Two"); (*iii*) visa fraud, in violation of 18 U.S.C. §§ 1546(a) and 2 ("Count Three"); (*iv*) four counts of illegally bringing aliens into the United States for commercial gain or advantage, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv), 1324(a)(1)(B)(i), and 2 ("Counts Four through Seven"); and (*v*) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) ("Count Ten").[8]  (*See* Ind. ¶¶ 114–28.)  Ms. Sun did not commit any of those offenses and expects that a jury would reject the government's claims at trial.  But this case should not get that far because all of the charges are legally deficient.

---

[7]      The Indictment specifically distinguishes between the "Taipei Economic and Cultural Representative Office in the United States ("TECRO") in Washington, D.C.," which it calls the "de facto, but unofficial, embassy of Taiwan" in the United States, and "representative economic and culture offices ('TECOs')" located "in various U.S. cities, including in New York City," which serve different purposes.  (Ind. ¶ 22.)  While it goes on to allege that "*TECRO* representatives regularly met with high-ranking officials *from the U.S. government*" (*id.* ¶ 23 (emphasis added)), the Indictment never alleges anything about meetings with state officials or TECO representatives.

[8]      Ms. Sun is not charged in Counts Eight or Nine, which respectively allege conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and misuse of identification, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(2)(B), 1028(c)(3)(A), and 2.  (*See* Ind. ¶¶ 123–26.)  Those omissions will be significant later.

## III.    THE COUNTS PREDICATED ON FARA MUST BE DISMISSED

Counts One and Two turn on supposed violations of FARA, with the former alleging a conspiracy to violate FARA and the latter charging a substantive violation.  Both fail for a litany of reasons based on the text and scope of FARA.  And with respect to the conspiracy, the Indictment both fails to allege that Ms. Sun entered into any unlawful agreement and attempts to charge multiple conspiracies in a single count.

### A.    Statutory History, Text, and Subsequent Interpretation of FARA

FARA stems from legislation first passed in 1938 "[t]o protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of foreign governments, foreign political parties, and other foreign principals," so that "the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities."  *Meese v. Keene*, 481 U.S. 465, 469 (1987) (quoting 56 Stat. 248–49 (1942)); *see also* Pub. Law 75-583, 52 Stat. 631–33 (1938).  At that time, Congress was specifically targeting "pernicious" propaganda disseminated to the public by mysterious "organizations," which purportedly "foster[ed] un-American activities" like "establishing in the United States a foreign system of government" or spreading "the ideology, the principle, and the practices of other forms of government and the things for which they stand."[9]  83 Cong. Rec. 8021 (1938).

---

[9]    For further context, a particular concern was "alien Nazi activities" that were "designed to aline [*sic*] American against American on subjects contrary to the principles" of democratic government.  79 Cong. Rec. 2668 (1935).

FARA has been amended twelve times since its passage.[10]  In 1942, Congress transferred administration of FARA from the Secretary of State to the Attorney General, but "d[id] not change fundamental approach of the statute."  H. Rep. No. 77-1547 at 2 (1941).  Since then, "FARA's focus has gradually shifted from Congress' original concern about the political propagandist or subversive seeking to overthrow the Government to the now familiar situation of lobbyists, lawyers, and public relations consultants" who act on behalf of particular clients.  *United States v. McGoff*, 831 F.2d 1071, 1073–74 (D.C. Cir. 1987) (quoting S. Rep. No. 143, 89th Cong., 1st Sess. 4 (1965)).  Notably, the last round of substantive amendments to FARA sought, among other things, to narrow the definition of what constitutes an "agent of a foreign principal," noting that "[t]he extreme breadth of the existing definition appear[ed] to have been dictated by the prewar circumstances surrounding enactment of the law."  H. Rep. No. 89-1470 at 4 (1966).  The amendments added a provision defining "political activities" in order to "better focus[] the act on those individuals attempting to influence Government policies through political activities," while exempting "activities not serving predominantly a foreign interest, even though they may be political in nature."  *Id.* at 2.  And "[t]he 1966 amendments also narrowed the reach of FARA so that the government has to prove that a foreign agent is acting at the order, request, or under the direction or control of a foreign principal."  Audit of the Nat'l Sec. Div.'s Enforcement & Admin. of the Foreign Agents Registration Act ("OIG Report"), OFF. OF THE INSPECTOR GEN., U.S. DEP'T

---

[10]    *See* Pub. Law 110-18, 121 Stat. 749 (2007); Pub. Law 105-166, 112 Stat. 39 (1998); Pub. Law 104-65, 109 Stat. 699, 700, 704 (1995); Pub. Law 98-620, 98 Stat. 3359 (1984); Pub. Law 91-375, 84 Stat. 773, 784 (1970); Pub. Law 89-486, 80 Stat. 244 (1966); Pub. Law 87-366, 75 Stat. 784 (1961); Pub. Law 84-893, 70 Stat. 899 (1956); Pub. Law 81-831 § 20, 64 Stat. 1005 (1950); Pub. Law 81-642, 64 Stat. 399-400 (1950); Pub. Law 77-532, 56 Stat. 248–58 (1942); Pub. Law 76-319, 53 Stat. 1244-1246 (1939).

OF JUST. (Sept. 7, 2016), at 2, *available at* https://oig.justice.gov/reports/audit-national-security-divisions-enforcement-and-administration-foreign-agents (last accessed Nov. 1, 2024).

Despite the fact that FARA has always been criminally enforceable, throughout history it has served primarily as a disclosure statute. In fact, there have been fewer than eighty prosecutions under FARA in the near century that it has been on the books. And before this indictment, the government had never charged a state government political appointee under FARA based on his or her political or policy advice (for good reason, as will be seen below).[11]

As relevant here, FARA currently provides that "[n]o person shall act as an agent of a foreign principal" within the United States unless he or she has filed, under oath, "a true and complete registration statement" with the Attorney General that meets certain specified criteria. 22 U.S.C. § 612(a). Anyone who "willfully violates" that requirement or associated regulations may be "punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both . . . ." *Id.* § 618(a)(1), (2). An "agent of a foreign principal" is defined as:

> [A]ny person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person . . . engages within the United States in political activities for or in the interests of such foreign principal . . . .

*Id.* § 611(c)(1)(i).[12] "Political activities" are further defined to mean:

---

[11]    It appears that only one state official has been charged under FARA: Sam Zahkem, a Colorado state politician who was indicted in 1992. *See United States v. Zakhem, et al.*, No. 92-CR-228 (RPM) (D. Co.). His case was dismissed a few years later.

[12]    An "agent of a foreign principal" also includes someone who acts within the United States "as a public relations counsel, publicity agent, information-service employee or political consultant" on behalf of a foreign principal; who "solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value" on behalf of a foreign principal; and who "represents the interests of such foreign principal" before any federal agency or official. 22 U.S.C. § 611(c)(1)(ii)–(iv). The Indictment does not and could not allege that Ms. Sun was any of those.

> [A]ny activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party . . . .

*Id.* § 611(o).  FARA applies to any agent "who agrees, consents, assumes or purports to act as, or who is or holds himself out to be . . . an agent of a foreign principal," regardless of whether there is a formal "contractual relationship."  *Id.* § 611(c)(2).  Specifically exempted, however, are "diplomatic or consular officer[s] of a foreign government" and their staff.  *Id.* § 613(a), (c).

**B.  The Indictment Fails to State Offenses Under FARA**

At the outset, determining what the Indictment alleges as possible violations of FARA is no small task.  It requires wading through frequently muddled allegations, which in some cases string together events that occurred years apart in service of a superficial narrative.  Yet after carefully parsing what is actually alleged in the Indictment, it turns out that the bulk of the alleged conduct is outside FARA's plain text.[13]

For example, FARA applies only to activities "within the United States," 22 U.S.C. § 611(c)(1)(i)–(iv); *see also id.* § 619 (limiting application to U.S. jurisdictions), so none of the international conduct alleged in the Indictment can constitute a violation.[14]  (*See, e.g.*, Ind. ¶¶ 83–85, 94–101.)  Similarly, FARA charges predicated on "political activities," 22 U.S.C. § 611(c)(1)(i)), presuppose efforts to "influence" either an agency or official of the Government of

---

[13]    Any analysis of FARA's scope must begin with its text.  *Aleynikov*, 676 F.3d at 76 (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)) ("Statutory construction 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'").

[14]    Doubtless the government would insist that alleged activities that do not constitute FARA violations may nevertheless be relevant to such violations.  Fair enough, but at most that suggests why the allegations were included in the charging instrument—it does not remove the requirement that, at some point, the Indictment must actually allege conduct that comes within FARA's scope.

the United States, "or any section of the public within the United States," regarding either "domestic or foreign policies of the United States" or "the political or public interests, policies, or relations of a government of a foreign country or a foreign political party . . . ." *Id.* § 611(o). Because state officials, including those in New York, are not "official[s] of the Government of the United States," *id.*, and the Indictment does not allege that Ms. Sun tried to influence any agencies, officials, or policies of the United States, that leaves only actions that Ms. Sun allegedly "intend[ed]" or "believe[d]" would "influence" members of "the public within the United States" regarding "the political or public interests, policies, or relations of a government of a foreign country or a foreign political party" as potential predicates for the FARA counts.[15] *Id.* § 611(o). So any passive or non-public activities alleged in the Indictment (*see, e.g.*, Ind. ¶¶ 23(d), 27, 51–53, 75) also do not qualify. *See* 22 U.S.C. § 611(o) (specifying that such actions must target a "section of the public within the United States"); *see also McGoff*, 831 F.2d at 1074 (quoting 22 U.S.C. § 611(c)) (observing that "[s]ection 611 defines the critical terms 'agents of foreign principals,' to include almost anyone who undertakes any *public-related* . . . activity on behalf of a foreign principal" (emphasis added)).

Focusing solely on FARA's plain text thus leaves few alleged actions that could constitute violations of the statute. But even assuming that some of the alleged conduct is not excluded by that plain text, cases interpreting FARA and its essential elements make clear that, as explained below, nothing in the Indictment ultimately "allege[s] a crime within the terms of the [] statute."

---

[15]    It is not clear that Ms. Sun's conduct comes within even that category. Congress understood "political or public interests, policies, or relations" as referring to "facets of *national* policy," H. Rep. No. 89-1470 at 31 (1966) (emphasis added), which "are to be distinguished from questions calling for [a] decision at the level of government or of a political organization charged with the administration of existing laws, regulations, and other policies." *Id.* Ms. Sun is only alleged to have interacted with New York state officials, who are not empowered to do anything beyond administer federal laws, regulations, or policies.

*Aleynikov*, 676 F.3d at 75–76 (citing *Dowling*, 473 U.S. at 213). As such, the counts predicated on FARA must be dismissed. *See Dowling*, 473 U.S. at 215–17 (1985) (finding indictment insufficient where digital property allegedly stolen by defendant was did not come within the relevant statute); *Pirro*, 212 F.3d at 92–93 (dismissing counts because conduct alleged did not violate that applicable statutes); *Heicklen*, 858 F. Supp. 2d at 275–76 (dismissing indictment where facts alleged did not constitute the crime of attempting to influence a juror); *United States v. Kerik*, 615 F. Supp. 2d 256, 271–74 (S.D.N.Y. 2009) (dismissing charge based on allegations that defendant failed to disclose information in response to a question the court determined to be "fundamentally ambiguous"). This is so for several reasons.

> ### i. The Indictment does not adequately allege the agency relationship required under FARA

First, an essential element of a FARA offense is that a defendant acted "at the order, request, or under the direction or control, of a foreign principal . . . ." 22 U.S.C. § 611(c)(1)(i). In this context, the term "request" has a particular meaning that is narrower than its everyday connotation, so not every ask by a foreign principal qualifies as a "request" under FARA.[16] Rather, a "request" is something more than an ordinary solicitation that carries with it some form of coercive control or obligation. An ask does not qualify merely because it is made or persuades another person to do something, even if its fulfilment would directly benefit a foreign principal. The crucial question

---

[16]    The Indictment hinges on allegations that Ms. Sun acted at the "request" of PRC representatives (*See* Ind. ¶ 9), so this motion focuses on the proper interpretation and application of that term. Since "request" is the broadest term included under FARA, s*ee, e.g.*, *United States v. Alshahhi*, No. 21-CR-371 (BMC), 2022 WL 2239624, at *5 (E.D.N.Y. June 22, 2022), *recons. denied*, 2022 WL 3595056 (E.D.N.Y. Aug. 23, 2022) (quoting *United States v. Rafiekian*, 991 F.3d 529, 539 (4th Cir. 2021)) (noting that agency under FARA is made "more sweeping" because FARA includes "requests" as well as actions pursuant to "direction or control"), the Indictment's failure to state an offense under the "request" rubric likewise fails to allege conduct undertaken at the "order" or "under the direction or control" of a foreign principal. 22 U.S.C. § 611(c)(1).

15

is whether an individual acted solely out of some compulsion or obligation to comply with the request, rather than based on his or her own judgment or for other reasons.

The Second Circuit long ago articulated this limiting gloss on the "request" term, cautioning that while FARA "requires registration by a person who acts, in specified ways, at a foreign principal's 'request,' . . . this word is not to be understood in its most precatory sense." *Att'y Gen. of United States v. Irish N. Aid Comm.* ("*INAC*"), 668 F.2d 159, 161 (2d Cir. 1982). Although "[t]he exact perimeters of a 'request' under the Act are difficult to locate," the Second Circuit has held that qualifying conduct must "fall[] somewhere between a command and a plea," such that "a particular individual . . . is . . . in some way authorized to act for or to represent the foreign principal." *Id.* As the court recognized, a contrary interpretation "would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate" and absurd results would quickly follow. *Id.* (observing that a broader reading "would make all Americans who sent money, food, and clothing to the Italian earthquake victims 'agents' of the Italian Government").

The Department of Justice ("DOJ") agrees, recognizing that under FARA "three of the four operative terms . . . ('order,' 'direction,' and 'control') convey that the foreign principal exercises some degree of authority over the agent." Scope of Agency, DEP'T OF JUST. (May 2020), at 2, *available at* https://www.justice.gov/nsd-fara/page/file/1279836/dl (last accessed Nov. 4, 2024); *accord* 28 C.F.R. § 5.100(b) ("[T]he term control or any of its variants shall be deemed to include the possession or the exercise of the power, directly or indirectly, to determine the policies or the activities of a person . . . ." (emphasis omitted)). While the DOJ views a "request" as "more expansive" than those terms, it nevertheless concedes that "request" also "must be read to connote *some form of authority by the principal over the agent*." *Id.* at 2 (emphasis added). Thus, simply making a request or "mere persuasion" are not enough; instead, the "circumstances must evince

some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request." *Id.* at 3; *see also Alshahhi*, 2022 WL 2239624 at *5 (citing DOJ guidance and noting that "the Justice Department recently clarified that to be an agent under FARA, the agent must feel 'some sense of obligation' to the foreign principal"). The DOJ therefore agrees that a "request" requires "acting as an agent or alter ego of the foreign principal" and "not acting independently," though it may fall short of an "order" or "legally enforceable obligation." DOJ Guidance at 3.

The allegations in the Indictment do not meet that threshold. In fact, in almost all instances, the Indictment fails to allege any specific request at all. When determining whether a particular request comes within FARA's ambit, courts must consider whether "a foreign principal establishe[d] a particular course of conduct to be followed" and the defendant "respond[ed]" to and "compl[ied]" with that specified "course of conduct." *INAC*, 668 F.2d at 161–62. Yet none of the conduct supposedly undertaken in connection with the Indictment's allegations about meetings with Taiwan or comments regarding the Uyghurs is alleged to have been initiated by any request from the PRC. (*See, e.g.*, Ind. ¶¶ 23, 33.) Where, as here, no actual request is alleged, the necessary legal assessment is impossible.

Nor is it enough for the Indictment to gesture at surrounding circumstances to imply that some "specific instruction" was made, because that would sweep in "[a] general plea for political or financial support," which cannot legally constitute a "request" under the statute.[17] *INAC*, 668

---

[17]    In a separate context, courts sometimes find illicit agreements based on a "showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007). The Second Circuit has never endorsed that theory in the FARA context, however, and is unlikely to do so given the specificity of FARA, the need to cabin overt regulation of political activities, and precedent expressing concern about "sweep[ing] within the statute's scope many

F.2d at 161–62.  Although it is "read to include facts which are *necessarily* implied by the specific allegations made," *Stavroulakis*, 952 F.2d at 693 (emphasis added), the Indictment also "must be considered as it was actually drawn, not as it might have been drawn."  *Pirro*, 212 F.3d at 92. Again, only "[o]nce a foreign principal *establishes a particular course of conduct to be followed*" can "those who respond to its 'request' for complying action [] properly be found to be agents under [FARA]."  *INAC*, 668 F.2d at 162 (emphasis added).  Circumstantial evidence may be allowed at trial, but that is separate and distinct from whether the Indictment actually alleges a qualifying "request" within the meaning of FARA.  *See Hamling*, 418 U.S. at 117 (providing that an indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished"); Fed. R. Crim P. 7(c)(1) (requiring an indictment to allege all "essential facts constituting the offense[s] charged"). It does not.

In fact, a commonsense reading of the allegations is that Ms. Sun typically acted independently, *cf.* DOJ Guidance at 3 ("The ultimate test for agency under FARA is whether it is fair to draw the conclusion that an individual is not acting independently . . . ."), not pursuant to some unspecified PRC request that "establishe[d] a particular course of conduct" with which she was expected to comply.[18]  *INAC*, 668 F.2d at 162.  And all of the actions that she supposedly took

---

forms of conduct that Congress did not intend to regulate."  *INAC*, 668 F.2d at 161.  In any event, the dearth of specific allegations here would not sustain even that broader theory.  *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020) (requiring that "a particular question or matter must be identified at the time the official makes a promise or accepts a [benefit]").  Indeed, the Second Circuit has rejected the notion that "any official who accepts a thing of value and then later acts to the benefit of the donor" commits a crime, *id.*, which parallels the relevant allegations here.

[18]     Confusingly, the Indictment sometimes refers to communications as a "direction" in different contexts, which undercuts any assumption that something called a "direction" carries the legal meaning required under FARA.  For instance, despite implying that Ms. Sun was somehow controlled by or beholden to CC-1, the Indictment alleges that she "directed CC-1" to take certain actions.  (Ind. ¶ 65.)

for the PRC's benefit can equally be viewed as acts in the interest of New York or others, rather than actions necessarily compelled by "some . . . power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request."  DOJ Guidance at 3; *cf.* 22 U.S.C. § 613(d) (exempting "activities not serving predominantly a foreign interest" even where conducted by agents of foreign principals).  The Indictment never alleges that Ms. Sun's alleged political activities did *not* advance the political or commercial interests of either New York or the elected officials for whom she worked.  Nor could it, since things like helping to obtain ventilators for the pandemic-stricken state and encouraging economic development clearly benefit New York (and the politicians supporting those initiatives).  (*See, e.g.*, Ind. ¶¶ 28, 91–92.)  That creates yet another problem for the government, because "[t]he requirements of section 612(a)" expressly do not apply to any "other activities not serving predominantly a foreign interest."  22 U.S.C. § 613(d)(2); *see also INAC*, 668 F.2d at 161 (requiring any request to "fall[] somewhere between a command and a plea").  The Indictment never alleges that Ms. Sun's political activities "predominantly" served the interests of a foreign principal, 22 U.S.C. § 613(d)(2), so even assuming its allegations are true, her activities may well have served primarily domestic interests and foreign ones only incidentally.  And that would not require any registration under FARA.

Seemingly to make up for failing to allege specific requests, the Indictment pivots quickly to claims that Ms. Sun received economic benefits in return for actions supposedly taken at the behest of the PRC.  (*See, e.g.*, Ind. ¶¶ 102–103.)  The intended implication, of course, is that Ms. Sun's actions were compensated and so it should be *assumed* anything she did was at the PRC's request.  But the Indictment does not allege facts establishing any *quid pro quo*; it lists supposed benefits, but never actually connects those benefits—temporally or otherwise—to any of Ms. Sun's purported actions.  Absent an allegation of some connection, the benefits that Ms. Sun supposedly

19

received are not identifiable as part of any bargain.  *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010) ("Ingratiation and access, in any event, are not corruption."); *Silver*, 948 F.3d at 558 (requiring that "a particular question or matter must be identified at the time the official makes a promise or accepts a [benefit]").[19]

Even assuming some connection were alleged, because the Indictment largely fails to allege any requests or agreements to take particular actions in exchange for those benefits (*see, e.g.*, Ind. ¶¶ 41, 74 (alleging Ms. Sun was "rewarded" after taking certain alleged actions)), at most such allegations are consistent with claims that Ms. Sun received improper gratuities, *see, e.g.*, *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 405 (1999) (describing "[a]n illegal gratuity" as "merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken"); *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) (describing a gratuity as "a reward for a past official act or made in the hope of obtaining general good will in the payee's performance of official acts off in the future"), which does not involve a *quid pro quo*.[20]  Regardless, even a sufficiently alleged *quid pro quo* cannot remedy the legal deficiencies of the FARA counts because proving a *quid pro quo* is not an element of FARA—rather, it is just one factor considered when determining whether a

---

[19]    The Indictment also mentions state conflict-of-interest requirements that allegedly applied to Ms. Sun (*see* Ind. ¶¶ 110–11), but those are outside the government's purview. *See, e.g.*, *Viereck v. United States*, 318 U.S. 236, 241 (1943) (recognizing that defendants "may be subjected to punishment for crime in the federal courts" only pursuant to statute or regulations "authorized by Congress"); 28 U.S.C. § 547(1) (limiting prosecutorial authority of "each United States attorney" to "offenses against the United States").  FARA cannot be used to prosecute alleged violations of state conflict-of-interest rules. *See McDonnell v. United States*, 579 U.S. 550, 576–77 (2016) (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)) (noting that courts should not "'construe [a] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials'").

[20]    Notably, gratuities are outside the scope of the federal bribery statute that applies to state officials. *See Snyder v. United States*, 144 S. Ct. 1947, 1959 (2024).

"request" is within the scope of FARA. *See* DOJ Guidance at 3–4 (considering among multiple

other factors "[w]hether [a] request is compensated or coerced").

Regardless, even if the Indictment had alleged specific requests in connection with

potential violations of FARA, there are no allegations establishing the requisite "level of power by

the principal over the agent" or "obligation on the part of the agent to achieve the principal's

request." *Id.*; *see also Alshahhi*, 2022 WL 2239624 at *5. The closest this Indictment comes is a

sprinkling of conclusory references to "actions at the order, request, or direction" of a foreign

principal. (*See* Ind. ¶¶ 13 (alleging that Ms. Sun "actively concealed that she took actions at the

order, request, or direction of PRC government and CCP representatives"), 20 (alleging Ms. Sun

"acted at the order, direction, or request of representatives of the PRC government and the CCP to

engage in political activities intended to influence the public").)[21] Those are legal conclusions

masquerading as factual allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (noting a

court is "not bound to accept as true a legal conclusion couched as a factual allegation"); *United

States v. Gabriel*, 920 F. Supp. 498, 506 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) ("It is

one thing to accept a facially sufficient indictment at face value; but it would be quite another to

allow broad conclusory allegations to override more particularized allegations of the same

pleading . . . ."). Indeed, the Indictment conspicuously does not allege the factual predicates for

those conclusory statements.[22]

---

[21]    Even the conclusory framing of those statements is insufficient. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 211 (2d Cir. 2020) (quoting *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995)) ("Where there are several ways to violate a criminal statute, federal pleading requires that an indictment charge in the conjunctive to inform the accused fully of the charges.").

[22]    In contrast, elsewhere the Indictment quotes liberally from communications purportedly between Ms. Sun and others. (*See, e.g.*, Ind. ¶¶ 23, 26, 31, 32, 75.) The failure to do so only in key passages underscores why the Court should not credit conclusory statements in the absence of any supporting factual allegations.

Apart from those statements, the Indictment's statutory allegations merely allege that Ms. Sun "acted and caused others to act as an agent of a foreign principal . . . without registering with the Attorney General," without mentioning any orders, directions, or requests. (*Id.* ¶ 118; *see also id.* ¶ 115.)  Parroting statutory language "declares the legal basis for claiming that [an] act is deserving of punishment, but does nothing to describe the act" or "give evidence of whether the grand jury considered and included within the offense charged [an] essential element." *United States v. Gonzalez*, 686 F.3d 122, 129 (2d Cir. 2012); *see also United States v. Galestro*, No. 06-CR-285 (ARR), 2008 WL 2783360, at *2 (E.D.N.Y. July 15, 2008) (observing that an indictment "cannot merely list the statutory elements").

This Indictment never "descend[s] to particulars," *Stavroulakis*, 952 F.2d at 693 (quoting *Russell,* 369 U.S. at 765), regarding whether or how Ms. Sun supposedly was compelled to act pursuant to some authority, control, or "sense of obligation . . . to achieve the principal's request." DOJ Guidance at 3.  Instead, it implies and erroneously assumes that any dialogue with representatives of the PRC, including any purported consideration of their requests, qualifies as a subordinate agency relationship under FARA.  But that is not sufficient when courts have specifically interpreted "request" to limit what conduct comes within the statute's scope.  As alleged, Ms. Sun's actions amount to little more than cooperation with a foreign nation engaged in frequent commerce and diplomacy with New York—a nation whose diaspora constitutes a substantial voting bloc in state elections.  Moreover, instances in which Ms. Sun refused her purported co-conspirators undermine any assumption that she felt compelled by some obligation to them.  (*See, e.g.*, Ind. ¶¶ 59–60 (declining pressure from CC-1 and CC-2 because neither Politican-1 nor Politician-2 were interested in what they proposed).)

Permitting the government to proceed without alleging facts that establish some authority or control over Ms. Sun's actions raises other serious concerns, including that anyone who agrees to *any* request from a foreign government representative could be criminally liable, even if—as was the case here—negotiating and coordinating with such representatives is part of their job. For example, consider the Indictment's allegations that Ms. Sun sought to prevent meetings with representatives of Taiwan. (*See, e.g.*, Ind. ¶¶ 21–23.) Ignoring for now that the Indictment only tells half the story, that federal policy precludes any formal recognition of Taiwan, and that no order, direction, or request from the PRC is actually alleged, the core allegations boil down to the accusation that Ms. Sun's alleged actions were consistent with unspecified requests from some PRC representative. But if that were enough, then Ms. Sun would have been equally wrong *to ensure* a meeting with Taiwanese representatives—that, after all, would also be agreeing to do something at the request of a foreign principal. Thus, "[u]nder the 'standardless sweep' of the [g]overnment's reading, public officials could be subject to prosecution, without fair notice, for the most prosaic interactions," *McDonnell*, 579 U.S. at 576 (citing *Kolender v. Lawson,* 461 U.S. 352, 358 (1983)), including whenever they acquiesce to even mundane requests from foreign representatives.[23]

In sum, Ms. Sun's alleged conduct is not within the scope of what FARA criminalizes because the Indictment does not allege that the requisite authority, control, or obligation compelled her actions. Without such allegations, the Indictment fails to state all "essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and "without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling*, 418 U.S.

---

[23]    Prosecutors might not bring charges in every such case, but the Court "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *McDonnell*, 579 U.S. at 576 (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

at 117 (quoting *Carll*, 105 U.S. at 612).   Nor are silence, inference, or implication adequate substitutes.  *See Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488) ("[W]hen one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense."); *accord* LaFave, et al., 5 CRIM. PROC. § 19.3(b) (observing that "a significant refinement in the interpretation of a particular statutory element" of an offense "must be pleaded as interpreted"). The Indictment's failure to allege specific requests—and, likewise, to explicitly allege the requisite degree of authority, control, or obligation attending any such requests—is fatal.

### ii.    The Indictment does not allege legally sufficient efforts to exert "influence" under FARA

Second, the Indictment fails to allege conduct intended to "influence" anyone covered under FARA.  22 U.S.C. § 611(o).  As noted above, to qualify under FARA's definition of "political activities," a purported agent must "intend[]" or "believe[]" that his or her conduct "will . . . influence" federal officials or "any section of the public within the United States" in connection with (*i*) "formulating, adopting, or changing" federal policy or (*ii*) "the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."  *Id.*  Since the Indictment does not allege that Ms. Sun attempted to influence federal officials or policy, the question here is whether the Indictment alleges conduct that Ms. Sun "intend[ed]" or "believe[d]" would "influence" members of "the public within the United States" regarding "the political or public interests, policies, or relations of a government of a foreign country or a foreign political party."  *Id.*  It does not.

As Congress did not define the term "influence," the Court considers its "ordinary, common-sense meaning."  *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000); *see also United States v. Norberto*, 373 F. Supp. 2d 150, 156 (E.D.N.Y. 2005) (stating that courts may

consider sources like Black's Law Dictionary, which is "the standard widely accepted law dictionary"). Generally, the term "influence" means the "[u]se of pressure, authority, or power," whether directly or indirectly, "to induce action or change the decisions or acts of another," such as efforts seeking to "alter, sway, or affect the will of another, but falling short of coercion." Influence, BLACK'S L. DICTIONARY (12th ed. 2024); *see also U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 469–70 (5th Cir. 2009) (noting dictionary definitions of "influence" including, *inter alia*, "exercis[ing] action or power of a non-material or unexpressed kind," "corrupt interference with authority for personal gain," and "ascendancy, sway, control, or authority, not formally or overtly expressed").

The Indictment never alleges that Ms. Sun intended or believed that her actions would "induce action or change the decisions or acts of another" through the "[u]se of pressure, authority, or power." *Id.* And even more is required here because of the unique twist in this case—*i.e.* the government's weaponization of FARA against a state political employee who, as part of her job, was "responsible for handling the Chinese and Taiwanese communities" and "liais[ing] with the Asian-American community." (Ind. ¶ 100.) Different considerations naturally arise for public officials than for the general public when talking about "influence," especially where such officials are responsive to electoral politics and "[r]eliance on a 'generic favoritism or influence theory is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'" *Citizens United*, 558 U.S. at 359 (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 296 (2003) (Kennedy, J., concurring in part)).

Public officials routinely engage in political and policy discussions. They are expected to be responsive to constituents and others, to be influenced by arguments and ideas, and to influence others in connection with politics and policy. Similar expectations also exist for officials charged

with fostering and maintaining relationships with foreign nations. Thus, if "influence" is to mean anything in the context of public officials, including state officials, it must mean more than merely engaging in discussions with colleagues, negotiating with other officials or representatives, making a recommendation within the scope of one's duties, or advocating for or against a particular political or policy choice. But that is all this Indictment alleges.

### iii.    The Indictment does not allege an essential component of the willfulness required to violate FARA

Third, the Indictment fails to allege that Ms. Sun had specific knowledge of FARA and its requirements at the time of her alleged conduct. Generally, "ignorance of the law or a mistake of law is no defense to criminal prosecution," *Cheek v. United States*, 498 U.S. 192, 199 (1991), but where criminal penalties arise from the willful disregard of duties imposed solely by a regulatory regime, willfulness requires knowledge that particular conduct was actually unlawful. *See Ratzlaf v. United States*, 510 U.S. 135, 136–37 (1994) (applying the principle to anti-structuring provisions); *Cheek*, 498 U.S. at 201–02 (applying the principle to tax offenses). Requiring such knowledge is essential to "'separate those who understand the wrongful nature of their act from those who do not.'" *Rehaif v. United States*, 588 U.S. 225, 231 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72–73 (1994)); *cf. Spies v. United States*, 317 U.S. 492, 496 (1943) ("It is not the purpose of the law to penalize frank difference of opinion of innocent errors made despite the exercise of reasonable care."). This Indictment fails to allege that Ms. Sun "willfully" failed under FARA to "file[] with the Attorney General a true and complete registration statement" after "act[ing] as an agent of a foreign principal." 22 U.S.C. §§ 618, 612(a); *cf. Ruan v. United States*, 597 U.S. 450 (2022) (holding that a scienter requirement applied to the "except as authorized" clause of the statute, therefore requiring the government to prove a defendant "knowingly and intentionally" acted in an unauthorized manner).

FARA is precisely the kind of complex registration scheme for which willfulness requires specific knowledge.  *See Viereck*, 318 U.S. at 241 (stating that FARA "requir[es] registration of agents for foreign principals"); *McGoff*, 831 F.2d at 1075 (noting that FARA "creates a comprehensive regulatory scheme for foreign agent registration").  Liability under FARA is tied to special obligations that are purely statutory and not discernible by resort to common law principles.  *See Viereck*, 318 U.S. at 241 (observing that FARA was "a new type of legislation" that imposed unique obligations); *INAC*, 668 F.2d at 161 (distinguishing interpretation of agency under FARA from a "determination of common law agency").  Even the DOJ recognizes that "FARA . . . is a *malum prohibitum* enactment not well known outside the legal/lobbying community."  U.S. Att'y's Manual, Criminal Resource Manual ("CRM") § 2062, DEP'T OF JUST., *available at* https://www.justice.gov/archives/usam/criminal-resource-manual-2062-foreign-agents-registration-act-enforcement (last accessed Nov. 1, 2024).  Under FARA, "the defendant's status"—here, as an "agent of a foreign principal," 22 U.S.C. § 611(c)(1)—"is the 'crucial element' separating innocent from wrongful conduct," *Rehaif*, 588 U.S. at 233 (quoting *X-Citement Video*, 513 U.S. at 73), which can only be discerned by reference to FARA's provisions.  And "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Liparota v. United States*, 471 U.S. 419, 426 (1985).  Indeed, since FARA expressly targets "political activities," interpreting the statute more broadly risks criminalizing a wide range of otherwise protected conduct.[24]

---

[24]     Further, "[o]n practical, purposive grounds, it is difficult to understand how elimination of the requirement of knowledge would have furthered the [c]ongressional aim," *United States v. Mancuso*, 420 F.2d 556, 558–59 (2d Cir. 1970)—namely, to promote contemporaneous disclosure of covered foreign agency relationships—since *ex post* criminal prosecution comes too late to ensure *ex ante* disclosure. *Cf.* OIG Report at ii (noting that "NSD officials . . . believe[] that even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure

This Indictment does not allege that Ms. Sun knew her purported conduct was unlawful under FARA.[25]  *See Ratzlaf*, 510 U.S. at 137–38.  Cognizant of that defect, the government attempted to shore up its allegations by describing a voluntary interview with the Federal Bureau of Investigation ("FBI") in July 2020, at which the FBI purportedly "advised [Ms. Sun] of the FARA requirements."  (Ind. ¶ 112.)  That is hardly the same as alleging that Ms. Sun was told that FARA required her to register or that her conduct was unlawful.[26]  In fact, when the DOJ "receives credible information establishing a *prima facie* registration obligation," it "usually sends a letter advising the person of the existence of FARA and the possible obligations thereunder" that "usually cites or provides the information prompting the inquiry," precisely out of concern about establishing "intent."[27]  CRM § 2062; *see also* OIG Report at 13 ("If there is no response to the letter, a seemingly false response, or another reason to believe a significant FARA offense has been committed, FARA personnel will refer the matter to the FBI.").  There is no allegation that happened here, and the roundabout allusions allegedly conveyed during the 2020 interview fall far short of alleging that Ms. Sun had the requisite knowledge for criminal culpability.  *Cf. Mancuso*,

---

appropriate regulation and public disclosure").  Prosecution might have some deterrent value, but that too requires knowledge of the statute and its requirements.

[25]    Even under an alternate and less exacting interpretation of willfulness that requires only 'act[ing] with knowledge that [] conduct was unlawful,'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf*, 510 U.S. at 137), knowledge of FARA is still necessary.  FARA's unique obligations are purely statutory and did not exist at common law.  Requiring knowledge that one's conduct was unlawful but not knowledge of the only statute *making* such conduct unlawful is perversely tautological.

[26]    That is especially true in this case, since the specific allegation says that the FBI supposedly "advised" Ms. Sun about FARA's requirements by "discuss[ing] a report by an American public policy think tank on malign influence by the PRC government and the CCP."  (Ind. ¶ 112.)

[27]    Notably, in connection with the anti-structuring provisions at issue in *Ratzlaf*, "the Secretary considered, but did not promulgate, a regulation requiring banks to inform currency transaction customers of the section's proscription."  510 U.S. at 140 n.6.  Here, the DOJ has clearly determined that some notice is necessary.

420 F.2d at 557 (quoting *United States v. Juzwiak*, 258 F.2d 844, 847 (2d Cir. 1958)) (reversing conviction and dismissing indictment where there was no "showing of the probability that the defendant . . . had knowledge of his duty to register" under 18 U.S.C. § 1407). To the contrary, Ms. Sun continued serving in state government for years following the 2020 interview without the FBI or anyone else questioning whether she had filed a FARA registration.[28] But even assuming the interview allegations could establish knowledge, they simultaneously demonstrate the government's agreement that specific knowledge of FARA is necessary and its failure to allege such knowledge until July 2020—well *after* most of the alleged conduct forming the basis of the FARA charges. *See id.* at 559 ("When there is no knowledge of the law's provisions, and no reasonable probability that knowledge might be obtained, no useful end is served by prosecuting the 'violators.'").

Nor can willfulness reasonably be inferred from other alleged circumstances. Unlike commercial actors who may expect to be regulated, it would be unusual for state officials to assume that, while serving in that capacity and tasked with representing the state in foreign diplomacy matters, they would be required to register as agents of a foreign nation. And because it is "not well known outside the legal/lobbying community," CRM § 2062, FARA also "is entirely different" from laws "akin to licensing statutes" that commonly "pertain to the regulation of business activities," and "which might move one to inquire as to the necessity of registration." *Lambert v. People of the State of California*, 355 U.S. 225, 229 (1957). Regardless, although the specific knowledge requirement is "implicit in the statute, rather than explicit," the Indictment was

---

[28]     If the government truly believed at that point that Ms. Sun was obligated to register under FARA, it could have notified her of that determination or even sought injunctive relief to prevent her "from continuing to act as an agent of [a] foreign principal, or for an order requiring compliance with any appropriate provision of [FARA] or regulation thereunder." 22 U.S.C. § 618(f). It did neither.

required to allege it "explicitly." *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488). Because it does not, dismissal is required. *Cf. United States v. Berlin*, 472 F.2d 1002, 1007–08 (2d Cir. 1973) (dismissing indictment where government failed to allege defendant's "knowledge of the falsity at the time he caused [] statements to be made" because it "[wa]s not necessarily implied from the allegation that he 'counseled and caused' the statements to be made").

### C. Expanding FARA to Include the Conduct Alleged in This Case Raises Grave Constitutional Questions

The Indictment's FARA charges focus generally on conduct that allegedly occurred while Ms. Sun was a political appointee working in state government, and specifically on her advice and decisions with respect to political and policy matters. Not only does the government's theory in this case attempt to convert disfavored "political activities" by a state official into tenuous FARA violations, it does so in a manner that would require the Court to "weigh foreign-policy concerns." *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 265 (2018) (noting that "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to" do so); *compare Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (observing that courts seek to avoid "erroneously adopt[ing] an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches"). No state political appointee has ever been prosecuted under FARA on those grounds, and for good reason: stretching FARA to criminalize political and policy activities by state officials contravenes important constitutional principles. The Court should not indulge the government's attempt to broaden FARA at their expense. *See Jones v. United States*, 529 U.S. 848, 857 (2000) (quoting *United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.").

### i. Using FARA to regulate permissible relations between states and foreign nations violates the separation of powers

First, the government's expansion of FARA threatens the separation of powers. Congress has the express power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST., art. I, § 8, cl. 3. "The Commerce Clause does not state a prohibition; it merely grants specific power to Congress." *Dep't of Revenue of State of Washington v. Ass'n of Washington Stevedoring Companies*, 435 U.S. 734, 749 (1978). State power is constrained in "the unique context of foreign commerce," given "the special need for federal uniformity,'" *Wardair Canada, Inc. v. Florida Dept. of Revenue*, 477 U.S. 1, 8 (1986), and they cannot pursue policies that would compromise the federal government's "capacity to speak with one voice when regulating commercial relations with foreign governments." *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 311 (1994) (quoting *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 451 (1979)). But so long as they do not run afoul of federal policies, states may pursue policies in relation to foreign nations absent "specific indications of congressional intent to bar the state action . . . ." *Id.* at 324. And many do; in today's global economy, states unquestionably play significant roles in foreign commerce.

The government's prosecution of political and policy choices by a state official expected to conduct foreign relations on the state's behalf usurps congressional authority to police state foreign relations. States act through their officials and are free to pursue relations with foreign nations provided they do not contravene federal policies. Criminally prosecuting a political appointee tasked with spearheading cooperation and diplomacy between New York and the PRC impermissibly chills such relations when that prosecution is predicated on political and policy-based decisions that did not violate any national or state foreign policy. It also circumscribes discretion by state officials, improperly arrogating to the Executive Branch greater control over

31

otherwise unregulated state functions. *Contra Jones*, 529 U.S. at 858 (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)) (observing that "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes").

Nevertheless, the Indictment invokes FARA to cast political and policy choices allegedly made by Ms. Sun as merely the bidding of a foreign power. That false equivalency is both unwarranted and misleading. As the DOJ acknowledges, "FARA does not require registration simply because a person expresses views that are favorable to or coincide with the interests of a foreign country . . . [a]nd the First Amendment protects the rights of U.S. persons to express such views." DOJ Guidance at 1. Declining to wade into politically fraught issues (*see, e.g.*, Ind. ¶ 23(j) (alleging that Ms. Sun urged colleagues "[p]olitically" to "refrain from using the phrase 'Republic of China'" in an announcement "so as to avoid creating an international incident by recognizing Taiwan"); 23(l) (alleging that Ms. Sun advised colleagues on how to avoid a "political firestorm")) may well align with some preferences of the PRC, with which Ms. Sun was asked to deal with regularly on New York's behalf. But avoiding antagonizing a counterparty—one that even the Indictment admits was helpful and important to the state (*see, e.g.*, *id.* ¶¶ 25, 28 (working with the PRC "to ship PPE and ventilators to New York State" and to facilitate a Chinese donation of "1,000 ventilators to the Greater New York Hospital Association" during the Covid-19 pandemic))—on hot-button issues is not evidence of direction or control by the PRC. It is more reasonably understood as an ordinary incidence of any bilateral relationship.

Allowing the government to superintend state relations with foreign nations under the guise of criminal prosecution permits the Executive Branch to usurp a "specific power" granted "to Congress." *Ass'n of Washington Stevedoring Companies*, 435 U.S. at 749; *Barclays Bank PLC*,

512 U.S. at 329 (quoting U.S. CONST., art. I, § 8, cl. 3) ("The Constitution expressly grants Congress, not the President, the power to 'regulate Commerce with foreign Nations.'"). Endorsing the government's novel application of FARA in this case would contravene that constitutional division of authority.

### ii. Stretching FARA to criminalize political and policy determinations by state officials impermissibly infringes on protected state activity

Second, the government's expansion of FARA infringes on state activity that is traditionally accorded robust constitutional protection. The most salient is the free speech interest associated with political and policy discussions among state officials, which are protected by the First Amendment.[29] *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009) (explaining that "[a] government entity has the right to speak for itself, . . . is entitled to say what it wishes, . . . and to select the views that it wants to express"); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 34 (2d Cir. 2018) (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015)) ("When it acts as a speaker, the government is entitled to favor certain views over others."). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Summum*, 555 U.S. at 468; *see also Garrison v. State of Louisiana*, 379 U.S. 64, 74–75

---

[29] At present, Ms. Sun does not seek to vindicate her own First Amendment rights. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes"). She is nevertheless permitted to challenge a statute that "would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). To the extent it becomes clear that the Indictment targets Ms. Sun for statements allegedly made in her personal capacity or based on her individual beliefs (*see, e.g.*, Ind. ¶ 23(f) (alleging that Ms. Sun personally participated in a political protest)), separate constitutional concerns would arise. Likewise, any selective prosecution of Ms. Sun based on her national origin and cultural heritage would raise additional issues.

(1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

Accepting the government's expansion of FARA would render it significantly overbroad. "A law is overbroad if it 'punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep,'" *United States v. Farhane*, 634 F.3d 127, 136 (2d Cir. 2011); *Alshahhi*, 2022 WL 2239624 at *5 (same), and even "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). Courts closely scrutinize such laws. *See, e.g.*, *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163–64 (2015) (explaining that strict scrutiny applies where laws "defin[e] regulated speech by particular subject matter" or "by its function or purpose" because "[b]oth are distinctions drawn based on the message a speaker conveys"); *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)) ("[T]he Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.").

Endorsing the government's theory in this case would vastly increase the amount of protected "political activities" punishable under FARA, broadening its scope to include discussions regarding policies and politics well beyond the statute's "plainly legitimate sweep." *Farhane*, 634 F.3d at 136. It is one thing to disseminate propaganda to the public or lobby federal agencies and officials who shape the foreign policy of the United States; it is quite another for a state political appointee to make decisions about what meetings may be beneficial or problematic, what policy positions are advantageous or provocative, whether to pursue stronger or weaker relations with another country, and what engagements may be politically advantageous with a particular demographic. Such activity is at the core of the First Amendment, *see Summum*, 555

34

U.S. at 467–68; *Garrison*, 379 U.S. at 74–75, and well beyond the proper scope of FARA.  Yet the government's reading would subject those activities and more by countless state officials to harsh criminal penalties.  *But see Snyder*, 144 S. Ct. at 1951 ("Section 666 does not supplement those state and local rules by subjecting 19 million state and local officials to up to 10 years in federal prison for accepting even commonplace gratuities.").

If the government may prosecute state officials whenever they agree to any ask from foreign representatives or advocate for a position that aligns with foreign interests—even in the absence of some federal or state foreign policy conflict—then the government may dictate, on pain of criminal prosecution, the public and private speech of state officials on matters pertaining to foreign policy.  *Contra Carroll v. Blinken*, 957 F.2d 991, 995 (2d Cir. 1992) (citing *West Virginia Board of Education v. Barnette,* 319 U.S. 624 (1943)) ("[I]t has been firm constitutional doctrine that the state cannot constitutionally compel individuals to speak or think in prescribed ways."). And as it seeks to do in this case, the government may also prosecute state officials based on non-public opinions and advice shared in the normal course of their duties.  Indeed, much of this Indictment focuses on internal opinions and advice that Ms. Sun allegedly conveyed only to her colleagues for the purpose of making political and policy decisions.  At a minimum, the government's theory would severely chill state political and policy discussions since, "[f]aced with the penalties that would accrue" based on any concessions or agreements the government finds "arguably within the reach of" FARA, state officials "might well conclude that the safe course is to avoid controversy."  *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257 (1974).

The government's novel expansion of FARA thus runs headlong into thorny constitutional issues and invites the Court to follow.  And the potential uncertainty inherent in the government's position is staggering.  For instance, the Indictment casts Ms. Sun's alleged advice to decline

meetings with Taiwanese representatives as actions on behalf of the PRC. As noted previously, however, the opposite advice to accept such meetings could equally be deemed actions on behalf of Taiwan. Under the government's theory, nothing would prevent an investigation into either scenario, and the scope of the government's newfound discretion would not stop there. What about state officials who take up foreign calls to provide funding to Ukraine? Or officials who decide whether or not to grant meetings with representatives of Israel or Palestine? All may easily become ensnared by the government's reading of "request," subject only to the exercise of prosecutorial discretion. *Contra Snyder*, 144 S. Ct. at 1958 (rejecting the argument that "federal prosecutors can be trusted not to enforce [a] statute" in unfair ways given "the legitimate concern that the federal lines are unknown and unknowable to state and local officials"). Applying the government's approach in a country-specific manner is even more troubling; whether or not the government's larger concerns about Chinese foreign influence are justified, FARA simply does not distinguish between particular countries or focus only on those perceived to exert malign influence.[30] Thus, the only restraint imposed on the government would be federal prosecutors' judgments about which countries are undeserving of cooperation or support. That reading offers no clear warning or protection at all, and it is the opposite of how courts construe broadly worded statutes when an expansive interpretation could impose wide-ranging criminal penalties. *See, e.g.*, *Van Buren v. United States*, 593 U.S. 374, 393 (2021) (rejecting the government's reading of the Computer Fraud and Abuse Act and observing that "the [g]overnment's interpretation of the statute would

---

[30]     The sole exception is a provision exempting "[a]ny person, or employee of such person, whose foreign principal is a government of a foreign country the defense of which the President deems vital to the defense of the United States . . . ." 22 U.S.C. § 613(f). According to the DOJ, "[t]here are currently no foreign governments so designated." Frequently Asked Questions, U.S. DEP'T OF JUST., *available at* https://www.justice.gov/nsd-fara/frequently-asked-questions (last accessed Nov. 3, 2024).

attach criminal penalties to a breathtaking amount of commonplace computer activity"); *McDonnell*, 579 U.S. at 576 (rejecting the notion that courts can construe criminal statutes based on the government's assurances about how it might use such statutes).

The government's expansion of FARA also threatens bedrock federalism principles. *Cf. Bond v. United States*, 572 U.S. 844, 859 (2014) (noting that prior cases "make clear that it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute"). Accepting the government's position means that "carefully calibrated policy decisions that the States and local governments have made" with respect to foreign diplomacy "would be gutted." *Snyder*, 144 S. Ct. at 1956. Because allowing federal prosecutors to exercise de facto veto power over political and policy-based decisions by state officials—at least where those decisions are consistent with federal foreign policy—intrudes on the sovereignty of the state, "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Bond*, 572 U.S. at 858 (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991)); *see also Bass*, 404 U.S. at 349 ("[W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction."). For the reasons already discussed, the government's interpretation of FARA would subject state officials to potential criminal liability for even mundane accessions to foreign representatives. *Cf. Snyder*, 144 S. Ct. at 1957 ("The flaw in the [g]overnment's approach—and it is a very serious real-world problem—is that the [g]overnment does not identify any remotely clear lines separating an innocuous or obviously benign gratuity from a criminal gratuity."). Courts require a clear statement by Congress before endorsing such consequences. *See Jones*, 529 U.S. at 858 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–222 (1952))

("[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."); *cf. Rewis*, 401 U.S. at 812 (1971) (reversing convictions and noting, *inter alia*, that "Congress would certainly recognize that an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies").  There is none here.

### D.  Even Accepting the Government's Novel Application of FARA in This Case, the Lack of Fair Notice and the Rule of Lenity Require Dismissal

The foregoing sections illustrate how the government's novel application of FARA is inconsistent with its plain text, precedent interpreting and limiting its scope, and bedrock constitutional principles.  For all of those reasons, the FARA counts should be dismissed.  In all events, however, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).  The FARA counts fail on that ground as well.

Ms. Sun and legions of state officials had no notice that simply doing their jobs could land them in federal prison.  That lack of fair notice is inconsistent with the rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008); *accord Davis*, 588 U.S. at 464 (noting that the rule of lenity "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor").  Here, it is hardly clear from FARA's text that it covers political activities by state officials that are consistent with federal and state foreign policies.  There have been few

prosecutions at all under FARA, none of any state political appointee, and none of any state official on facts remotely akin to the allegations in this case. Case law and DOJ guidance do not support the broad reading that the government tries to give FARA's provisions. And it seems that even those charged with enforcing FARA have recently disagreed on its purpose and application. *See* OIG Report at ii–iii (describing "differing understandings between field agents and prosecutors and NSD officials about the intent of FARA as well as what constitutes a 'FARA case'").

"The rule of lenity ensures that criminal statutes will provide fair warning of what constitutes criminal conduct, minimizes the risk of selective or arbitrary enforcement, and strikes the appropriate balance between the legislature and the court in defining criminal liability." *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015). And it "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Lanier*, 520 U.S. at 266. The lack of fair notice here is evident based on the preceding discussion. But it is further exacerbated by the nature of a FARA offense, because a "mere failure to register" may violate the statute even if it is "wholly passive." *Lambert*, 355 U.S. at 228; *see also Viereck*, 318 U.S. at 242 ("Penal sanctions attach here for *willful failure to file a statement* when required . . . ." (emphasis added)); 22 U.S.C. § 612(a) (providing, *inter alia*, that "every person who becomes an agent of a foreign principal shall, within ten days thereafter, file . . . a registration statement").[31] In such

---

[31] Two district courts have said that FARA prohibits acting as a foreign agent and not just failing to register. *See United States v. Michel*, No. CR 19-148-1 (CKK), 2024 WL 1603362, at *13 (D.D.C. Apr. 12, 2024); *United States v. Manafort*, 318 F. Supp. 3d 1, 3–4 (D.D.C. 2018). But that conflicts with how FARA operates in certain cases. First, FARA expressly exempts some "agents of foreign principals" acting within the United States from registration. 22 U.S.C. § 613. Thus, it expressly contemplates that a person may, in some cases, "act" as an undisclosed "agent of a foreign principal," *id.* § 612(a), without violating FARA. *Contra Michel*, 2024 WL 1603362 at *13 ("FARA . . . prohibits one from acting as an undisclosed foreign agent."); *see also* H. Rep. No. 89-1470 at 7–8 ("[P]ersons acting under this exemption would still be agents of foreign principals . . . ."). Second, while acknowledging that "FARA does not prohibit being a

---

circumstances, "the lack of either notice or a showing of probability of knowledge of the statute . . . violate[s] fundamental precepts of due process." *Mancuso*, 420 F.2d at 557; *cf. Cheek*, 498 U.S. at 201 (observing that prior precedents "conclusively establish that the standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a *known* legal duty'" (emphasis added)). As discussed above, neither is adequately alleged here.

In sum, it is at least ambiguous whether FARA covers the conduct alleged here, much of which is unconnected to any particular "request" and all of which was consistent with Ms. Sun's political and policy-related responsibilities. (*See id.* ¶¶ 1, 100.) And never before has the government sought to prosecute a state political appointee under FARA for actions taken in the course of his or her duties that were consistent with prevailing federal and state policies. In such situations, "the tie must go to the defendant." *Santos*, 553 U.S. at 514; *Davis*, 588 U.S. at 465 ("Applying constitutional avoidance to narrow a criminal statute . . . accords with the rule of lenity."); *Valle*, 807 F.3d at 523 ("[W]here, as here, the Government and the defense both posit plausible interpretations of a criminal statute, the rule of lenity requires us to adopt the defendant's construction."). Declining to bless the government's novel application of FARA "also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Santos*, 553 U.S. at 514. Congress has

---

foreign agent, undertaking activities on behalf of a foreign client, or 'acting' as a foreign agent *per se*," those decisions conclude that "[t]he statute gives a person ten days after becoming an agent to register, *after which time*, acting . . . is prohibited." *Manafort*, 318 F. Supp. 3d at 4 (emphasis added); *Michel*, 2024 WL 1603362 at *13 (citing *Manafort*). Neither decision addresses the resulting anomaly: what happens if someone acting as a foreign agent stops before ten days are up? *Manafort* and *Michel* suggest that such conduct is not punishable or else punishable only retroactively because of a later choice. *Contra United States v. Muzii*, 676 F.2d 919, 920 (2d Cir. 1982) (explaining that "a guilty act, or actus reus . . . must be contemporaneous with the guilty mind"). That is hard to square with FARA's purpose; the more sensible reading is that a willful failure to file is the actus reus under the statute.

demonstrated a ready ability to revise FARA over the years when necessary; to the extent the government believes that FARA should cover the political and policy-related conduct at issue in this case, its remedy lies with the legislature. *Cf. United States v. Craig*, 401 F. Supp. 3d 49, 78 (D.D.C. 2019) (dismissing FARA charge based on rule of lenity).

### E. The Indictment Separately Fails to Allege a Conspiracy to Violate FARA

Both Counts One and Two fail for the reasons already discussed.[32] But Count One, which alleges that Ms. Sun "knowingly conspire[d] . . . to knowingly and willfully act as an agent of a foreign principal . . . without registering with the Attorney General," during the period from "[i]n or about and between January 2015 and December 2023" (Ind. ¶ 115), also fails for additional reasons. To be guilty of conspiracy, there must be "(1) an agreement among two or more persons, the object of which is an offense against the United States; (2) the defendant's knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators." *United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003). To satisfy those elements, "[t]he partners in the criminal plan must agree to pursue the same criminal objective," *Salinas v. United States*, 522 U.S. 52, 63–64 (1997), and there must be "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the

---

[32]    The Indictment alleges in Count Two that Ms. Sun "knowingly and willfully acted *and caused others to act* as an agent of a foreign principal . . . ." (Ind. ¶ 118 (emphasis added).) That pro forma allegation is meaningless since the Indictment is devoid of any allegations suggesting that Ms. Sun caused anyone else to commit an offense. *Cf. Gonzalez*, 686 F.3d at 128 (noting that "it has long been the rule in this Circuit" that a statutory citation does not cure "a deficiency in an indictment's factual allegations of the elements of an offense"). The Court should strike the boilerplate citation to 18 U.S.C. § 2 and preclude an aiding-and-abetting theory that the grand jury does not appear to have considered. *See Pirro*, 212 F.3d at 92.

underlying substantive criminal offense.'"[33]  *Ocasio v. United States*, 578 U.S. 282, 287 (2016) (quoting *Salinas*, 522 U.S. at 65).  The Indictment does not clear those hurdles.

The first deficiency is the most basic:  the Indictment does not sufficiently allege that two or more persons joined a conspiracy to violate the law.  Although the relevant allegations are somewhat vague, a "common sense" reading of the Indictment, *Stavroulakis*, 952 F.2d at 693, discloses a limited universe of potential co-conspirators.  That list includes CC-1 and CC-2, but also must encompass others since there are no allegations that Ms. Sun ever "understood that CC-1 and CC-2 were themselves acting as agents of the PRC government and the CCP" until at least three years into the purported conspiracy.  (*Id.* ¶ 40.)[34]  (*See* Ind. ¶¶ 39–86.)  At the same time, the Indictment claims that Ms. Sun acted covertly, so the list of potential co-conspirators is short.[35] (*See, e.g.*, *id.* ¶ 9 (alleging that Ms. Sun "acted as an undisclosed agent of . . . the PRC and the CCP").)  And the content of the actual allegations further reduces the pool to one group:  officials and staff at the PRC consulate.  (*See id.* ¶¶ 21–38.)

But therein lies the problem, because consular officials and their staff could not have conspired to violate FARA.  The statute expressly exempts from its coverage "duly accredited diplomatic or consular officer[s] of a foreign government," as well as "[a]ny member of the staff of, or any person employed by, a duly accredited diplomatic or consular officer of a foreign

---

[33]    For this reason, the Indictment's failure to allege any violation of a "known legal duty," *Cheek*, 498 U.S. at 201, takes on even greater significance in the conspiracy context.  Ms. Sun could not, as alleged, agree with others to violate FARA unless she knew that it existed and imposed on her an obligation to register.  The Indictment does not allege that she specifically knew either of those things.

[34]    If CC-1 and CC-2 really were the only alleged co-conspirators, then the allegations involving consular officials—which are entirely separate from those involving CC-1 and CC-1—are prejudicial surplusage and should be stricken.

[35]    The candidates notably do not include Ms. Sun's husband, Chris Hu, who was not charged in any of the FARA counts and is never alleged to have been a co-conspirator.

government . . . ." 22 U.S.C. § 613(a), (c). While generally "[a] person ... may be liable for conspiracy even though he was incapable of committing the substantive offense," *Salinas*, 522 U.S. at 64, an exception applies where, as here, "it is clear from the structure of a legislative scheme that the lawmaker must have intended that accomplice liability not extend to certain persons whose conduct might otherwise fall within the general common-law or statutory definition of complicity." *United States v. Hoskins*, 902 F.3d 69, 77–78 (2d Cir. 2018); *accord Gebardi v. United States*, 287 U.S. 112, 123 (1932) (overturning conviction of male defendant under the Mann Act because the only alleged co-conspirator was a woman who consented to transportation, and the statute evinced "an affirmative legislative policy to leave her acquiescence unpunished").

In *Gebardi v. United States*, the Supreme Court derived from the language of the Mann Act, which prohibited transporting women across state lines for "immoral purposes," 36 Stat. 825 (1910), "evidence of an affirmative legislative policy" to preclude conspiracy or accomplice liability for women involved in the offense because the statute was silent as to punishment for their consensual participation. *Gebardi*, 287 U.S. at 121–23. Since the male defendant in *Gebardi* was only alleged to have conspired with the woman who participated, the Court reversed his conviction after finding that he "had no one with whom to conspire." *Hoskins*, 902 F.3d at 79 (citing *Gebardi*, 287 U.S. at 123). Subsequently applying that principle to the Foreign Corrupt Practices Act ("FCPA") in *United States v. Hoskins*, the Second Circuit explained that this exception applies where there is "'something more' that evinces an affirmative legislative policy to leave the category of defendants omitted from the statutory framework unpunished." *Id.* at 83.

That "something more" is clearly present here. In *Gebardi*, it was "Congress's silence" regarding a woman's liability under the statute despite her participation being "'an inseparable incident of all cases in which the woman is a voluntary agent' capable of entering into a

conspiracy." *Hoskins*, 902 F.3d at 80 (quoting *Gebardi*, 287 U.S. at 121–23).  A comparable recognition applies with even more force here, as Congress went beyond silence and *expressly* exempted foreign emissaries and their staff from FARA's coverage, despite their potential participation in a FARA offense being easily anticipated.[36]  Later, in *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987), the Second Circuit found "something more" when it concluded that "broadening the scope of liability [under the continuing enterprise statute] with the conspiracy statute would subvert th[e] purpose" of the continuing enterprise statute.  *Hoskins*, 902 F.3d at 80 (quoting *Amen*, 831 F.2d at 381).  And in *Hoskins*, the Second Circuit found "something more" based on "the carefully tailored text of the statute, read against the backdrop of a well-established principle that U.S. law does not apply extraterritorially without express congressional authorization and a legislative history reflecting that Congress drew lines in the FCPA out of specific concern about the scope of extraterritorial application of the statute . . . ."  902 F.3d at 83–84.  Those observations echo this case, because using the conspiracy statute to broaden FARA's coverage would include the very individuals that Congress sought to exclude from liability.  Worse, it would do so in the context of foreign relations, where congressional judgment circumscribing the criminal liability of foreign actors deserves special deference.

Thus, any conspiracy must be limited to an agreement with CC-1 and CC-2.  But that only raises more issues.  For example, the Indictment never alleges that Ms. Sun mentioned or discussed FARA with CC-1 or CC-2 at all, let alone that there was any agreement among them to violate FARA.  The allegations skip over that subject entirely, reciting instead particular activities on

---

[36]    Notably, the application of the exception is not "limited to situations where . . . conduct is inherent in the substantive offense," nor do courts "ask[] whether a certain type of . . . conduct is 'frequently, if not normally' involved in an offense."  *Hoskins*, 902 F.3d at 81–82 (quoting *Gebardi*, 287 U.S. at 121).  Rather, the question is whether there is a discernible "legislative policy" to exclude certain individuals.  *Id.* at 82.

which Ms. Sun and CC-1 or CC-2 supposedly agreed.  But conspiracy requires "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense.'"  *Ocasio*, 578 U.S. at 287 (quoting *Salinas*, 522 U.S. at 65).  The Indictment's failure to allege any facts regarding an agreement to violate FARA is insufficient to sustain a purported conspiracy with CC-1 and CC-2 to that end.

Similarly, the Indictment does not sufficiently allege that Ms. Sun knew activities by CC-1 or CC-2 "[we]re directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal."  22 U.S.C. § 611(c)(1).  At most, the Indictment alleges that Ms. Sun supposedly "understood that CC-1 and CC-2 were themselves acting as agents of the PRC government" because CC-1 attended events "organized" by local governments within the PRC (Ind. ¶ 40), and Ms. Sun "was aware" that a trip allegedly arranged by CC-1 and CC-2 "was organized and partially funded" by the PRC.  (*Id.* ¶ 78.)  It hardly follows from those allegations that Ms. Sun would know that CC-1 or CC-2 were agents of a foreign principal.  It is not illegal to attend events in China and those hosting meetings or conferences often provide funds to attendees for travel.  Moreover, both CC-1 and CC-2 had strong ties to the United States, as CC-1 was a "naturalized citizen" and CC-2 was a "legal permanent resident."  (*Id.* ¶¶ 3, 4.)  Indeed, CC-1 allegedly needed Ms. Sun's help to "facilitate his direct communications with principals of the Henan provincial government," which makes no sense if CC-1 was already serving as the PRC's agent.  (*Id.* ¶ 51.)  There are no allegations that Ms. Sun had any knowledge of the organizational daisy chain—*i.e.* Association-1 to the United Front Work Department to the CCP (*see id.* ¶ 3)—that supposedly established the PRC's indirect (and presumably, covert) control over CC-1 and CC-2.  And the Indictment alleges that CC-1 expressed to Ms. Sun a desire to encourage

"economic cooperation between Henan Province and New York State," which is entirely consistent with a goal of benefitting New York.[37]  (*Id.* ¶ 51.)

But even assuming that allegations involving CC-1 and CC-2 might be sufficient to allege a conspiracy to violate FARA, Count One clearly alleges "multiple separate and distinct conspiracies in a single count," *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992), by claiming that Ms. Sun conspired with different people—including PRC officials, CC-1, and CC-2—at different times, which would constitute separate agreements with different co-conspirators. There is no allegation in the Indictment of "mutual dependence among the participants" in the supposed conspiracies, *United States v. Geibel*, 369 F.3d 682, 692 (2d Cir. 2004) (quoting *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000)), nor any facts alleged to suggest that members of the purported conspiracies agreed to join "what he [or she] knew to be a collective venture directed toward a common goal." *United States v. Eppolito,* 543 F.3d 25, 47 (2d Cir. 2008) (quoting *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000)).  Indeed, there are no allegations at all linking officials at the PRC consulate with CC-1 or CC-2.  Because "[a]n indictment is duplicitous if it joins two or more distinct crimes in a single count," *Aracri*, 968 F.2d at 1518, Count One fails on that ground as well.

## IV.    THE VISA FRAUD AND ALIEN SMUGGLING COUNTS MUST BE DISMISSED

Five of the remaining counts against Ms. Sun are based entirely on one document—a so-called "invitation letter" dated September 19, 2019 (the "Invitation Letter"), which allegedly was appended to visa applications submitted by the Director of Henan's Foreign Affairs Office and

---

[37]    In this connection, even if the Indictment alleged sufficient facts to establish Ms. Sun's knowledge that CC-1 and CC-2 sometimes acted as foreign agents—and, for the reasons outlined above, it does not—it nevertheless fails to allege that Ms. Sun knew the particular actions alleged in this case were predominantly for or on behalf of the same foreign principal.

three accompanying Chinese delegates who visited New York as part of a governmental delegation in November of 2019.[38]  The Indictment alleges that the delegation's visit had two purposes:  "to facilitate economic exchange" and to "persuade Politician-2 to visit Henan Province."  (Ind. ¶ 61.) It goes on to allege that the delegation actually came to the United States and met with New York representatives to discuss those topics as set forth in the Invitation Letter.  (*See id.* ¶ 72 ("During their trip, [Ms. Sun] arranged for them to meet with a principal of Global NY, a department of the NYS government charged with facilitating foreign investment in New York State.").)   The Indictment also makes plain that delegations from various Chinese provinces regularly visited New York and governors often issued and approved invitation letters in connection with those visits. (*See, e.g.*, ¶¶ 44 (referencing a "previously authorized invitation letter for a delegation from Jiangxi Province"), 45 (stating that in June 2018, "several members of the Henan Province delegation successfully applied for U.S. entry visas to enter the United States"), 49 (showing a picture of a meeting between members of the Henan Province delegation and Politician-2 to "discuss economic cooperation"), 87 (referencing a delegation from Jiangsu Province's visit to New York).)

Based solely on the Invitation Letter, Count Three purports to charge Ms. Sun with visa fraud.   Counts Four through Seven allege identical charges of bringing in aliens, the only differences being the identities of the individuals who were allegedly smuggled into the United States as part of the state delegation.[39]  For the reasons discussed below, the sole allegation of falsity underlying those charges is insufficient to sustain them.  All five counts must be dismissed.

---

[38]    For unknown reasons, it appears that the Government has yet to produce the Invitation Letter or the delegates' visa applications in discovery.

[39]    The Indictment briefly acknowledges that these same four individuals were part of a larger delegation, the remainder of whom already had valid visas.  (*See* Ind. ¶ 71 ("the other members of the delegation already had visitor's visas").)

**A. The Indictment Fails to Sufficiently Allege Falsity and Materiality in Connection with Visa Fraud**

As charged in Count Three, visa fraud requires proof that a defendant: (1) knowingly (2) presented (3) an application or "document required by the immigration laws" (4) that contained a false statement (5) as to a material fact. 18 U.S.C. § 1546(a). The Second Circuit has emphasized that this statute "applies only to *knowing falsehoods* material to the immigration submission at issue[.]" *United States v. Konstantakakos*, 121 F. App'x 902, 905–06 (2d Cir. 2005) (emphasis added). Allegedly false statements must be made in connection with a material fact. *United States v. Patnaik*, No. 22-CR-00014-BLF, 2023 WL 1111829, at *5 (N.D. Cal. Jan. 30, 2023) (granting motion to dismiss indictment alleging visa fraud because alleged false statements at issue were not material). The Indictment fails to allege at least two of these essential elements: first, that Ms. Sun "knowingly" did anything to commit the alleged visa fraud; and second, that the Invitation Letter central to Count Three actually contained any materially "false statement" within the meaning of the statute.

The substantive allegations relating to the visa fraud count (as well as the alien smuggling counts) do not proceed chronologically and often jump around between unrelated events, but they are all clumped together. (*See* Ind. ¶¶ 61–73.) The gist of those allegations is that in the spring of 2019, CC-1 asked Ms. Sun whether she could obtain an "invitation letter" for a delegation from Henan Province to visit New York for the dual purposes discussed above. (*Id.* ¶¶ 61–62.) Ms. Sun allegedly provided CC-1 with a draft of the letter, which she later revised to account for a scheduling change. (*Id.* ¶¶ 63–65.) Ms. Sun then allegedly told CC-1 to pick up the revised letter on June 2, 2019. (*Id.* ¶ 65.) The Indictment never alleges who signed the letter, the names of the delegates in the letter, or that it contained any false statements. (*See id.*)

Vaulting ahead more than three months to September 16, 2019, the Indictment next alleges that CC-1 told Ms. Sun that the time of the visit had changed again and that there were some changes to the people in the delegation.  (*Id.* ¶ 66.)  Ms. Sun allegedly emailed the names of the delegates to her work email and requested that CC-1 come to her state government office in Manhattan to retrieve the letter.  (*Id.* ¶¶ 67–68.)  The Indictment then begins referring to an "unauthorized invitation letter"—presumably the same letter, though there are no allegations regarding any lack of authorization—and alleges that the letter accurately stated the purpose of the delegation's visit was to "further greater economic cooperation between Henan Province and New York State."  (*Id.* ¶ 69.)  In a revealing shift to the passive voice, the Indictment next alleges that although the letter "was purportedly signed by Policitian-2 . . . the handwritten signature *was falsified*."[40]  (*Id.* (emphasis added).)  This is the Indictment's sole allegation of any falsity in connection with Counts Three through Seven, and it is insufficient to allege visa fraud by Ms. Sun.

The Indictment never alleges who supposedly falsified the signature or that Ms. Sun knew the signature was inauthentic.  Indeed, the Indictment never even reveals what it means by "falsified."[41]  *See United States v. Stringer*, 730 F.3d 120, 126–27 (2d Cir. 2013) (observing that "charges of criminal falsity" have been found to require "specification of what statements are alleged to be false, and in what respect they are false"); *United States v. Tonelli,* 577 F.2d 194, 200 (3d Cir. 1978) ("Because the indictment in this case did not set forth the precise falsehood(s)

---

[40]    This is not the only example of this tell.  In several places, the Indictment slips into the passive voice to imply—but not quite *allege*—that Ms. Sun was involved in some wrongdoing.  (*See, e.g.*, Ind. ¶ 44 (lapsing into the passive voice in connection with another letter and stating that "the letter drafted by SUN for CC-1 was signed by hand with a falsified version of Politician-2's signature").)

[41]    For example, does the Indictment mean simply that the Invitation Letter was not signed by Politician-2 personally?  If so, it would hardly be surprising for the governor of New York to delegate ministerial tasks like signing letters to other staff members.

alleged and the factual bases of their falsity with sufficient clarity to permit a jury to determine their verity and to allow meaningful judicial review of the materiality of those falsehoods, the conviction here must be vacated.").  In most circumstances, an official signature is material only as a proxy for official *approval*, unlike other situations—*e.g.*, the sale of a valuable autograph—where authenticity carries inherent value and is therefore of central concern.  Here, while the Indictment alleges that the signature on the Invitation Letter was inauthentic, it does not allege—and it does not follow, given the delegation's subsequent unquestioned arrival and participation in state events—that the overall *Invitation Letter* was somehow false.[42]

Although the Indictment alleges that Ms. Sun "lacked authorization to issue an invitation letter without necessary approvals," (*id.*), it conspicuously does not allege that she actually lacked the necessary approvals to issue the Invitation Letter, knew or believed she lacked such approvals, forged Politician-2's signature, knew or believed Politician-2's signature was inauthentic, or otherwise thought the Invitation Letter was false in any way.  Nor does the Indictment allege that anything other than the "falsified signature" rendered the Invitation Letter a false statement within the meaning of the statute.  If it had, perhaps the failure to allege Ms. Sun's knowledge of or involvement in any falsification of Politician-2's signature would not be fatal.  But since the signature is the only alleged falsity and the Indictment never claims that Ms. Sun falsified that signature or knew it was falsified, Count Three fails to sufficiently allege that Ms. Sun committed visa fraud.  *Cf. Berlin*, 472 F.2d at 1007–08 (dismissing indictment for failure to allege "knowledge of the falsity at the time [the defendant] caused [] statements to be made").

---

[42]      In fact, the Indictment alleges that the four individuals relevant to Count Three were part of a larger delegation that came to New York without incident for the exact purpose stated in the Invitation Letter.  (*See* Ind. ¶ 72.)  It thus concedes that representatives of the NYS government knew the delegation was in the United States to discuss economic issues, met with them for that purpose, and never evinced any concerns about the delegation.

**B.  The Indictment Fails to Allege a Violation of Law in Connection with the Alleged Alien Smuggling**

The specific portion of the alien smuggling statute that Ms. Sun allegedly violated in Counts Four through Seven subjects to criminal sanctions any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."  8 U.S.C. § 1324(a)(1)(A)(iv).  The Indictment also seeks a penalty enhancement, alleging—without providing any context—that Ms. Sun engaged in this conduct "for the purpose of commercial advantage or private financial gain."  *Id.* § 1324 (a)(1)(B)(i).  Specifically, the Government alleges that, "[i]n or about and between August 2019 and November 2019,"[43] Ms. Sun, "together with others, encouraged and induced the aliens listed . . . to come to and enter the United States, knowing and in reckless disregard of the fact that such coming to and entry *was and would be in violation of law*, for the purpose of commercial advantage and private financial gain."  (Ind. ¶ 122 (emphasis added).)

Like visa fraud, in order to properly charge Ms. Sun with alien smuggling, the Indictment must allege that she encouraged or induced the delegates to enter the United States knowingly or with reckless disregard that doing so—*i.e.*, by providing the Invitation Letter—was in violation of the law.  Doing so requires alleging the intentional solicitation and facilitation of unlawful entry. *See United States v. Hansen*, 599 U.S. 762, 775 (2023) (explaining that "'[e]ncourages or induces' . . . carries a specialized meaning'" that connotes the common law concepts of criminal "solicitation and facilitation").  As other courts have concluded, immigration offenses of this kind

---

[43]    A similar time frame applied to the visa fraud count, the only difference being that the period here extends to November 2019—presumably because the delegation entered the United States in November after their visas were approved in October 2019.

require knowledge of some wrongful conduct and an intent violate the law. *See, e.g.*, *United States v. Tydingco*, 909 F.3d 297, 302–03 (9th Cir. 2018) (holding that holding that conviction for harboring an illegal alien "require[s] a finding that [d]efendants intended to violate the law"); *United States v. Parmelee*, 42 F.3d 387, 391 (7th Cir. 1994) (holding that a "[d]efendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States is an essential element of the crime [of transporting illegal aliens]").

The allegations relating to the alien smuggling counts are exactly the same as the deficient allegations surrounding the visa fraud count, and thus fail for very similar reasons. As noted, the Indictment does not allege that Ms. Sun lacked the necessary approvals to issue the Invitation Letter, knew or believed she lacked such approvals, forged Politician-2's signature, knew or believed Politician-2's signature was inauthentic, or otherwise thought the Invitation Letter was false. Nor does the Indictment allege that Ms. Sun knew or had any reason to believe that the Invitation Letter—or the delegation's subsequent visit to New York—was somehow "in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iv). Again, the Indictment is more notable for what it does not allege than what it does. After investigating this case for several years, the government still could not allege in this Indictment any of those crucial facts. The failure to do so requires that the alien smuggling counts be dismissed.

## V. THE MONEY LAUNDERING CONSPIRACY COUNT MUST BE DISMISSED

Finally, Count Ten fails because it is completely devoid of any factual allegations connecting Ms. Sun to any supposed money laundering conspiracy. The utter lack of supporting allegations deprives Ms. Sun of sufficient notice regarding what this count charges, makes it impossible to prepare a defense to the charge, and practically requires the government to "fill in elements of its case with facts other than those considered by the grand jury." *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44). As such, Count Ten must be dismissed.

A.  **The Indictment Fails to Allege Any Facts Establishing a Money Laundering Scheme Involving Ms. Sun**

Despite the overall length of the Indictment, only a handful of disparate allegations even potentially relate to the use or movement of "monetary instrument[s] or funds."  18 U.S.C. § 1956(a)(2).  For example, the Indictment alleges that Ms. Sun's husband "laundered unlawful proceeds through bank accounts opened in the name of a close relative but that were actually for [his] exclusive use," and that "[t]o open these accounts, [he] unlawfully used an image of the relative's driver's license."  (Ind. ¶ 12.)  In another paragraph, the Indictment alleges that Ms. Sun's husband "received a series of wire transfers from a PRC-based account bearing the name of the Business Partner totaling more than $2.1 million."  (*Id.* ¶ 105.)  It further alleges that:

> HU repatriated this wealth to the United States by, among other measures, (1) having payments made directly from the PRC to U.S. accounts created by HU in the name of SUN's close relative (the "Relative," an individual whose identity is known to the Grand Jury), which HU then transferred to a Financial Consultancy account, (2) structuring cash payments into multiple accounts associated with HU's family and businesses, and (3) conducting layering activities, that is, moving funds between multiple family and business accounts, to conceal the original provenance of the funds. Notably, HU created the accounts in the Relative's name without the Relative's knowledge or authorization.

(*Id.* ¶ 104.)  To the extent those allegations relate to some money laundering conspiracy, none mention Ms. Sun or provide any insight into any scheme in which she supposedly was involved.[44] Of course, the Indictment does allege that Ms. Sun and her husband "laundered the monetary proceeds of [the FARA] scheme to purchase, among other items, real estate property in Manhasset, . . . a condominium in Honolulu, . . . and various luxury automobiles . . . ."  (*Id.* ¶ 11.)  But that allegation cannot bolster Count Ten, because the purported FARA scheme expressly is *not* the specified unlawful activity ("SUA") alleged as part of the money laundering conspiracy charge.

---

[44]    Quite the contrary, as the Indictment expressly alleges that the referenced bank account was opened "for HU's exclusive use."  (Ind. ¶ 12.)

(*See id.* ¶ 128.)  No other factual allegations say a word about whether Ms. Sun knew about or intended to enter any conspiracy to transmit or transfer funds; knew that any such funds were the proceeds of some unlawful activity; or knew that a transfer was designed to conceal or disguise anything at all.[45]  As a result, the Indictment fails to "fairly inform[]" Ms. Sun "of the charge against which [s]he must defend" or "enable[] h[er] to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling*, 418 U.S. at 117.

The only identifiable allegations relating to the charged money laundering conspiracy are found in the "to wit" clauses of the statutory allegations pertaining to Count Ten.  (*See* Ind. ¶ 128.)  But the Indictment's reliance on largely boilerplate allegations is insufficient to describe the purported money laundering conspiracy, because an indictment "must state some fact specific enough to describe a particular criminal act, rather than a type of crime."  *Pirro*, 212 F.3d at 93.  Moreover, the government's "to wit" clauses only make matters worse.

For instance, those clauses allege that the SUAs underlying the conspiracy are bank fraud and misuse of means of identification, in violation of 18 U.S.C. § 1344, and 18 U.S.C. §§ 1028(a)(7) and 1028(c)(3)(A), respectively.  (Ind. ¶ 128.)  Those track the crimes alleged in Counts Eight and Nine, even though Ms. Sun is not charged with committing those offenses.  (*See id.* ¶¶ 123–26.)  Putting aside whether the Indictment adequately alleges the offenses in Counts Eight and Nine, those counts fail to allege any facts connecting Ms. Sun to any bank fraud or misuse of identification, let alone allege that she knowingly and intentionally participated in a criminal

---

[45]    In fact, throughout the entire Indictment, Ms. Sun is mentioned in connection with only a *single* wire transfer of less than $48,000 on April 22, 2016.  (Ind. ¶ 88 ("On or about April 22, 2016, a bank account held by the defendants . . . received an incoming wire transfer in the amount of $47,895.00 from a PRC-based bank account.").)

conspiracy related to them.[46]  *Cf. United States v. Howard*, No. CR H-03-0093, 2005 WL 8157704, at *2 (S.D. Tex. Apr. 7, 2005) (stating the court would have to dismiss money laundering counts if counts identified as SUAs were dismissed, "for there would be no basis upon which to support the money laundering charges"); *United States v. Finn*, 919 F. Supp. 1305, 1352 (D. Minn. 1995) (same); *United States v. D'Alessio*, 822 F. Supp. 1134, 1146 (D.N.J. 1993) (finding counts charging money laundering violations had to be dismissed after court dismissed counts which had served as the SUA).

Against this empty backdrop, the government's hollow statutory recitation (*see* Ind. ¶ 128) is insufficient to provide notice to Ms. Sun of the nature and essential facts of the allegations against her in Count Ten.  *See Pirro*, 212 F.3d at 92; *Stavroulakis*, 952 F.2d at 693; *Galestro*, 2008 WL 2783360 at *2.  And it thus runs afoul of "[t]he Indictment Clause of the Fifth Amendment[, which] requires an indictment [to] contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury."  *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44).  Moreover, while a money laundering conspiracy typically has "no requirement that the defendant must have committed the [predicate] crime" yielding illegal proceeds, *United States v. Smith*, 46 F.3d 1223, 1234 (1st Cir. 1995), the Indictment must at least allege facts sufficient to establish that Ms. Sun had knowledge that such proceeds were illegal.  It does not.  As such, Count Ten must be dismissed.

---

[46]    The Indictment's allegations also reflect unexplained departures from even Counts Eight and Nine.  While those counts purportedly pertain to a period "[i]n or about and between April 2020 and June 2022" (Ind. ¶¶ 124, 126), Count Ten supposedly relates to a period "[i]n or about and between January 2016 and August 2024."  (*Id.* ¶ 128.)  There are no allegations whatsoever shedding any light on that alleged period, which also differs from the period applicable to the FARA conspiracy in Count One.  (*Compare id.* ¶ 115.)

Notably, the particular SUAs that the Indictment does allege, which again are entirely unconnected to Ms. Sun, are revealing. Even though FARA can serve as an SUA, *see* 18 U.S.C. § 1956(c)(7)(D) (defining "specified unlawful activity" to include "any felony violation of the Foreign Agents Registration Act of 1938"), the government could not allege a money laundering conspiracy with FARA as the predicate. Instead, it chose two crimes with which Ms. Sun is not charged and that the Indictment wholly fails to describe. That decision can only flow from factual limitations, revealing that even the government is unconvinced by its own allegations.

This is the paradigmatic case where permitting Count Ten to stand would "allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment[, which] would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure." *Pirro*, 212 F.3d at 92 (quoting *Russell,* 369 U.S. at 770). Despite there being dozens of paragraphs accusing her of various things, the Indictment does not even remotely allege a connection between Ms. Sun and any money laundering conspiracy. Indeed, no alleged facts even *suggest* that she knowingly and intentionally conspired to "transport[], transmit[], or transfer[] a monetary instrument or funds"; that she knew that there were any such money instruments or funds that "represent[ed] the proceeds of some form of unlawful activity"; or that she knew that such transportation, transmission and transfer was designed "to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds." 18 U.S.C. § 1956(a)(2)(B)(i). Given these critical deficiencies, Count Ten must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Indictment fails to state offenses under FARA, fails to allege all essential elements constituting the crimes charged, and fails to allege offenses with sufficient

particularity.  Those failures "offend[] both the Fifth and Sixth Amendments," *Pirro*, 212 F.3d at

92 (citing *Russell*, 369 U.S. at 760–61), and require dismissal of all counts against Ms. Sun.

Dated:  November 4, 2024
      New York, New York

                                      Respectfully submitted,

                                      /s/ *Jarrod L. Schaeffer*

                                      Kenneth M. Abell
                                      Jarrod L. Schaeffer
                                      Scott Glicksman

                                      ABELL ESKEW LANDAU LLP

                                      256 Fifth Avenue, 5th Floor
                                      New York, NY 10001
                                      (646) 970-7341 / -7339 / -7338
                                      kabell@aellaw.com
                                      jschaeffer@aellaw.com
                                      sglicksman@aellaw.com

                                      *Counsel for Defendant Linda Sun*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that, on November 4, 2024, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve notification of the filing to all registered parties of record.

/s/ *Jarrod L. Schaeffer*

Jarrod L. Schaeffer