# EXHIBIT A

DMP:AAS/RP
F. #2021R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF:

███████████████████

███████████████████;

AND ALL ELECTRONIC DEVICES USED
BY LINDA SUN, CHRIS HU, MEIPING
SUN, AND GUOXIAN SUN;

AND THE PREMISES KNOWN AND
DESCRIBED AS A SAFE DEPOSIT BOX
██████████████ AT CITIBANK
BRANCH 701;

THE PREMISES KNOWN AND
DESCRIBED AS A SAFE DEPOSIT BOX
████████████████AT BANK OF
AMERICA BRANCH 487;

AND THE PREMISES KNOWN AND
DESCRIBED AS A SAFE DEPOSIT BOX
███████████████AT TD BANK
BRANCH 529.

**FILED UNDER SEAL**

APPLICATION FOR SEARCH
WARRANTS

Case No. 24 MJ 2841

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE**

I, Devin Perry, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the single-family residence known as

███████████████████████████████, as further described in Attachment A1 and below, and the single-family residence known as ████████████████████████████ ████, as further described in Attachment A2 and below, as well as (1) all closed and locked containers therein; and (2) all electronic devices, other than those that can be readily identified as belonging to members of the household other than LINDA SUN, CHRIS HU, MEIPING SUN, and GUOXIAN SUN, all for the property to be seized in Attachments B1 and B2; as well the safe deposit box ██████████████ at Citibank Branch 701 located at 502 Old Country Road, Garden City, NY 11530, as described in Attachment A3 and below; the safe deposit box ████████████ ████ at Bank of America Branch 487 located at 240 Plandome Rd Manhasset, NY 11030, as described in Attachment A4 and below; and the safe deposit box ██████████████ at TD Bank Branch 529 located at 38-19 Main Street, Flushing, NY 11354, as described in Attachment A5 and below, for the property to be seized in Attachments B3 through B5.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). Since becoming a Special Agent, I have participated in numerous investigations into organized criminal activity, during which I have, among other things: (a) conducted physical and electronic surveillance, (b) reviewed search warrant returns, (c) reviewed and analyzed recorded conversations and records, and (d) debriefed cooperating witnesses and informants. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and reports of other law enforcement officers involved in the investigation.

3.      I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law

2

enforcement authorities, and (c) review of other records and reports, including public records and reports created by news agencies.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.  Statements attributed to individuals in this affidavit are set forth in sum, substance, and in part, unless otherwise indicated.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 8 U.S.C. § 1324 (alien smuggling), 18 U.S.C. § 951 (agents of a foreign government), 18 U.S.C. § 1349 (visa fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), and 18 U.S.C. § 1001 (false statements) and conspiracies to commit the same have been committed by LINDA SUN, CHRIS HU, MEIPING SUN, GUOXIAN SUN, and others known and unknown (the "Subject Crimes").  There is also probable cause to search the locations described in Attachments A1 through A5 for evidence, instrumentalities, and/or fruits of these crimes, further described in Attachments B1 through B5.

## DESCRIPTION OF THE PREMISES

6.      The property to be searched includes a single-family residence located at ▮ ▮, depicted below.

3



7.     The property to be searched also includes the apartment located at ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████.  The edifice in which the ████████████████████████ is located is

depicted below.



8.      The property to be searched also includes the safe deposit box ▮▮▮▮ ▮▮▮▮ at Citibank Branch 701 located at 502 Old Country Road, Garden City, NY 11530 (the "CITIBANK SUBJECT DEPOSIT BOX"). Subpoena returns from Bank confirm that CHRIS HU and LINDA SUN are the primary account holder and user of the CITIBANK SUBJECT SAFE DEPOSIT BOX.

9.      The property to be searched also includes the safe deposit box ▮▮▮▮ ▮▮▮▮ at Bank of America Branch 487 located at 240 Plandome Rd Manhasset, NY 11030 (the "BANK OF AMERICA SUBJECT DEPOSIT BOX"). Subpoena returns from Bank of

America confirm that CHRIS HU and LINDA SUN are the current account holders and users of the BANK OF AMERICA SUBJECT SAFE DEPOSIT BOX.

10.    The property to be searched also includes the safe deposit box ███ ███████ at TD Bank Branch 529 located at 38-19 Main Street, Flushing, NY 11354 (the "TD BANK SUBJECT DEPOSIT BOX," or, together with the CITIBANK SUBJECT SAFE DEPOSIT BOX and the BANK OF AMERICA SUBJECT SAFE DEPOSIT BOX, the "SUBJECT SAFE DEPOSIT BOXES"). Subpoena returns from TD Bank confirm that Mei P Ying Sun, who I assess to be MEIPING SUN, is the current account holder and user of the TD BANK SUBJECT SAFE DEPOSIT BOX.

## PROBABLE CAUSE

11.    The investigation has revealed that LINDA SUN, who resides in ███ ████████████████ with CHRIS HU, and others, has agreed to act as an agent of the government of the People's Republic of China ("PRC") without prior notification to the Attorney General.  SUN, who previously worked for the New York State government, acted under the direction and control of PRC officials and agents.  MEIPING SUN and GUOXIAN SUN, who are LINDA SUN's parents and who reside in ████████████████████, have engaged in a scheme with CHRIS HU to launder proceeds of LINDA SUN's pay-to-play scheme.

I.    The Coconspirators

12.    LINDA SUN, also known as "Wen Sun" and "Linda Hu," is a naturalized U.S. citizen who was born in the People's Republic of China ("PRC") and resides in the Eastern District of New York.  From in or about 2012 until 2023, SUN worked for the New York State government, including as Deputy Chief of Staff for New York State Governor Kathy Hochul.  SUN's positions within the government included (a) Director of Asian American Affairs and Queens Regional Representative for then-Governor Andrew Cuomo from in or about August 2012

to February 2015; (b) Director of External Affairs of Global NY for Empire State Development, the economic development arm of the New York State government, from in or about April 2015 to February 2018; (c) Deputy Chief Diversity Officer for then-Governor Cuomo from in or about February 2018 to July 2020; (d) Superintendent for Intergovernmental Affairs and Chief Diversity Officer at the New York State Department of Financial Services from in or about July 2020 to September 2021; (e) Deputy Chief of Staff for the New York State Executive Chamber (the "Executive Chamber"), working as an advisor for New York State Governor Hochul, from in or about September 2021 until September 2022; and (f) Deputy Commissioner for Strategic Business Development for the New York State Department of Labor from in or about September 2022 until March 2023.

13.     CHRIS HU, a U.S. citizen, is married to LINDA SUN.  Together with SUN, HU has operated business ventures that benefited economically from SUN's activities on behalf of the PRC government, described below.  These business ventures included (a) a seafood exporter based in Queens that was organized in March 2016 (the "Seafood Company"); (b) a purported financial consultancy based in Queens organized in February 2016 (the "Financial Consultancy"); and (c) a wine and liquor business based in Queens organized in June 2021.  SUN filed the articles of incorporation for the Seafood Company with the New York State Department of State.  Additionally, HU frequently used the services a carrier business with U.S. headquarters in Queens that was an authorized freight agent by the PRC government ("Company-1").

14.     ███████████  ("CC-1") is a PRC national who became a naturalized U.S. citizen.  CC-1 serves as the president of an association of persons from Henan Province, PRC who are located in the New York metropolitan area ("Association-1").  Association-1 is a nonprofit 501(c)(3) organization closely associated with the United Front Work Department ("UFWD") and

the Chinese Communist Party ("CCP" or "Party").  The UFWD is a CCP department that attempted to manage relationships with and generate support for the CCP among elite individuals inside and outside the PRC, including by gathering human intelligence.  After 2018, the UFWD reported directly to the CCP's Central Committee, a national Party organization that helped drive political decision-making in the PRC.  In his role as principal of Association-1, CC-1 maintains contact with PRC government officials and frequently travels to the PRC for UFWD-sponsored events.

15.                  ("CC-2"), is a U.S. legal permanent resident who maintains active business interests in Shandong Province, PRC.  CC-2 also has served as principal of numerous U.S.-based Chinese organizations, including an economic interest group for persons of Chinese origin ("Association-2").

16.                  ("PRC Official-1") is a PRC diplomat who is the Consul General of the Consulate General of the People's Republic of China in New York ("PRC Consulate").

17.                  ("PRC Official-2") is a PRC diplomat who is the Deputy Consul General of the PRC Consulate.

18.                  ("PRC Official-3") is a PRC diplomat assigned to the Political Section of the PRC Consulate.

19.                  ("PRC Official-4") is a PRC diplomat assigned to the Political Section of the PRC Consulate.

## II.  Legal Requirements for Agents of Foreign Governments

20.       An individual who acts in the United States as an agent of a foreign government is required to provide prior notification to the Attorney General, under the rules and regulations established by the Attorney General.  See 18 U.S.C. § 951(b); 28 C.F.R. §§ 73.1 et seq.

21.     The term "agent of a foreign government" includes an individual who agrees to operate within the United States subject to the direction and control of a foreign government or official.  See 18 U.S.C. § 951(d).

III.    The Criminal Scheme

22.     While working for the New York State government, LINDA SUN's core responsibilities included acting as a liaison with Asian communities in New York State, including the Chinese diaspora community.  In furtherance of these responsibilities, SUN regularly communicated with PRC diplomatic and consular establishments in the United States, including the Embassy of the PRC in the United States of America ("PRC Embassy") and the PRC Consulate.  SUN communicated with the heads of these establishments, including the PRC Ambassador to the United States and PRC Official-1, as well as their deputies and support staff, including PRC Official-2, PRC Official-3, and PRC Official-4.  For example, SUN facilitated communications between the PRC establishments and the governor's office, arranged for meetings between various representatives of the PRC government and the New York State government, and coordinated appearances by heads of New York State government at events involving the PRC establishments or Asian communities.  As another part of her core responsibilities, SUN helped coordinate constituent services for Asian communities.

23.     However, throughout much of her employment with New York State government, LINDA SUN acted to benefit the PRC government and traded access for various PRC government representatives and agents, in return for economic considerations.  While acting at the direction of the PRC Consulate, SUN limited access to the governor's office of representatives of the Taipei Economic and Cultural Representative Office in the United States ("TECO")—the de facto embassy of the Republic of China ("ROC," also known as Taiwan), provided PRC consular officials with access to information from a nonpublic New York State database and to a nonpublic

9

New York State government call concerning the response to the COVID-19 pandemic, and implemented directives as to the governor's messaging regarding issues of importance to the CCP. Additionally, SUN repeatedly violated internal rules and protocols within the New York State governor's office to provide improper benefits to PRC representatives and agents, including by (a) providing unauthorized invitation letters from the office of the New York State governor that were used to facilitate travel by PRC government representatives into the United States; (b) drafting a fake employment letter from the New York State governor's office for CC-1 to use in the PRC; and (c) obtaining official New York State governor proclamations for PRC government representatives without proper authorization.   Finally, SUN attended—ostensibly as a representative from the New York State governor's office though she lacked authorization to do so—official PRC government events in the PRC, including events co-hosted by the UFWD.  SUN did not notify the Attorney General of her acts as an agent of a foreign government.

24.     The economic considerations for LINDA SUN's illicit acts included facilitation for millions of dollars in transactions for CHRIS HU's businesses, travel benefits, tickets to events, promotion of Company-1, employment for SUN's cousin in the PRC, and Nanjing-style salted ducks prepared by PRC Official-1's personal chef that were delivered to the residence of SUN's parents.  HU laundered the monetary proceeds to purchase, among other items, real estate in Manhasset, New York currently valued at $4.05 million, a condominium in Honolulu, Hawaii currently valued at $2.1 million, as well as various luxury automobiles, including a 2024 Ferrari.  SUN never disclosed these benefits from the PRC government and its representatives to the New York State government, as she was required to do as a New York State employee.

A.    SUN Prevents TECO Representatives from Meeting High-Level New York State Officials

25.    The PRC constitution asserted that the islands of Taiwan were a part of the PRC, though the PRC has not controlled these areas since the PRC was established in or about 1949.  In accordance with this claim, the CCP legislature also reserved a position for representatives of the geographic areas controlled by the Taiwanese government.  Since in or about the 1970s, the PRC and Taiwan have competed for diplomatic recognition worldwide.

26.    Neither then-Governor Cuomo nor Governor Hochul had a policy of either declining to meet with Taiwanese representatives or recognizing Taiwan. Beginning no later than 2016, however, LINDA SUN acted at the direction of the PRC Consulate to minimize contact between Taiwanese government officials and the governor's office. [1]  For example, in repeated written communications with PRC Consular representatives, including PRC Official-1 and PRC Official-3, SUN bragged that she had successfully prevented TECO from meeting with Governors Cuomo and Hochul.  In return for these and other acts, the PRC Consulate provided SUN and her family with gifts, including tickets to shows, concerts, and events, as well as salted ducks prepared by PRC Official-1's personal chef.  The PRC Consulate also agreed to promote Company-1, a business that SUN characterized as CHRIS HU's company.

27.    On or about June 9, 2016, LINDA SUN wrote a PRC Consular official, "Just FYI for you, the Taipei economic office is trying to secure the Lt. Governor for an event in DC during Select USA.  They sent the invitation to another colleague trying to bypass me.  I am working on it right now to resolve the issue."  After the consular official responded, "Thank you [f]or letting me know," SUN wrote, "It's all been taken care of satisfactorily."

---

[1]    All translations are in draft form and are subject to revision.

28.    On or about November 1, 2017, the TECO political director wrote LINDA SUN to thank her for meeting and to invite government officials and scholars to travel to Taiwan in December 2017 to discuss, among other topics, Taiwanese foreign affairs, security, and industrial innovation.  The email also contained the TECO political director's contact information. SUN forwarded the message to PRC Official-4.  There is no record of an email response by SUN to the TECO political director.

29.    In January 2019, LINDA SUN wrote to PRC Official-3, "I very much value my relationship with the consulate and have done many things to make the relationship between the state and the consulate flourish during my tenure with the Governor.  Certainly I have managed to stop all relationships between the TECO and the state.    I have denied all [r]equests from their office."  PRC Official-3 responded, "I know and do appreciate your help."  PRC Official-3 also indicated "with us now in the political section, you are the most important hub connecting us with Gov. Cuomo and his team."

30.    On or about February 27, 2019, LINDA SUN directed a member of then-Governor Cuomo's staff to decline a request for a meeting between a mayor of a Taiwanese city and then-Governor Cuomo.  SUN instructed, "No to the request.  Explain in person."

31.    On or about April 5, 2019, the TECO deputy consul wrote to LINDA SUN to arrange a lunch meeting, so that SUN could meet the new TECO Director of Political Affairs. After TECO's repeated requests to schedule a meeting, SUN wrote that "our director of Asian American Affairs and I would rather pay an office visit.  We can also order in if it is around lunch time."  SUN and the Director of Asian American Affairs agreed to a meeting to occur on or about May 1, 2019 at the TECO office.  On April 30, 2019, the Director of Asian American Affairs wrote

to postpone the meeting.  There is no record of an email response by SUN or the Director of Asian American Affairs to the deputy consul's subsequent request for alternate dates.

32.    On or about July 5, 2019, the TECO deputy consul wrote LINDA SUN that the Taiwanese President would be visiting New York City on July 12, 2019 and invited SUN and then-Governor Cuomo to attend a banquet in Manhattan.  Several minutes later, SUN forwarded the email to PRC Official-4, writing "FYI."  Contemporaneously, SUN texted PRC Official-4, "I sent you an email / Just an FYI / I already blocked it."  PRC Official-4 responded, "Got [i]t / Thanks."  On July 6, 2019, SUN replied to the TECO deputy consul, declining the invitation because "the Governor is hosting summer activity day for staff in the Catskills on that day."  In fact, the summer activity day occurred on July 11, not July 12, 2019.  Before SUN declined the invitation on then-Governor Cuomo's behalf, there is no record of SUN either forwarding the TECO deputy consul's invitation to the Executive Chamber's invitations office or checking then-Governor Cuomo's schedule for July 12.

33.    On or about July 10, 2019, LINDA SUN sent the following email message to a staff member in the Executive Chamber: "I wanted to check if there's a particular event in the system."  In a follow-up email, she clarified that the event was a "dinner banquet hosted by . . . [the] President of Taiwan.  It's on Friday I believe."  As reflected by the email from the TECO deputy consul, the event for the Taiwanese President was scheduled for Friday, July 12, 2019.  The following day, another staff member in the Executive Chamber wrote, "I am not seeing that we have anything for tomorrow (or at all)."  SUN responded, "Perfect!"

34.    On or about July 10, 2019, SUN sent the following SMS message to PRC Official-1, referencing the July 12, 2019 event for the Taiwanese President: "[T]he mayor

[referring to then-New York City mayor Bill de Blasio] will not be attending the event on Friday. I've confirmed with his staff." PRC Official-1 responded, "Thank you so much!"

      35.    As reflected in open-source materials and photographs found in one of her electronic accounts, on or about July 12, 2019—the date of the scheduled event for the Taiwanese President—LINDA SUN and various leaders of local Chinese associations participated in a protest in Manhattan against the Taiwanese President's visit to New York City. CC-1 was aware that SUN attended the protest. The photograph below, depicting SUN at the protest, is from a news publication.



      36.    On or about August 6, 2019, the new TECO director for political affairs invited LINDA SUN to coffee or to a meeting at SUN's office to introduce him- or herself. The next day, on or about August 7, 2019, SUN wrote to PRC Official-1, "As you know, I have successfully blocked all formal and informal meetings between the Governor, Lt. Governor and TECO. I myself have maintained a bare minimum of a relationship with them." Further, SUN also asked for direction as to how to address a TECO request—likely referencing the previous day's email invitation from TECO: "With regard to their current request," she continued, "I would assume that a visit to the Governor's office is probably best avoided lest it leads to ramifications

of them claiming that [we] are recognizing them?  But wanted to make sure we are on the same page."

37.     Almost a week later, on or about August 13, 2019, LINDA SUN responded to the August 6, 2019 email from the TECO Director of Political Affairs, offering to "meet at Pret [a Manger] near our office if you want."  According to internal correspondence, SUN and her office's Director of Asian American Affairs met with the TECO representative on or about August 20, 2019.

38.     On or about August 21, 2019, LINDA SUN messaged PRC Official-4 that "one area that TECO is better than you guys," referring to representatives of the PRC Consulate, was "outreaching."  SUN continued, "[T]hey regularly reach out to me to have coffee.  Same with all other reps in other electeds [sic] offices.  Not that we need to have coffee because we are in regular contact."  SUN continued, "It might be helpful to building a better relationship. Not everyone is like me :)"

39.     In late August 2019, LINDA SUN provided a single proposed edit to a draft statement by the governor commemorating soldiers and veterans of the U.S. and Taiwanese armed forces: "Politically can we refrain from using the phrase 'Republic of China' so as to avoid creating an international incident by recognizing Taiwan."  SUN eventually indicated her approval of a draft statement that removed all references to the "Republic of China."

40.     On or about September 5, 2019, the TECO Director of Political Affairs wrote LINDA SUN to invite the governor to attend Taiwan's national day event on October 7, 2019 at a hotel in Manhattan.  After various members of the governor's office asked SUN to weigh in regarding the appropriate response, SUN advised against attending the event.  On or about September 12, 2019, SUN instructed the office's Director of Asian American Affairs, "No

message and no rep." On or about October 2, 2019, the TECO Director of Political Affairs wrote SUN again to ascertain her office's availability for the event—suggesting that the governor's office had not responded to the initial invitation. There is no record of an email response by SUN to the TECO Director of Political Affairs.

41.    On January 13, 2020, the TECO Ambassador wrote a letter to then-Governor Cuomo informing the governor of the latest presidential election results in Taiwan and writing, "I will be honored to forward your congratulatory message to Taipei." An employee in the governor's office forwarded the letter to LINDA SUN and asked for her input. SUN responded, "No letter; would set off political firestorm."

42.    On or about May 7, 2020, following onset of the COVID-19 pandemic, LINDA SUN wrote PRC Official-1, "Taipei economic and cultural office donated 200,000 surgical masks. No formal acknowledgment but I will be arranging for the Lt. Gov to call their office to thank them. Just wanted to update you." PRC Official-1 thanked her for the update.

43.    On or about August 3, 2020, the TECO Director of Political Affairs informed LINDA SUN of the passing of a former Taiwanese president, writing, "May our office respectfully request a condolence letter or message from the Governor?" There is no record of an email response by SUN to the TECO Director of Political Affairs.

44.    On or about October 25, 2020, LINDA SUN and PRC Official-2 communicated in a text exchange. After PRC Official-2 praised Governor Cuomo's pandemic efforts, SUN wrote, "I'm still in charge of all Asian affairs. A few weeks [ago] when we released a press release for international travel—I almost had a heart attack when we referred to Taiwan as a country. Thankfully I had the press team correct it immediately." PRC Official-2 responded,

16

"Thank you for your every effort to improve understanding and cooperation between the two great peoples of China and the United States.  Keep in touch."

45.     On or about December 20, 2021, a Taiwanese association invited the Governor Hochul's Director of Asian American Affairs to an event honoring the association's membership.  After the Director of Asian American Affairs requested a framed letter to be presented at the event, LINDA SUN wrote, "Officially we've never met with any representatives of the Taiwanese government, including representatives here . . . . I recommend we keep the letter very specific to the organization's contributions to the ppl of New York and the greater Chinese-American community."

46.     On or about December 22, 2021, TECO requested a meeting between the TECO Ambassador and the new Lieutenant Governor.  In response, LINDA SUN advised, "We've generally not taken these meetings.  Gov did not as LG [Lieutenant Governor] and I would recommend the LG does not take this meeting.  It is a very sensitive subject."  In a later email, SUN further recommended that "any engagement" with TECO "needs to be kept at staff level."

47.     On or about March 3, 2022, the principal of a nonprofit organization that promoted Taiwan wrote to LINDA SUN, to thank the governor for spending time with him the previous week.  The email attached a photograph depicting the governor and the principal holding a baseball jersey featuring the word "Taiwan."  SUN forwarded the email internally, asking when the meeting occurred and writing, "I really want to avoid any photos of her posing with anything that says Taiwan on it.  I'd like to avoid us losing support with the majority of Chinese American groups."  In a later email in the same thread, she added, "Most of my community leaders would los[e] their minds over this."

48.    On or about April 21, 2022, an employee in the governor's office wrote LINDA SUN, indicating receipt of an invitation to recognize May 8 to 15 as "Taiwanese American Heritage Week."  After the employee asked how the governor's office should respond, SUN wrote, "Please do not issue.  Thank you."

49.    On or about May 2, 2022, a member of the New York State Assembly invited the governor to attend a meeting with the TECO Ambassador.  When asked whether the governor should attend such a meeting, LINDA SUN wrote, "No meeting please.  Kindly decline. Do not want her to wade into this China/Taiwan sensitivity."

B.    SUN Provides Non-Public Information to PRC Consular Officials

50.    In addition to preventing TECO representatives from developing ties with the Executive Chamber, LINDA SUN repeatedly provided PRC consular officials with access to nonpublic information belonging to New York State, including information from a nonpublic New York State database, and access to a nonpublic call regarding the New York State government's response to the COVID-19 pandemic.  Additionally, SUN helped shape the governor's official statements to conform with expectations of the PRC Consulate.

51.    In or about January 2019, LINDA SUN shared with PRC Official-3 information from a nonpublic New York State government database regarding a non-governmental organization ("NGO") registered in New York ("NGO-1").

52.    On or about January 22, 2019, PRC Official-3 asked LINDA SUN, "If an NGO claims it has registered in New York, what website or resources can I use to verify its authenticity?"  On January 23, 2019, SUN replied, "I can look into it when I'm back in the office."

53.    On or about January 24, 2019, LINDA SUN wrote PRC Official-3, "Our office does have an internal verification system because we give funding to many ngos."  PRC Official-3 responded, "Sounds great.  Is that system open to the public?  Or shall I go through

18

some protocol if I want to verify a certain ngo?" SUN offered to "verify for [PRC Official-3]." SUN continued that "the system isn't open to the public," but noted that there was "no protocol necessary. I can just ask our vetting team to verify for you." PRC Official-3 thanked SUN and directed her "help verify [NGO-1's registration status]" and asked if SUN could "guide [PRC Official-3] to any public disclosure [regarding NGO-1's] funding, activities and leadership." SUN responded, "Sure."

54.    In a follow-up message, PRC Official-3 asked, "If I am just an ordinary citizen here, without connection with people in the government, which government agency can help with such a request as to verification and getting access to public disclosures of an NGO?" LINDA SUN responded, "[P]ossibly the department of state," but "I have to double check. We have someone on staff who overse[e]s all the ngos in the state. I can go pick her brain."

55.    On January 28, 2019, LINDA SUN used her personal email account to send an email message to PRC Official-3. SUN wrote, "[H]ere is the information regarding [NGO-1]. From our internal database, they are a legitimate organization." She then provided information about whether NGO-1 had active contracts with New York State. Indicating that she had also relied upon open-source websites to gather information about NGO-1's funding and leadership, SUN instructed PRC Official-3 how to perform such open-source searches. On January 30, 2019, PRC Official-3 asked SUN to "look up in your system about whether [NGO-1's registration date] corroborates" the open-source information that SUN had provided. Two days later, SUN responded "I will have the vetting team do a bit more research."

56.    In another example of LINDA SUN providing PRC consular officials with access to nonpublic information, on or about March 16, 2020, SUN surreptitiously dialed in PRC Official-4 to listen into a New York State government conference call concerning the health

response to the COVID-19 pandemic and the administration's response to rising hate crimes against Asian Americans.  Speakers on the conference call included the then-New York State Commissioner for the Division of Human Rights and the then-Director of Education and Outreach for the Center for Environmental Health at the New York State Department of Health. The call was not open to the public, and PRC Official-4's name did not appear on the invitation list. During the call, SUN repeatedly admonished PRC Official-4 in writing to "keep your phone muted" and provided a brief written summary of the call.  At the close of the call, PRC Official-4 commented that the call was "[v]ery useful."

57.     In or about early 2021, LINDA SUN provided the PRC Consulate with access to shape the content of then-Lieutenant Governor Hochul's public remarks.  Specifically, SUN took action to ensure that then-Lieutenant Governor Hochul did not publicly address the detention of Uyghurs in PRC state-sponsored camps in Xinjiang Province, PRC.

58.     On or about January 12, 2021, PRC Official-4 wrote LINDA SUN to inquire as if then-Governor Cuomo would like to make a short video commemorating the Lunar New Year. The following day, SUN replied, "[l]et me ask but likely the LG [then-Lieutenant Governor Hochul] can [probably] do it." After exchanging a few messages about the request, SUN asked "Do you have time for a call later?" PRC Official-4 replied that he was available and set a time to speak with SUN on the phone.  On or about January 19, 2021, SUN confirmed with PRC Official-4 that then-Lieutenant Governor Hochul had agreed to deliver the speech.  SUN asked if there were any themes or topics [Hochul] should include in her speech.  PRC Official-4 replied, "Mostly holiday wishes and hope for friendship and cooperation / Nothing too political."  SUN responded, "Ok."

59.     On or about January 25, 2021, LINDA SUN corresponded with PRC Official-1 about the then-Lieutenant Governor's Lunar New Year message.  PRC Official-1 wrote SUN that he or she had read the text of the message sent by SUN and "it is very good."  PRC Official-1 continued that she "sincerely appreciate[d]" SUN for sending the message.  SUN replied that it was unnecessary to thank her, adding that the then-Lieutenant Governor listened to her advice more than the then-Governor.  SUN also wrote PRC Official-1 detailing that she had had an argument with the governor's speech writer concerning the draft Lunar New Year message.  SUN wrote that the speech writer had insisted that the Lieutenant Governor mention the "Uyghur situation" in the PRC during the speech.  PRC Official-1 commented that the speechwriter likely had never been to the PRC before and did not know the PRC well.  SUN agreed that the speechwriter had never been to the PRC and that SUN was starting to lose her temper.  PRC Official-1 wrote SUN that U.S.-PRC relations turn sour because of people like the speech writer.  SUN promised that she would figure out how to remedy the situation the following day, adding that she could not let the Lieutenant Governor mention the situation.  In fact, in her public Lunar New Year message for 2021, then-Lieutenant Governor Hochul did not refer to the plight of Uyghurs in the PRC.

### C.    SUN Acts Under the Direction of CC-1 and CC-2

60.     Beginning in or about 2017, LINDA SUN repeatedly acted under the direction of CC-1 and CC-2, whom SUN understood were providing directives on behalf of the PRC government.  Pursuant to these directives, and among other actions, SUN facilitated travel for two governmental delegations from Henan Province, PRC, to travel to the United States, and sought to cause the New York State governor's office to enter into a memorandum of understanding with Henan Province regarding a proposed economic exchange.  Additionally, CC-1 and CC-2 arranged for SUN to travel overseas to attend official PRC functions, ostensibly on

behalf of the New York State government, and paid for SUN's accommodations during those trips. In return for SUN's actions, CC-1 and CC-2 materially assisted CHRIS HU's business in the PRC. Notably, SUN did not report the cost of her accommodations or the financial assistance from CC-1 or CC-2 on her financial disclosure forms for the New York State government, as she was required to do.

61.     In written communications with LINDA SUN, CC-1 made clear that he was acting on behalf of the PRC government.  For example, in 2018, CC-1 informed SUN that CC-1 was then attending a "Belt & Road Initiative" round table meeting in Henan Province, PRC.[2]  In these communications, CC-1 indicated that CC-1's round table meeting in Henan Province was organized by five overseas Chinese affairs offices of the Henan Provincial People's Government, and that CC-1 was the only overseas Chinese person to represent Chinese people from Henan and would be giving remarks at the meeting.

i.     Early Communications about HU's Business Interests

62.     As early as 2016, CC-1 and LINDA SUN discussed how to expand CHRIS HU's seafood exporting business into the PRC.  In or about May 2016, CC-1 shared a news article with SUN about the first shipment of live lobsters from a United States city to Zhengzhou, a city in Henan Province, PRC.  In response, SUN asked CC-1 if "we [SUN and HU] still have the chance to do [this business]."  CC-1 replied that [SUN and HU] surely have the opportunity of [selling

---

[2]     The Belt and Road Initiative is a global infrastructure development strategy adopted by the PRC government to invest in nearly 70 countries and international organizations.  The Belt and Road Initiative is considered a centerpiece of PRC foreign policy.  While the PRC government touted the project as an effort to enhance regional connectivity, a U.S. State Department report characterized it as the PRC government engaging in debt-trap diplomacy to fund infrastructure projects that the loan recipients could not afford.  According to the report, PRC banks have engaged in lending practices that appeared to purposefully trap foreign governments to gain strategic opportunities for the PRC, including by pressuring the foreign governments to support the PRC's geostrategic interests.  In one notable example, Sri Lanka lost control of a port to the PRC after defaulting on loans it took out under the Belt and Road Initiative.

live seafood to the PRC]."  In June 2016, CC-1 sent SUN a message indicating that he was in Henan Province and reiterated that "[his associates] hope that [SUN and HU] can export [live] lobsters to [Henan]."

ii.    SUN's Family and Company-1 Employees Travel to Henan

63.    In or about February and March 2017, CC-1 arranged for LINDA SUN to attend and speak at the "China Henan International Investment & Trade Fair," taking place in Zhengzhou, Henan Province at the end of March 2017.  CC-1 asked SUN to speak on behalf of New York State regarding economic trade relations between the PRC and New York State, in the context of the Henan Province Free Trade Zone.  In response, SUN forwarded CC-1 an official Global NY PowerPoint presentation that she planned to deliver.  However, SUN did not have authorization to speak on behalf of Global NY at that event.  CC-1's organization handled SUN's registration for the event.  CC-1 also agreed to make local travel arrangements, including hotel accommodations, for SUN and her family, CHRIS HU's PRC-based business partner (the "Business Partner"), and several representatives—including the principal—of Company-1.

64.    LINDA SUN was aware that the PRC government had organized and partially funded the trip.  A close associate of CC-1 (the "Associate") wrote to SUN that the Overseas Chinese Affairs Office—a PRC government body which, after 2018, became directly managed by the UFWD—had booked two rooms for SUN's party.  On or about February 1, 2017, amid planning discussions, SUN wrote that representatives of the Henan provincial government had given a red envelope containing $200 to SUN's young son.  Later, in written communications with the principal of Company-1, SUN wrote that "main dinner is set by the Henan government" and clarified that "the Henan government is setting up a special itinerary for you and [CHRIS HU]."

65.     While coordinating travel logistics, CC-1 and LINDA SUN discussed CC-1's efforts to help CHRIS HU's business in the PRC, including discussing the viability of importing frozen seafood from the United States to Henan Province.  In messages to SUN, CC-1 agreed to make efforts to personally intervene as to PRC customs issues and arranged business meetings for HU to discuss the importation of lobsters into the PRC.  In a separate chat, SUN indicated that HU would meet with the "Commercial Department" while he was in Henan Province. According to written correspondence, CC-1 did ultimately arrange multiple business meetings for HU in Henan Province and facilitate business meetings for HU elsewhere in the PRC, including with a director of the Commercial Department in Nanjing.  In or about March 2017, the Associate wrote that "several appointments" had been scheduled between HU and "officials from the Airport Free Trade Zone and the Wholesale Market" during HU's visit to Henan Province.  Writing to the principal of Company-1, SUN commented, "[CC-1] wants to make sure he sets up special meetings" for the principal of Company-1 and HU.  In response, the principal of Company-1 agreed that Chinese Associations like Association-1 (of which CC-1 was president) are "somewhat useful to do business in [C]hina."

66.     On or about March 26, 2017, LINDA SUN and her parents flew from John F. Kennedy International Airport in Queens, New York to Shanghai Pudong International Airport, with an ultimate destination of Zhengzhou Xinzheng International Airport in Zhengzhou, Henan Province.  CHRIS HU arrived in Zhengzhou on or about March 29, 2017.  After their arrival, CC-1 agreed to arrange for HU and the representatives from Company-1 to attend the fair's symposium on e-commerce.

67.     Later in 2017, CC-1 and CC-2, who was the principal of Association-2 and a close contact of CC-1, continued to help CHRIS HU cultivate business in the PRC.  In

communications from November 2017, CC-1 and CC-2 discussed a business proposal by HU, apparently for a project in the PRC.  CC-1 and CC-2 discussed ways to improve the proposal, including by adding the construction of an ocean park to procure more land, as well as the possibility of traveling to Shandong, PRC with HU.  In a follow up message, CC-1 "recommend[ed]" that "[CC-2] try to finalize Chris's project" before leaving the PRC; CC-2 responded, "Ok."  Later, in December 2017, CC-2 invited HU to visit Qingdao, Weihai, and Yantai—three cities in Shandong Province, PRC.  CC-2 stated that the vice president of one of CC-2's organizations would accompany HU in Qingdao, and CC-2 would meet HU in Yantai.  CC-2 further indicated that he had contacted government leaders in Qingdao, Weihai, and Yantai on behalf of HU.

68.     On January 5, 2018, CHRIS HU flew from John F. Kennedy International Airport in Queens, New York to Guangzhou Baiyun International Airport in Guangzhou, PRC.

iii.    SUN Travels to the PRC for UFWD Event

69.     In early 2018, CC-1 and CC-2 helped arrange for LINDA SUN to travel to the PRC in 2018 to speak at a conference sponsored by the All-China Federation of Returned Overseas Chinese ("ACFROC"), which was a UFWD agency.  As contemplated, SUN would be accompanied by CC-2 and representatives from the Overseas Chinese Affairs Office.  In written correspondence, CC-1 indicated that CC-2 would book SUN's hotel in the PRC and asked for SUN's resume.  SUN sent CC-1 English- and Chinese-language versions of the resume, and CC-1 asked her to make sure to include her current position in the resume.  SUN asked CC-1 to help CHRIS HU, indicating that it would be HU's first investment in the PRC and that HU did not understand much.  She further indicated that the "loan" would be HU's first.  CC-1 agreed to help and indicated that CC-2 would give a maximum effort.

70.     LINDA SUN traveled between New York City and Beijing, PRC, leaving from John F. Kennedy International Airport in Queens, New York on January 30, 2018 and returning on February 3, 2018.   According to written correspondence, CC-2 made travel arrangements for SUN, including reserving a presidential suite previously used by First Lady Michelle Obama during her stay in Beijing.

71.     A February 2018 press clipping from a PRC news agency reported on a meeting between a delegation of Association-2 members and ACFROC members.   The article featured a photograph of LINDA SUN (fourth from left) and CC-2 (third from left) standing together with various ACFROC members, including the Chairman and CCP Party Secretary of ACFROC.   Notably, in an electronic communication from February 2018, SUN sent a link to a news article to her parents about a delegation of the U.S. Federation of Chinese-American Entrepreneurs visiting the Deputy Director of the Overseas Chinese Affairs Office.



72.     In written correspondence from 2018, CC-1 and CC-2 continued to assist CHRIS HU's PRC business affairs, as SUN had requested in return for her participation in the ACFROC meeting conference.  In May 2018, in response to a solicitation from CC-2 to HU and the Business Partner for an update on the project's progress, HU provided a document titled "The Lobster Project Entry Agreement."

iv.     SUN Drafts Fraudulent Invitation Letter for Henan Delegation's 2018 Visit to New York _____

73.     In the spring of 2018, CC-1 tasked LINDA SUN with arranging for a delegation from Henan Province, PRC, to travel to the United States and to meet with then-Lieutenant Governor Hochul.  On March 18, 2018, CC-1 provided SUN a list of delegation members in Chinese and English and a draft, English-language invitation letter called "Reference of Invitation Letter" for then-Lieutenant Governor Hochul's signature, which would assist the delegation in obtaining travel visas to enter the United States.  On or about March 23, 2018, SUN messaged CC-1 and notified him that "the letter is done, however the Lieutenant Governor has not signed it yet."  On or about March 26, 2018, CC-1 asked SUN to "send him the original with the Governor's signature which he will then bring to Henan."  The following day, after CC-1 asked "if there had been any word from the Governor," SUN responded "not yet" and indicated that she "can ask if she can use the Lieutenant governor's signature stamp."

74.     On or about March 29 and April 5, 2018, LINDA SUN provided CC-1 two versions of an invitation letter she had drafted without authorization from the governor's office. SUN had relied on language from a previously authorized invitation letter for a delegation from Jiangxi Province.  The letter drafted by SUN for CC-1 was signed by hand with a falsified version of the then-Lieutenant Governor Hochul's signature.

75.     On or about May 30, 2018, CC-1 wrote LINDA SUN regarding the arrival and departure times for the delegation from Henan Province at LaGuardia Airport and John F. Kennedy International Airport, respectively.  The next day, CC-1 wrote SUN to reiterate the arrival and departure times and requested that SUN arrange tours of Columbia and Cornell Tech campuses in New York City for the delegates, whom CC-1 characterized as high level.

76.     On or about June 1, 2018, several members of the Henan Province delegation successfully applied for U.S. entry visas; they identified themselves on their visa applications as members of a delegation of Henan Provincial government officials.  These individuals listed "Kathleen C. Hochul" as the name of their contact person in the U.S. and listed LINDA SUN's personal cellular telephone number as their contact phone number in the United States.

77.     On or about June 4, 2018, LINDA SUN informed CC-1 that the Henan Province delegation could not meet with then-Governor Cuomo during their visit.  On June 5, 2018, CC-1 asked SUN if meeting with the Lieutenant Governor would pose a problem.  SUN informed CC-1 that she had already arranged for the Henan Province delegation to meet with then-Lieutenant Governor Hochul on June 26, 2018.

78.     On or about June 26, 2018, the Henan Province delegation met with then-Lieutenant Governor Hochul to discuss economic cooperation between Henan Province and New York State.  Metadata from the below photograph indicates that it was taken on June 26, 2018 at or around the same city block in Manhattan as the Office of the Governor of the State of New York.



The photograph depicts then-Lieutenant Governor Hochul standing with CC-1 (third from left) and members of the Henan Province delegation. In the photograph, then-Lieutenant Governor Hochul holds the gift that was presented to her by members of the delegation. Notably, four days earlier, CC-1 informed LINDA SUN that the delegation would present to the then-Lieutenant Governor an embroidered depiction of a famous Chinese painting.

79.     Later that same day, LINDA SUN, CC-1, two delegates from the PRC Consulate, as well as various leaders of local Chinese associations, participated in a welcome dinner on behalf of the delegation from Henan Province.

v.    SUN Grants Official New York State Title to CC-1

80.     On or about August 30, 2018, CC-1 told LINDA SUN that, to further promote cooperation between New York State and Henan Province, SUN should assign an official title from New York State to CC-1.  CC-1 wanted the official title to facilitate his direct communications with principals of the Henan Provincial government, including the provincial governor, regarding the contemplated economic cooperation between Henan Province and New York State.  CC-1 also indicated that CC-1 was planning to travel to Henan Province the following day. SUN replied, "Asian American Advisory Council."  At that time, SUN was serving as the Deputy Chief Diversity Officer for then-Governor Cuomo and was a Co-Director of the Governor's Asian American Advisory Council, which was established in or around March 2018.

81.     In the same conversation, CC-1 asked for a paper document reflecting this position, and LINDA SUN indicated she would write something to CC-1 on paper with her office's letterhead.  She instructed CC-1 never to let anyone know about what she had just done because she was already being asked by people from the community about why she had issued the invitation letters for the Henan Province delegation.  CC-1 told SUN that, if she were asked questions by the local Chinese community, she should indicate that the governor had instructed her to write the letter.  CC-1 added that Association-1 and CC-1 appreciated SUN's help.

82.     CC-1 was assisted by the Associate in CC-1's effort to lobby LINDA SUN to grant CC-1 a New York State title. On August 28, 2018 – two days before SUN notified CC-1 that she would write something to CC-1 on paper with her office's letterhead – CC-1 and the Associate discussed how to secure a title from SUN. The following day, after speaking with SUN, the Associate wrote that the SUN instructed that CC-1's title "can only be used to promote cooperation among the leaders of Henan Province" and "cannot be shared externally when [CC-1] returns to the United States." CC-1 responded, "Okay."

vi.    SUN Returns to the PRC for UFWD Events

83.    In September 2019, CC-1 arranged for LINDA SUN return to the PRC to attend other UFWD meetings.  SUN traveled to Beijing, PRC on or about September 26, 2019 and returned to the United States through South Korea on or about October 17, 2019.  CC-2 paid for SUN's lodging in the PRC and coordinated her travel within the PRC.  This travel coincided with receptions in Beijing celebrating the 70th anniversary of the PRC's founding.

84.    One of LINDA SUN's electronic accounts contained the images below of invitations to events hosted by national-level PRC government organizations.  The first photograph depicts the invitation to an event titled "Celebrating the 70th Anniversary of the founding of the People's Republic of China" hosted on or about September 28, 2019 in Beijing.  According to the invitation, the host organizations were the General Office of the Chinese People's Political Consultative Conference ("CPPCC"); the UFWD of the CCP Central Committee; the Overseas Chinese Affairs Office of the State Council; the Hong Kong and Macao Affairs Office of the State Council; the Taiwan Affairs Office of the State Council; and ACFROC.  The second photograph depicts a similar event occurring on or about September 29, 2019 in Beijing.





85.     According to her August 15, 2019 registration for the event, LINDA SUN listed her institution title as "Chairman of the Youth Committee of [Association-2]"—the organization of which CC-2 served as principal—and her position as "New York State Deputy Chief Diversity Officer."

86.     According to written correspondence and contemporaneous photographs, LINDA SUN attended the 70th anniversary event held in Beijing in September of 2019.  SUN is pictured in the center of the below photograph, with CC-1 and CC-2 pictured on her right and left, respectively.



87.     On or about September 29, 2019—while LINDA SUN was in the PRC—CC-1 wrote SUN that SUN had been hired as a committee member for ACFROC. CC-1 instructed SUN to fill out the registration form and attend the meetings. On or about October 11, 2019, because SUN had not yet prepared the registration form, SUN requested that CC-1 find someone to prepare the form on her behalf. On or about October 29, 2019, CC-2 wrote to a representative of ACFROC that SUN's title was "Chairman of the Youth Committee" of Association-2.

      vii.    <u>SUN Drafts a Second Fraudulent Invitation Letter for Henan Delegation's 2019 Visit to New York</u>

88.     In the fall of 2019, LINDA SUN facilitated the travel of another delegation from Henan Province to the United States through another fraudulent invitation letter; this fraudulent letter was submitted by four members of the delegation to the U.S. Department of State in support of their applications for travel visas to enter the United States.

89.     The letter, dated September 18, 2019, invited the delegation to visit New York State in October 2019. According to the letter, the purpose of the trip was to further greater

economic cooperation between Henan Province and New York State.  The letter was written on then-Governor Cuomo's letterhead but was purportedly signed by then-Lieutenant Governor Hochul. In fact, the handwritten signature was falsified. Neither then-Governor Cuomo, then-Lieutenant Governor Hochul, or their respective staffs authorized LINDA SUN to draft or issue an invitation letter in support of the Henan Province delegation's proposed visit to the United States.

90.    At LINDA SUN's written direction, CC-1 personally retrieved the letter from SUN's office in Manhattan.  On or about September 20, 2019, while located in Eastern District of New York, CC-1 electronically conveyed the letter to his contact in the PRC.

91.    On or about October 15, 2019, the U.S. Department of State approved B1/B2 visas for four members of the Henan Province delegation ("Delegate-1," "Delegate-2," "Delegate-3," and "Delegate-4"); the other members of the delegation already had valid visitor's visas.  The letter drafted by LINDA SUN was appended to the four visa applications.  According to U.S. Department of State records, the delegation was "[g]oing to visit Governor Cuomo as the . . . delegate[s] from Henan province.  Trip aimed at furthering greater economic cooperation between Henan Province and NY State."

92.    On or about November 4, 2019, Delegate-1, Delegate-2, Delegate-3, and Delegate-4 entered the United States at John F. Kennedy International Airport in Queens, New York pursuant to the B1/B2 visas that had been fraudulently obtained through LINDA SUN's assistance.

       viii.    <u>HU's Seafood Business Conducts Millions of Dollars of Business Between 2016 and 2019</u>

93.    Between mid-2016 and late 2019 – during which time LINDA SUN traveled to the PRC on multiple trips organized and partially funded by CC-1, CC-2, and associated

organizations; issued two fraudulent invitation letters to CC-1 with the knowledge that they would be disseminated to PRC government delegations from Henan Province; and granted a New York State title to CC-1 – CHRIS HU's Seafood Company generated millions of dollars of business from the PRC. Between November 2016 and December 2019, the Seafood Company's account received around $13.9 million in disbursements from a PRC-based company associated with the Business Partner: approximately $660,000 in November and December 2016; $4.6 million in 2017; $4.6 million in 2018; and $3.9 million in 2019. The account also received an additional $2 million from the Business Partner's PRC-based personal account between November 2016 and December 2019.

### D.    SUN and HU Benefit Financially from Dealings with Jiangsu Province

94.    While she was employed with the New York State government, LINDA SUN traveled to Jiangsu Province and received benefits from Jiangsu Provincial officials, including the provision of a job in the PRC for SUN's cousin. As with the governmental delegations from Henan Province, SUN later assisted a delegation from Jiangsu Province to visit New York, where they entered into a memorandum of understanding with New York State.

95.    In 2016, while she was employed by Global NY, LINDA SUN traveled with a work colleague to Jiangsu Province. Global NY was a suboffice of Empire State Development, the economic development arm of the New York State government, that was charged with attracting foreign direct investment to New York State. While in Jiangsu, SUN met with PRC government officials, one of whom secured a job in the PRC for SUN's cousin.

96.    On or about April 22, 2016, a bank account held by SUN and CHRIS HU received an incoming wire transfer in the amount of $47,895.00 from a PRC-based bank account. The notation on the wire transfer read, "Payment for Travelling."

97.     On or about May 14, 2016, LINDA SUN departed the United States from John F. Kennedy International Airport in Queens, New York and landed in Shanghai Pudong International Airport, PRC.  SUN returned to John F. Kennedy International Airport on or about May 24, 2016.

98.     On or about May 18, 2016, LINDA SUN sent members of her family an electronic message explaining she was meeting with the Governor and Lieutenant Governor of Jiangsu Province that day.  SUN noted that "none of her colleagues could join her."  In written correspondence from the following day, she sent a photograph depicting her and the vice governor of Jiangsu Province.

99.     On or about May 20, 2016, following up on her prior message, LINDA SUN wrote that she had met with the president of the Jiangsu Council for the Promotion of International Trade.  SUN reported that, after hearing that SUN's cousin was looking for work, the president of the Jiangsu Council for the Promotion of International Trade told SUN that her cousin could come work for him.  In later correspondence, SUN confirmed that her contact at the Jiangsu Council for the Promotion of International Trade had helped her cousin secure a 10-year employment contract.

100.    On or about July 7, 2017, LINDA SUN traveled from John F. Kennedy International Airport in Queens, New York to Guangzhou Baiyun International Airport in Guangzhou, PRC.  SUN returned to New York from Shanghai Pudong International Airport on or about July 17, 2017.  As reflected by the photograph below captured on or about July 13, 2017, SUN's visit was part of a "Discovery Trip to China for Eminent Young Overseas Chinese, 2017," hosted by the Overseas Chinese Affairs Office.  Notably, after 2018, the Overseas Chinese Affairs Office became governed by the UFWD.



101.    On or about November 13, 2017, LINDA SUN sent a message noting that the Division Chief of the Commerce Department of Jiangsu Provincial People's Government was visiting New York.  SUN reported that the Division Chief had given her cousin a job and that she would take the Division Chief out that night.

102.    Approximately two weeks later, LINDA SUN sent an article about an overseas Chinese businessman in New York visiting the Secretary of the Jiangsu Provincial Committee on July 11, 2017.  SUN wrote that she and CHRIS HU would have dinner with the overseas Chinese businessman that night.  According to SUN, the overseas Chinese businessman instructed HU to see him in Xiamen, PRC during HU's planned visit to the PRC the following month, as the overseas Chinese businessman could assist HU in purchasing land in Xiamen, PRC.

37

103.    On or about December 7, 2017, CHRIS HU traveled from John F. Kennedy International Airport in Queens, New York to Xiamen Gaoqi International Airport in Xiamen, PRC, via Incheon International Airport in Seoul, Korea.  He returned to John F. Kennedy International Airport in Queens, New York on or about December 22, 2017.

104.    In or about 2019, LINDA SUN helped draft a memorandum of understanding between Jiangsu Province and New York State.  According one provision of the memorandum of understanding,

> The Parties shall encourage inter-governmental exchanges and mechanism on science, technology and innovation, include higher learning institutes, R&D facilities, enterprises and other key stakeholders, and promote cooperation on basic research, technology innovation and commercialization of research results.

According to another provision, "A mechanism for exchange and cooperation between the State University of New York and the universities in Jiangsu is expected to be established."

105.    On October 29, 2019, then-Lieutenant Governor Hochul and the Vice Governor of Jiangsu Province signed the memorandum of understanding at a Manhattan hotel. The event was hosted by the Foreign Affairs Office of Jiangsu Provincial People's Government.

106.    On or about December 20, 2023—more than half a year after she had separated from New York State government— LINDA SUN wrote an email to the Director of Constituency Affairs at the New York State Governor's Office (the "Director") and to a newly arrived consul at the PRC Consulate (the "Consul").  SUN advised the interlocuters of each other's respective roles and advised, "The consulate is looking for a point of contact for events and representation for the Governor's office."  On or about February 8, 2024, the Director received an email from a representative of the "Jiangsu Provincial Affairs Office, responsible for affairs between Jiangsu and New York State."  The email, which copied the Consul, sought to reinitiate contact between New York State and Jiangsu Province, referring to and attaching the

memorandum of understanding between New York State and Jiangsu Province executed in 2019 by then-Lieutenant Governor Hochul.

### E.     SUN Requests that PRC Officials Promote Company-1's Business During the COVID-19 Pandemic

107.    In early 2020, during the onset of the COVID-19 pandemic, LINDA SUN was in frequent communication with principals of the PRC Consulate, including PRC Official-1, PRC Official-2, PRC Official-3, and PRC Official-4, to help secure personal protective equipment ("PPE") and ventilators for New York State.  During these communications, SUN repeatedly asked the PRC Consulate to promote Company-1, which she characterized as CHRIS HU's company.

108.    On or about January 20, 2020, LINDA SUN wrote PRC Official-1 to provide an update on PPE donated by members of a U.S.-based Chinese overseas association to Wuhan, PRC.  According to SUN, the shipping and customs clearance were provided for by CHRIS HU's logistics company—a reference to Company-1.  SUN stated that Company-1 would provide free shipping services for shipments to epidemic areas and offered to provide free shipping services for other Chinese overseas associations.  In communications with SUN about the same donation, PRC Official-3 sent a link to what appears to be a PRC media statement about the donation, and wrote, "Please say thank you to your husband and his company [Company-1]."  SUN responded, "Thank you so much . . . !  But can we make a slight edit to the part about [Company-1]?" and proposed alternative text.  PRC Official-3 agreed to make the edit.

109.    On or about February 9, 2020, LINDA SUN indicated to PRC Official-1 that Company-1 consistently provided shipping and customs clearance services to the overseas Chinese leaders in New York City and sought to work with a specific Middle East airline.  She added that Company-1 was willing to pay shipping expenses, as the overriding concern was delivering material to epidemic areas.  PRC Official-1 responded that he would contact the airline

the following day and would immediately relay any news to SUN.  SUN added that Company-1 was interested in booking a charter flight through a state-owned PRC air carrier, which could potentially offer a discount rate if Company-1 received an official document issued by the Civil Administration of China and authorized by the PRC National Health and Family Planning Commission.  She asked PRC Official-1 if he had any connections.  PRC Official-1 responded that he would consult on this matter the following day.

110.    On or about March 23, 2020, in an email to the procurement office, LINDA SUN recommended that the New York State government contract with Company-1. SUN wrote, "I have personally worked with [Company-1] when many organizations in the Chinese community were shipping masks back to China at their height of the epidemic. My husband has also used [Company-1] previously for his seafood and fruits business."  SUN did not disclose that she and CHRIS HU maintained a close personal relationship with the principal of Company-1, or that she had arranged for Company-1 employees and the principal of Company-1 to accompany her and HU to Henan, PRC in March 2017. The New York State government ultimately contracted with Company-1 for hundreds of thousands of dollars of business during the pandemic.

111.    On or about April 3, 2020, PRC Official-1 wrote LINDA SUN that several Chinese foundations would donate 1,000 ventilators to the Greater New York Hospital Association.  SUN informed PRC Official-1 that then-Governor Cuomo would call him.  After waiting two hours for the call, PRC Official-1 complained that he had not yet heard from Governor Cuomo.  SUN indicated that then-Governor Cuomo was in a meeting with the Commissioner of the Department of Health and apologized for wasting PRC Official-1's time.  SUN further indicated that then-Governor Cuomo would call the following day.  PRC Official-1 instructed SUN to remind the governor to thank the PRC government for facilitating the donation.  On April 4,

2020, then-Governor Cuomo publicly thanked PRC Official-1 for helping arrange the donation, which was scheduled to arrive at John F. Kennedy International Airport that day.

112.    On or about April 4, 2020, the principal of Company-1 wrote LINDA SUN the following message: "See if you can get [Company-1] name out there."  Later that day, SUN asked PRC Official-1 to promote Company-1, which had provided the logistics arrangement for the donation of ventilators.  PRC Official-1 agreed and asked SUN to take photographs when the goods were delivered to various hospitals.  The following day, SUN thanked PRC Official-1 for complimenting SUN's work to then-Governor Cuomo, which would empower SUN to do more for the PRC.  PRC Official-1 responded that he was compelled to compliment SUN's work, which was phenomenal.

F.    SUN Makes False Statements in an Interview with the FBI

113.    On July 15, 2020, an agent from the Federal Bureau of Investigation ("FBI") interviewed LINDA SUN in the Eastern District of New York.  During the interview, SUN stated that her job was to liaise with the Asian-American community on behalf of then-Governor Cuomo.  SUN stated that she was responsible for handling the Chinese and Taiwanese communities.  SUN admitted that she spoke directly with PRC Official-1 and PRC Official-4 but claimed to have contact with the PRC Consulate on no more than a weekly basis.

114.    When shown a photograph from an article titled "Overseas Chinese Representatives Invited to Reception in Celebration of the 70th Anniversary of the Establishment of PRC, at the Great Hall of the People," LINDA SUN acknowledged that she was in the photograph and claimed that she was already in the PRC for a family visit and that a real estate developer from Long Island procured her a ticket for the event.  However, as noted above, CC-1 had arranged for SUN to attend UFWD events in 2019, and CC-2 had made travel arrangements,

including hotel accommodations. SUN further claimed that the stage was too far away for SUN to clearly see PRC government officials in attendance.

115. With respect to TECO, LINDA SUN claimed that she had never accepted an offer to travel to Taiwan because of timing. As described above, SUN often failed to respond to solicitations from TECO not because of scheduling issues, but rather due to her efforts to prevent TECO from developing a relationship with the Executive Chamber, as directed by representatives of the PRC government. For example, as previously noted, on or about November 1, 2017, the TECO political director wrote LINDA SUN to invite government officials and scholars to travel to Taiwan in December 2017 to discuss, among other topics, Taiwanese foreign affairs, security, and industrial innovation. SUN forwarded the message to PRC Official-4. There is no record of an email response by SUN to the TECO political director.

116. At the conclusion of the meeting, the interviewers told LINDA SUN about a recent report from the Hoover Institution titled "Report on China's Influence and American Interests: Promoting Constructive Vigilance." They noted that a person operating on behalf of the Chinese government without registering as a foreign agent could be in violation of the law. SUN expressed some interest in reading the report.

G.    SUN Purports to Represent New York State Government Without Authorization, Including at PRC Consular Events

117. After LINDA SUN transferred to the Department of Labor in or about September 2022, she continued to act as though she were the governor's liaison with New York State's Asian community, including with PRC establishments. However, these activities were outside the scope of her official responsibilities with the Department of Labor.

118. In or about January 2023, LINDA SUN arranged for the Executive Chamber's Office of Correspondence ("Office of Correspondence") to produce a framed

gubernatorial proclamation for SUN to present to PRC Official-1, celebrating the Lunar New Year. SUN did not follow protocol and seek supervisory authorization to create such a proclamation; therefore, the proclamation was not logged in the Executive Chamber's online tracking system. SUN sent the Office of Correspondence employee who created the proclamation a personal gift basket and claimed to have sent the employee wine. Both gifts were reportedly addressed to the home address of a relative of the employee. The employee sent the framed proclamation to SUN's personal address in Long Island.

119.    On or about February 14, 2023, LINDA SUN submitted to a voluntary interview with the New York State Office of the Inspector General. During the interview, SUN claimed to attend Asian community events in her personal capacity and not in her new capacity at the Department of Labor. She falsely claimed that she had not requested any proclamations since transferring to the Department of Labor. Upon further questioning, she admitted that she had requested a proclamation for PRC Official-1, after receiving a request from the PRC Consulate in New York. She further admitted that she attended the event, which occurred in mid-January 2023, and that PRC Official-1 had called her to the stage to speak and had identified her as the Deputy Commissioner of the Department of Labor. SUN stated that she had not notified the Department of Labor about the proclamation or received permission from the governor's office to provide the proclamation. A photograph of SUN appearing at the event from the PRC Consulate's website is below.



120.    The Department of Labor terminated LINDA SUN's employment on or about March 2, 2023.  As late as July 2023, however, SUN continued to attend public and professional Asian community events purporting to represent the Department of Labor while claiming to be the Deputy Commissioner of the Department of Labor.  For example, one Chinese language news article included the below photograph of SUN with other dignitaries and stated, "Sun Wen, deputy director of the New York State Department of Labor . . . attended the speech and delivered speeches."



121.    On or about August 10, 2023, LINDA SUN received a cease-and-desist letter from the Department of Labor, which indicated that SUN had "allegedly attended public and professional events purporting to represent [her]self as an agency official for the New York State Department of Labor . . . after [her] employment was terminated on March 2, 2023."

H.    SUN's Gifts and Benefits

122.    On or about May 3, 2018, LINDA SUN completed an ethics training course that instructed her on the requirements under New York Public Officer's Law § 73, which generally prohibited receipt of gifts from interested sources who did or wanted to do business with the governor's office, such as CC-1 and CC-2.  According to applicable rules, SUN was required to completing the ethics training course on a biannual basis.

123.    As noted above, LINDA SUN received gifts and benefits from CC-1, CC-2, the Henan provincial government, and the Jiangsu provincial government. Among those benefits were: the assistance CC-1 and CC-2 provided to CHRIS HU's PRC-based businesses; travel expenditures incurred by Henan provincial government and associated organizations for SUN's

repeated trips to the PRC, including the March 2017 trip by HU, Company-1 employees, and SUN's family members; travel expenditures incurred by the Jiangsu provincial government and associated organizations on SUN's behalf; and the employment for SUN's cousin. Despite her training, SUN did not disclose any of these gifts and benefits in her annual financial disclosures to New York State government.

124. LINDA SUN and her family also received numerous other gifts and benefits from PRC representatives and agents, including members of the PRC Consulate, CC-1, and CC-2. Despite her training, SUN did not disclose any of these gifts and benefits in her annual ethics disclosures to New York State government. According to written correspondence, gifts from the PRC Consulate to SUN and her family included:

(a) Tickets to the Chinese National Traditional Orchestra concert at Carnegie Hall on or about December 18, 2015;

(b) Five tickets, each of which had a value of $37 or greater, to an unspecified event occurring on or about January 9, 2017;

(c) Three tickets to an unspecified concert for SUN and her family;

(d) Tickets to an unspecified show from PRC Official-3 on or about January 2, 2018;

(e) Six tickets to the Guangzhou Ballet performance at Lincoln Center on August 17, 2019;

(f) Six salted ducks from PRC Official-1 on or about July 28, 2021;

(g) Six salted ducks from PRC Official-1 on or about November 23, 2021;

(h) Salted ducks from PRC Official-1 on or about March 15, 2022;

(i)      Six tickets with VIP suite access for an unspecified sporting event on or about August 6, 2022 from PRC Official-2;

(j)      Salted ducks from PRC Official-1 and PRC Official-2 on or about November 23, 2022; and

(k)      Dinner for SUN's family at PRC Official-1's house on or about February 8, 2023.

I.      <u>Financial Fraud and Money Laundering</u>

125.     As a result of LINDA SUN's activities on behalf of the PRC government, CHRIS HU's businesses made millions of dollars in the PRC.  HU repatriated this wealth to the United States by, among other measures, (1) having payments made directly from the PRC to U.S. accounts at a financial institution ("Financial Institution-1") created by HU in the name MEIPING SUN, which HU then transferred to a Financial Consultancy account, (2) structuring cash payments into multiple accounts associated with HU's family and businesses, (3) conducting layering activities, that is, moving funds between multiple family and business accounts, to conceal the original provenance of the funds, and (4) using the funds to purchase real estate properties and luxury automobiles, such as a 2024 Ferrari Roma vehicle.  The Ferrari is pictured below in the driveway of SUN and HU's residence, with SUN and HU's son in the driver's seat.

126.    On or about April 29, 2020, CHRIS HU opened a checking account and a savings account in the Mother's name.  According to account opening documents, HU was not an authorized signatory to the accounts, but was an authorized individual "to initiate and/or verify Payment Orders made by fax, telephone, messenger or e-mail."  HU informed Financial Institution-1 that the Mother was unemployed but had previously been employed as a "Garment Manufacturing supervisor."  HU directed Financial Institution-1 to use HU's personal address for all mail correspondence and advised that he "will confirm [wire] transfers" for both accounts.

127.    Subsequently, CHRIS HU used the Mother's two accounts at Financial Institution-1 for his own purposes; the Mother never deposited or withdrew funds from either account.  In or about and between June 16, 2020 and August 4, 2020, the Mother's checking

48

account received a wire in the amount of $99,975 from the Business Partner and three wires each in the amount of $500,000 from a PRC-based business associated with LINDA SUN's family (the "Family Business").  These transactions constituted the sole deposits to the checking account.  In or about and between July 16, 2020 and May 13, 2022, the Mother's checking account incrementally transferred substantially its entire balance to the Mother's savings account; all of the funds with the exception of approximately $20,000 had been transferred as of August 4, 2020. These transactions constituted the sole deposits to the Mother's savings account.  On or about May 16, 2022, the Mother's savings account transferred substantially its entire balance to an account for the Financial Consultancy, one of the businesses operated by HU.

128.    When Financial Institution-1 asked a principal of the Family Business the purpose of the three wires to the Mother totaling $1.5 million, the principal claimed that the Mother was the company's "sales agent[], and the wires were for their sales commission and bonus." According to U.S. Department of Labor records, the Mother applied for unemployment benefits and claimed no income.  Notably, in communications from March 2017, the Mother asked LINDA SUN to find out how her family could collect welfare payments in the PRC.

129.    In or about 2021, LINDA SUN and CHRIS HU purchased a real estate in Manhasset, New York, currently valued at approximately $4.05 million, and an ocean-view condominium on the 47th floor of a high rise building in Honolulu, Hawaii, currently valued at approximately $2.1 million.  There were no mortgage loans taken in connection with these acquisitions, and the acquisitions occurred soon after HU received a series of wire transfers from a PRC-based account bearing the name of the Business Partner totaling more than $2.1 million. Notably, SUN did not report the real estate acquisitions on her financial disclosure statements, as she was obligated to do.

130.    In an electronic communication from 2020, while LINDA SUN was shopping for a new house in Long Island, the Mother worried that people would wonder how SUN could afford to purchase an expensive investment property. SUN replied, "Mortgage."

131.    I assess that CHRIS HU often structured his financial transactions to maintain secrecy. For example, HU listed in a running document how much cash he deposited into his personal and business accounts. Notably, every transaction listed a cash deposit of slightly less than $5000 – the reporting threshold for FinCEN Suspicious Activity Reports. Further, written correspondence has revealed that HU instructed that the purchase of the Honolulu property be as secretive as possible, and that he "paid Anderson for asset protection" while forming a new LLC, "which meant staying anonymous."

IV.    The SUBJECT PREMISES

132.    As LINDA SUN and CHRIS HU's primary residence is the ███████████ ████████████, and MEIPING SUN and GUOXIAN SUN's primary residence is ███ ███████████████████, I assess that all four individuals' cellular phones, as well as other electronic devices they use, will be found in their residences during an early morning search.

133.    With regard to the SUBJECT SAFE DEPOSIT BOXES, subpoena returns indicate that the CHRIS HU and LINDA SUN have rented the CITIBANK SUBJECT DEPOSIT BOX from in or about September 2016 to present; HU and SUN have rented the BANK OF AMERICA SUBJECT SAFE DEPOSIT BOX since in or about December 2023 to present; and Mei P Ying Sun, who I assess to be MEIPING SUN, has rented the TD BANK SUBJECT SAFE DEPOSIT BOX from in or about October 2008 to present. Subpoena returns from TD Bank also reveal that the TD BANK SUBJECT SAFE DEPOSIT BOX was last accessed in August 2021.

134.    I assess that it is likely that a search of the SUBJECT RESIDENCES and the SUBJECT SAFE DEPOSIT BOXES will contain fruits and instrumentalities of violations of the predicate statutes identified in Attachments B1 through B5.

135.    The investigation has uncovered numerous WeChat communications between LINDA SUN, MEIPING SUN, and GUOXIAN SUN in which they discuss the pay-to-play scheme and the money laundering scheme. Some of these communications are summarized above. I assess that these conversations will be found in the electronic devices used by each of these individuals. Among other communications uncovered are the following:

- On January 12, 2015, SUN provided a PRC Consul's phone number to MEIPING SUN and GUOXIAN SUN.

- On September 23, 2015, SUN sent photos to MEIPING SUN and GUOXIAN SUN. MEIPING SUN then directed SUN to send the photos to the then-Consul General of the PRC Consulate.

- On September 28, 2015, SUN wrote MEIPING SUN and GUOXIAN SUN that she planned to ask a PRC Consul for a box of moon cakes. In response, MEIPING SUN advised SUN as to how to make the request to the PRC Consul and recommended that SUN regift the moon cakes to her mother-in-law. MEIPING SUN recommended that SUN tell SUN's mother-in-law that "the moon cakes are reserved for [SUN] by the Consulate" and "[SUN] is invited to the National Day celebration [the annual holiday commemorating the founding of the PRC on October 1, 1949]."

- On November 15, 2015, SUN wrote MEIPING SUN and GUOXIAN SUN that her trip to Chengdu, PRC had been decided. "President Li" would pay

for the trip, including lodging, food, and transportation, and return to the PRC to host her.

- On December 17, 2015, SUN wrote MEIPING SUN and GUOXIAN SUN that she had two tickets to the Chinese National Traditional Orchestra concert in Carnegie Hall, courtesy of the Chinese Consulate. SUN asked MEIPING SUN and GUOXIAN SUN if they would be interested in attending.

- On April 25, 2016, SUN wrote MEIPING SUN and GUOXIAN SUN that the President of the Yantai Association, a Chinese hometown association, gave a cash gift to her son of $200.  MEIPING YING responded that it's great that those people have so much money.

- On September 19, 2016, SUN wrote MEIPING SUN and GUOXIAN SUN that the PRC Division Chief and Deputy Director of Commerce were in New York and invited SUN to dinner.

- On January 9, 2017, GUO XIAN SUN wrote LINDA SUN and MEIPING SUN that the Consulate General had sent five tickets to LINDA SUN, two tickets for $67, two tickets for $47, and one ticket for $37.

- On January 12, 2017, SUN instructed MEIPING SUN and GUOXIAN SUN instructed that salesperson from a luxury car dealership might call GUOXIAN SUN to verify the purchase of a vehicle and that her father should say that the vehicle was for his use only.  In a later communication, MEIPING SUN asked about transferring the name on the title of the new car to HU.

- On February 1, 2017, LINDA SUN wrote MEIPING SUN and GUOXIAN SUN, "New World gift card $1,000.00USD."

- On February 9, 2017, LINDA SUN wrote MEIPING SUN and GUOXIAN SUN that the President of the Hebei Association would send a spring festival gift to her parents' house and that she had provided her father's phone number.  Notably, Hebei is a province of the PRC.

- On March 8, 2017, GUOXIAN SUN wrote LINDA SUN and MEIPING SUN that Chairman Xia had just came to pick up a bottle of wine from the governor's office given by LINDA SUN.  Chairman Xia presented to GUOXIAN SUN a kiln-altered glaze vase from Lang-kiln made during the Qing dynasty.  GUOXIAN SUN accepted the gift even though he knew it was expensive.

- On March 16, 2017, GUOXIAN SUN wrote that LINDA SUN and MEIPING SUN he could write a $30,000 check to Citibank and that LINDA SUN had to sign the $20,000 check that would pay for TD Bank.

- On June 1, 2017, MEIPING SUN wrote LINDA SUN and GUOXIAN SUN that the Consulate General told her to pick up gifts (at the PRC Consulate).

- On February 24 and 25 and March 2 and 5, 2018, MEIPING SUN wrote LINDA SUN and GUOXIAN SUN about the red envelopes (containing cash gifts), including envelopes received by SUN's son.

- On May 30 and June 8, 2018, LINDA SUN wrote MEIPING SUN and GUOXIAN SUN about her airfare upgrades arranged by "Shen of China Eastern Airlines" and "Chairman Xia."  SUN added that she assumed that

Xia would start asking her to do him favors such as arranging peoples' visits (to the Governor's office).

- On July 17, 2018, LINDA SUN wrote MEIPING SUN and GUOXIAN SUN to her parents that Chairman Xia presented an emerald bracelet to SUN. MEIPING SUN said LINDA SUN could not accept such an expensive gift.

- On December 28, 2018, GUOXIAN SUN wrote MEIPING SUN and GUOXIAN SUN to ask for the passcode and the place where MEIPING SUN had put her TD Bank card. GUOXIAN SUN wrote that HU used the father's name to purchase a new car, so they needed to deposit funds to the bank card.

- On February 12, 2019, LINDA SUN wrote MEIPING SUN and GUOXIAN SUN that the owner of Maotai Liquor gave $300 to SUN's son.

- On April 13, 2020, GUOXIAN SUN wrote LINDA SUN and MEIPING SUN that he had received a package and asked if the package was from Division Chief Lu of the Jiangsu Federation of Returned Overseas Chinese from Japan. LINDA SUN responded that the package was from the Deputy Director of the Beijing Federation of Returned Overseas Chinese.

- On February 15, 2021, LINDA SUN asked MEIPING SUN and GUOXIAN SUN if the red envelope was from Chen Shanzhuang, a leader of a Chinese hometown association in the New York area.

- SUN and HU purchased a condominium in Hawaii in 2021 currently valued at approximately $2.1 million. GUOXIAN SUN wrote LINDA SUN and

MEIPING SUN that the Hawaiian residence is "big and beautiful."  SUN later wrote that the apartment was in an ocean-view high rise apartment on the 47th floor.

136.     To the extent these communications reflect that LINDA SUN, CHRIS HU, MEIPING SUN, and GUOXIAN SUN received gifts from PRC officials and agents, such as the vase or cash, such gifts may be stored in the SUBJECT RESIDENCES and the SUBJECT SAFE DEPOSIT BOXES.  Additionally, based on the above communications, it appears that LINDA SUN and HU have used MEIPING SUN and GUOXIAN SUN as straw purchasers for vehicles.  I assess that records of these purchases will also be in the SUBJECT RESIDENCES or the SUBJECT SAFE DEPOSIT BOXES.

137.     As part of the investigation, the government has obtained judicial authorization to search HU's email account.  The search warrant returns contain evidence of money laundering and bank fraud, including records pertaining to the Financial Institution-1 account discussed above and a ledger in which HU tracks cash deposits into his family and his businesses' accounts.  I assess that these electronic records are in electronic devices used by HU.

138.     U.S. bank records for personal accounts of LINDA SUN and CHRIS HU are registered to ███████████████████████, and the records for the personal accounts of MEIPING SUN and GUOXIAN SUN are registered to ████████████████ ███████.  These U.S. bank records constitute evidence of the money laundering conspiracy. To the extent that LINDA SUN, CHRIS HU, MEIPING SUN, or GUOXIAN SUN maintain records of assets located in the PRC, including bank records, such materials would constitute evidence of the money laundering conspiracy charge.

139.    Several corporate entities used in furtherance of the money laundering scheme are registered to ███████████████████████, including Sun Strategies LLC (which company LINDA SUN used to purchase a new Range Rover vehicle in January 2024 for more than $140,000), LCA Holdings LLC, and HC Paradise (which SUN and HU used to purchase the condominium in Honolulu, Hawaii). I understand from my review of the financial records that assets obtained by SUN and HU are now held in trusts controlled by SUN and HU. I assess that corporate records of these and other entities under the control of SUN and HU, including financial records and records for assets held in trust, will be found in ███████████████████ ██████.

140.    The investigation has uncovered receipts from American Express accounts associated with SUN and HU that reveal multiple purchases of expensive jewelry in the amount of tens of thousands of dollars. The American Express accounts are funded by an account that has received primary or secondary disbursements from the Business Partner. I assess that individuals involved in money laundering schemes often purchase luxury goods, including but not limited to jewelry and watches, and store them in their original packaging to maintain their value over time. I assess that it is likely that luxury goods will be found in the SUBJECT RESIDENCES and the SUBJECT SAFE DEPOSIT BOXES.

<u>BIOMETRIC UNLOCK</u>

141.    In my training and experience, it is likely that if LINDA SUN, CHRIS HU, MEIPING SUN, or GUOXIAN SUN have any electronic devices on their person or in their belongings, then one or more of those devices uses biometric unlocking features, such as facial recognition unlocking.

142.     The warrants I am applying for would permit law enforcement to compel LINDA SUN, CHRIS HU, MEIPING SUN, or GUOXIAN SUN to unlock any electronic devices using the devices' biometric features.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features including fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to TouchID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain cellular phone devices.  In order to activate this unlocking mechanism, the user holds the device in front of his or her face.  The device's front-

57

facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

d.  If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features on other manufacturers' devices have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive or

58

has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked, or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Biometric features from other electronic device brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. The passcode or password that would unlock a given device recovered during execution of the requested warrant likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the search authorized by the requested warrant, it will likely be necessary to press the finger(s) of the user on the fingerprint reader of any device capable of biometric unlocking. The government may not otherwise be able to access the data contained on the electronic devices for the purpose of executing the search authorized by this warrant.

h. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

143.    Due to the foregoing, if any of LINDA SUN, CHRIS HU, MEIPING SUN, or GUOXIAN SUN's electronic devices may be unlocked using one of the aforementioned biometric features, then the warrants I am applying for would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of LINDA SUN, CHRIS HU, MEIPING SUN,

or GUOXIAN SUN against the fingerprint scanner of the device; (2) hold LINDA SUN, CHRIS

HU, MEIPING SUN, or GUOXIAN SUN in place while holding the device in front of his face to

activate the facial recognition feature; and/or (3) hold LINDA SUN, CHRIS HU, MEIPING SUN,

or GUOXIAN SUN in place while holding the device in front of his face to activate the iris

recognition feature, for the purpose of attempting to unlock the device in order to search the

contents as authorized by this warrant.

144.    Law enforcement officers will select which fingers to press to LINDA SUN,

CHRIS HU, MEIPING SUN, or GUOXIAN SUN's electronic devices.  The warrants do not

authorize law enforcement to compel that LINDA SUN, CHRIS HU, MEIPING SUN, or

GUOXIAN SUN state or otherwise provide the password or any other means that may be used to

unlock or access any electronic devices.  Moreover, the warrants do not authorize law enforcement

to compel LINDA SUN, CHRIS HU, MEIPING SUN, or GUOXIAN SUN to identify the specific

biometric characteristics (including unique fingerprint(s) or other physical features) that may be

used to unlock or access any electronic devices.[3]

---

[3]    In the course of my training and experience, I have become familiar with federal court decisions standing for the proposition that government agents may compel individuals to provide biometric data in order to effectuate a search of devices lawfully seized pursuant to a warrant. For example, in In re Search Warrant Application, 279 F. Supp. 3d 800, 801 (N.D. Ill. 2017), a district court in the Northern District of Illinois reversed a magistrate judge's decision that the Fifth Amendment's privilege against self-incrimination barred a portion of a search warrant that would have required "residents of a home to apply their fingers and thumbs (as chosen by government agents) to the fingerprint sensor on any Apple-made devices found at the home during the search." The district court noted that the Fifth Amendment "only prevents the government from compelling a person from being a 'witness' against himself" and that, since "[w]itnesses provide testimony, [ ] that is the forbidden compulsion; the government cannot force someone to provide a communication that is 'testimonial' in character." Id. at 803 (emphasis in original). On the other hand, "the Supreme Court has distinguished between compelling a communication versus compelling a person to do something that, in turn, displays a physical characteristic that might be incriminating." Id. (citing United States v. Hubbell, 530 U.S. 27, 34 (2000) and collecting cases). Applied in the context of biometric data, the court held that,

TECHNICAL TERMS

145.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    b.  Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

146.    As described above and in Attachments B1 and B2, this application seeks permission to search for records that might be found in the SUBJECT RESIDENCES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

---

especially where government agents select the fingers to be pressed on the Touch ID sensor, thereby eliminating the "need to engage the thought process of any of the residents at all in effectuating the seizure," "[t]he application of the fingerprint to the sensor is simply the seizure of a physical characteristic, and the fingerprint by itself does not communicate anything." Id. at 803–04 (emphasis in original). Recently, similar reasoning supported a search warrant that would compel biometric data not only from an individual's fingerprints, but from his face and irises as well. See In re Search of [Redacted Text], No. 18-SW-0122 (GMH), 2018 U.S. Dist. LEXIS 109572 (D.D.C. June 26, 2018).

147.    *Probable cause.*  I submit that if a computer or storage medium is found on the Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users

typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

148. *Forensic evidence.* As further described in Attachments B1 and B2, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.

For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer

and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrants.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

149.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the Premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine

storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

150.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

151.    Additionally, because the search warrants for the SUBJECT RESIDENCES authorize the search for multiple electronic devices and media, some of which may belong to occupants thereof who are not believed to be involved in the Subject Crimes, reasonable efforts will be taken by the agents conducting the search to avoid the seizure of electronic devices and media – if any – that can be readily identified as belonging to any other individual residing at or visiting the SUBJECT RESIDENCES.

## **CONCLUSION**

152.    I submit that this affidavit supports probable cause for a warrant to search the items, locations, or persons described in Attachments A1 and A5 and seize the items described in Attachments B1 and B5.

**REQUEST FOR SEALING**

153.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and resulting search warrant. I believe that sealing these documents is necessary because the affidavit and warrant are relevant to an ongoing covert investigation, and the subjects of the investigation are at large and unaware of the investigation. Premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates. Some of the evidence in this investigation is stored electronically and can be completely and permanently erased. Some of the evidence in this investigation involves communications that can be transferred to alternate platforms (including encrypted platforms and platforms beyond the jurisdictional reach of U.S. legal process). If alerted to the existence of the search warrant, there is reason to believe that the subjects under investigation will destroy that evidence and change their patterns of behavior.

DEVIN PERRY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 19, 2024:

*Lois Bloom*

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A1

**Property to Be Searched**

The property to be searched is a single-family residence and grounds located at ███ ████████████████████████████████████████████████████████ depicted below.



The property to be searched includes (a) all closed and locked containers found therein and (b) all electronic devices and digital media present at ████████████████ ████████, whether in the house or on the surrounding grounds, whether or not they are on someone's physical person, with the exception of those that can be readily identified as belonging exclusively to occupants of ████████████████████████ other than CHRIS HU and LINDA SUN.

Law enforcement personnel are authorized to use reasonable force to (1) press or swipe the fingers (including thumbs) of CHRIS HU and LINDA SUN to the fingerprint scanner of each device; (2) hold each device in front of the face of CHRIS HU and LINDA SUN to activate the facial recognition feature; and/or (3) hold each device in front of the face of CHRIS HU and LINDA SUN and activate the iris scanning recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this search warrant.

## ATTACHMENT B1

### Particular Things to be Seized

1.        All records, including all records on the Devices described in Attachment A that relate to 8 U.S.C. § 1324 (alien smuggling), 18 U.S.C. § 951 (agents of a foreign government), 18 U.S.C. § 1349 (visa fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), and 18 U.S.C. § 1001 (false statements), and conspiracies to commit the same (the "Subject Crimes") involving LINDA SUN, CHRIS HU, MEIPING SUN, and GUOXIAN SUN, among others, since January 1, 2016, including:

      a.  All communications with any coconspirators regarding the Subject Crimes;

      b.  Documents and records related to the Subject Crimes, including cash, bank statements and other financial records, correspondence, payment records, and photos regarding the Subject Crimes;

      c.  Luxury goods, including but not limited to jewelry and watches, stored in their original packaging;

      d.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2.        Records on the Devices including:

      a.  Records of Internet Protocol addresses used;

      b.  Location information;

      c.  Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.