

**JARROD L. SCHAEFFER**
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

August 25, 2025

**By ECF**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:  *United States v. Linda Sun, a/k/a "Wen Sun," "Ling Da Sun," and "Linda Hu,"*
> *and Chris Hu*, S2 24 Cr. 346 (BMC) (TAM)

Your Honor:

We represent Linda Sun in the above-referenced matter and, together with counsel for Chris Hu, write respectfully in advance of the pretrial conference scheduled for August 26, 2025. In the service of efficiency and in an effort to assist the Court, the defense submits this letter to outline several issues that it anticipates raising at the conference.

*First*, on August 5, 2025, Ms. Sun filed a motion to dismiss the second superseding indictment ("S-2"), which was joined by Mr. Hu that same day.  (*See* Dkts. 144–46.)  The government has not requested—and the Court has not ordered—a deadline for any opposition.  As such, the Local Rules ordinarily would provide the briefing schedule.  *See* Local Crim. R. 49.1(a) ("Unless otherwise provided by statute or rule, or unless ordered otherwise by the court in a judge's individual practices or in a direction in a particular case, the following dates will govern deadlines for motions filed in a criminal case . . . .").  Based on those rules, the government's opposition was due on August 19, 2025.  *See id.*  The defense recognizes, of course, that the government previously required more than two weeks to oppose a prior motion and may need additional time again. Because the timing of any opposition necessarily affects the deadline for the defense's reply—and because the Court's eventual resolution of the motion will significantly impact the parties' trial preparations—the defense plans to request that a deadline be set for the filing of any opposition.

*Second*, as the Court is aware, this case has received significant publicity—in part because of actions by the government.  (*See* Dkt. 131.)  The defense is grateful for the Court's recognition of the risk that such publicity entails for the defendants' right to a fair trial, and for its prior assurance that "'searching *voir dire* and emphatic jury instructions' . . . will be necessary" in this case.  (*Id.* at 5.)  As part of that effort, the defense respectfully submits that it is necessary and appropriate to utilize an advance questionnaire in order to conduct and expedite jury selection.  *See United States v. Dervishaj*, No. 13 Cr. 668 (ENV), 2015 WL 3794803, at *1 (E.D.N.Y. June 17, 2015) ("It is well established that a jury questionnaire may be an effective aid in *voir dire* in a

number of circumstances, such as where a large number of prospective jurors must be screened . . . or where there has been extensive pre-trial publicity . . . ."); *United States v. Cacace*, No. CR-08-240-14 (BMC), 2013 WL 4775531, at *5 (E.D.N.Y. Sept. 6, 2013) (concluding that "the use of a jury questionnaire, drafted with input from both parties, is appropriate to facilitate the *voir dire* process"). Accordingly, the defense wanted to flag this issue early in order to discuss its request and how best to prepare any questionnaire for review and distribution in advance of jury selection.

*Third*, as the Court is also aware, the current charging instrument is the third indictment in this case. Following unexplained delay in filing the S-2, the Court previously admonished the government that it was "going to have to do something if we don't get that superseding indictment within a couple of weeks," and further "emphasize[d]" that it was "trying this case in the fall, one way or another, one form or another, it's going to happen or it's not going forward ever." Tr. of Hr'g dated June 16, 2025 ("6/16 Tr.") at 6:3–5, 23–25. The S-2 was subsequently filed on June 25, 2025. (Dkt. 116.)

Nevertheless, the defense has learned that last week the government issued at least four new grand jury subpoenas with return dates in early September, all of which concern the period charged in the S-2 and seek information regarding Ms. Sun, Mr. Hu, and their property or businesses. To put it mildly, the defense was surprised by the issuance of new grand jury subpoenas almost a month after the S-2 was returned and just weeks after the government appeared to concede that the S-2 concluded its prior grand jury investigation. (*See* Dkt. 132 at 2.) Indeed, just last week the Court precluded the government from using records obtained pursuant to a prior grand jury subpoena after the S-2 was returned because "even if a subpoena is properly issued while the grand jury is impaneled, the subpoena becomes void and may not be enforced once the grand jury investigation terminates." (Dkt. 149 at 2 (citing *United States v. Frankel*, No. 22 Cr.180, 2023 WL 7091917, at *4 (E.D.N.Y. Oct. 26, 2023)).

Given the succession of charging instruments, the Court's prior admonitions, the pending trial date, and the government's concessions regarding the conclusion of its investigation, the defense respectfully submits that issuing new grand jury subpoenas now indicates that the government is misusing the grand jury to prepare its case for trial.[1] The defense also understands, however, that the government may continue to investigate new charges (assuming it uses proper means to do so), and that the Court's latitude to scrutinize reasons proffered by the government for any investigatory actions is limited. (*See* Dkt. 104 at 3–4 (discussing scope of review).)

Accordingly, the defense respectfully requests that the Court adjourn the return dates for the recently issued grand jury subpoenas—and any additional grand jury subpoenas that the government has issued or will issue since the S-2 was returned—until after the November trial concludes. *Cf. United States v. Bergstein*, 302 F. Supp. 3d 580, 583 (S.D.N.Y. 2018) ("In order to accommodate the grand jury's legitimate need for the materials to further its investigation without allowing the government to improperly bolster its trial evidence, the Court extends the return date

---

[1] The defense previously expressed concerns that the government was improperly using the grand jury to prepare for trial. (*See* Dkts. 85, 94.) After reviewing prior grand jury minutes preceding the S-2, the Court found no impropriety. (*See* Dkt. 104.)

. . . to no earlier than fourteen days after the discharge of the jury . . . .").[2]  Even if a grand jury is actually investigating new charges, the Court has already indicated that it may sever any new charges brought in a superseding instrument after June.  (*See* 6/16 Tr. at 5:16–21; *see also* Dkt. 132 at 2 (acknowledging "the Court's order during the June 16, 2025 status conference . . . that the government must present the S-2 Indictment within two weeks, i.e., by June 30, 2025").) Extending until after trial the return dates for any grand jury subpoenas issued after the S-2 was returned will avoid interfering with any legitimate grand jury investigation while also safeguarding the defendants' rights and limiting any improper use of the grand jury for trial preparation.

*Fourth*, the defense is compelled to bring a concerning development to the Court's attention.  Last week, on August 18, 2025, the government disclosed three interview reports to the defense "in an abundance of caution and pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963)."  The defense appreciates the government's recognition of its constitutional obligation and was glad to receive material that was quite obviously both significant and exculpatory.  One report in particular, however, raises concerns that the government has been withholding crucial *Brady* material for some time.

Specifically, one of the reports disclosed on August 18th documented an interview of the individual identified in the S-2 as "CC-1," who was questioned by U.S. Customs and Border Patrol ("CBP") agents upon returning to the United States from an overseas trip.  During that interview, CC-1 was asked a number of case-specific questions about Ms. Sun, Mr. Hu, and the allegations in this case.[3]  In response, CC-1 gave answers that are directly contrary to the allegations in the S-2.  Among other things,[4] in response to questioning by federal agents, CC-1:

- Denied assisting any Chinese government officials, except with logistics of visits by such officials to the United States in his capacity as the president of a U.S.-based organization (identified in the S-2 as "Association-1");

- Denied having any personal relationship with anyone in the Henan provincial government or Zhengzhou municipal government;

---

[2]    The government would, of course, still be able to utilize trial subpoenas if necessary to compel the production at trial of evidence that it intends to introduce.

[3]    As far as the defense is aware, CBP is not part of the prosecution team in this case and thus must have received any case-specific information from a member of the prosecution team.  It is difficult to see how the prosecution team could have been unaware of the interview or its results.

[4]    Because there is a protective order in this case and criminal discovery typically is not filed on the docket, the defense will provide a copy of this report to the Court under separate cover.  *See, e.g.*, *United States v. Wolfson*, 55 F.3d 58, 61 (2d Cir. 1995) (rejecting notion that "documents submitted to a court *in camera* for the sole purpose of confirming that the refusal to disclose them to another party was proper, are to be deemed judicial records open to the public"); *United States v. Smith*, 985 F. Supp. 2d 506, 520 (S.D.N.Y. 2013) (noting that "even discovery materials filed with the court in connection with discovery-related disputes are not covered by the qualified right of access" to judicial documents).  If so directed by the Court, the defense will file an appropriately redacted version of the report on the docket.

- Agreed that, in his capacity as Association-1's president, CC-1 attempted to assist Ms. Sun and Mr. Hu with opening a lobster business in Henan Province, but denied that effort was successful;

- Denied any personal relationship with the individual identified in the S-2 as "CC-2";

- Denied knowledge of any personal relationship between Ms. Sun and CC-2;

- Stated that the purpose of Association-1 is to facilitate trade and business between New York State and Henan Province;

- Agreed that Ms. Sun had assisted Association-1 and helped to connect New York State with Henan Province for purposes of trade, agriculture, and cultural exchange, but denied that Ms. Sun had ever helped him personally;

- Stated that Association-1 is supported through donations from its members, and denied that New York City, New York State, the Chinese government, or anyone living in China provided financial support for Association-1;

- Denied meeting with any representatives from the Chinese government since 2020; and

- Denied having any ties to the Chinese government.

The issue of withholding arises because the interview documented in the report was conducted on May 6, 2025.  In other words, the defense first learned of this significant exculpatory evidence more than three months after the interview occurred.  Even more troubling, the government previously withheld this report even as it sought to delay trial in this case to pursue new charges— a request that came more than a month after the interview.  At that point, trial was scheduled to begin in approximately six weeks, yet the government was still holding on to this crucial *Brady* material.

It is unclear why the defense has only now learned of this interview.  Since it was conducted, the government has made at least seven discovery productions to the defense, but the report of CC-1's interview was not in any of them.  Moreover, since CC-1's interview the government has returned the S-2 and obtained at least two search warrants predicated in part on allegations relating to CC-1.  At no point, however, did the government disclose information concerning CC-1's interview to the judges from whom those warrants were sought.  *Compare, e.g.*, *Franks v. Delaware*, 438 U.S. 154, 165 (1978) ("Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his [or her] authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." (internal citations omitted)); *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) (explaining that "the magistrate must be made aware of any material new or correcting information" because "when a definite and material change has occurred in the facts underlying the magistrate's determination of probable

cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists" (emphasis omitted)).[5]

The defense understands that mistakes can happen even with the best intentions, and it has no desire to burden the Court with unnecessary motion practice. But given the obvious significance of this interview report, it is hard to understand how it could have been held back for so long. In light of the important and exculpatory nature of the report, the inexplicable delay in its disclosure, and the conspicuous omission of any disclosures in the government's subsequent warrant applications, the defense believes it is appropriate to discuss what, if any, steps should be taken to ensure that the defendants have and will timely receive material that the government is statutorily and constitutionally obligated to provide. At a minimum, if the government is unable to appreciate the significance of material so obviously exculpatory as this report, that augurs in favor of an earlier deadline to provide information pursuant to 18 U.S.C. § 3500 and *Giglio v. United States*, 405 U.S. 150 (1972).

We thank the Court for its consideration of this letter and are available to provide any additional information that may be helpful.

Respectfully submitted,

*Jarrod L. Schaeffer*

Jarrod L. Schaeffer

ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7339
jschaeffer@aellaw.com

*Counsel for Linda Sun*

cc:    Counsel of Record (via ECF)

---

[5]    It is also unclear whether the government complied with the requirement that it provide this *Brady* material to the grand jury when it re-presented the charges in the S-2. *See* JUST. MANUAL § 9-11.233 ("It is the policy of the Department of Justice . . . that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.").