AFM:AAS/RMP/ADR/AS
F. #2021R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

  UNITED STATES OF AMERICA                         Cr. No. 24-346 (S-3) (BMC)

      - against -

  LINDA SUN and CHRIS HU,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
THE DEFENDANTS' MOTIONS TO DISMISS


                              JOSEPH NOCELLA, JR.
                              United States Attorney
                              Eastern District of New York


Alexander A. Solomon
Robert M. Pollack
Andrew D. Reich
Amanda Shami
Assistant U.S. Attorneys

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

ARGUMENT ......................................................................................................................... 5

    I.       Count One Sufficiently Alleges FARA Conspiracy ............................................... 5

    II.      Counts Eight and Nine Sufficiently Allege Honest Services
           Wire Fraud Charges ............................................................................................... 9

          A.       The Second Superseding Indictment Sufficiently
                  Alleges Materiality.................................................................................. 9

          B.       The Fraudulent Intent Element for Federal Fraud
                  Statutes Has Been Abrogated................................................................ 13

          A.       The Second Superseding Indictment Sufficiently
                  Alleges Fraudulent Intent...................................................................... 17

          B.       Counts Eight and Nine Are Not Barred by the
                  Statute of Limitations............................................................................ 19

          C.       Counts Eight and Nine Properly Charge Hu............................................ 21

    II.      Counts Ten and Eleven Sufficiently Allege Section 666 Charges ....................... 22

          A.       Counts Ten and Eleven Sufficiently Allege a *Quid Pro Quo* .................. 22

          B.       Count Eleven Alleges One or More Offenses......................................... 25

          C.       The First Object of Count Eleven Is Not Time-Barred........................... 27

    III.     Count Fourteen Sufficiently Alleges Money Laundering Conspiracy ................. 27

CONCLUSION.................................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Hamling v. United States*,
   418 U.S. 87 (1974) .................................................................................. 9, 10, 28

*Johnson v. United States*,
   144 F.4th 133 (2d Cir. 2025) ................................................................. 21

*McDonnell v. United States*,
   579 U.S. 550 (2016) .............................................................................. 16

*Neder v. United States*,
   527 U.S. 1 (1999) .................................................................................. 10

*Percoco v. United States*,
   598 U.S. 319 (2023) .............................................................................. 21

*Salinas v. United States*,
   522 U.S. 52 (1997) ............................................................................ 6, 22

*Skilling v. United States*,
   561 U.S. 358 (2010) ............................................................... 13, 16, 20, 21

Snyder v. United States,
   603 U.S. 1 (2024) ............................................................................. 22, 24

*United States v. Adams*,
   760 F. Supp. 3d 6 (S.D.N.Y. 2024) ...................................................... 23

*United States v. Amen*,
   831 F.2d 373 (2d Cir. 1987) ................................................................... 7

*United States v. Ashley*,
   905 F. Supp. 1146 (E.D.N.Y. 1995) ..................................................... 17

*United States v. Avenatti*,
   81 F.4th 171 (2d Cir. 2023) ................................................................. 15

*United States v. Benjamin*,
   95 F.4th 60 (2d Cir. 2024) .............................................................. 23, 24

*United States v. Berg*,
   710 F. Supp. 434 (E.D.N.Y. 1988) ....................................................... 18

*United States v. Berlin*,
  472 F.2d 1002 (2d Cir. 1973) ........................................................ 12

*United States v. Brewster*,
  No. 19-CR-833 (SHS), 2021 WL 3423521
  (S.D.N.Y. Aug. 5, 2021) ................................................................ 10

*United States v. Capacho*,
  No. H-17-019, 2018 WL 1334812
  (S.D. Tex. Mar. 15, 2018) ............................................................. 11

*United States v. Cornier-Ortiz*,
  361 F.3d 29 (1st Cir. 2004) ........................................................... 26

United States v. Dawkins,
  999 F.3d 767 (2d Cir. 2021) .......................................................... 22

*United States v. Elliott*,
  711 F. Supp. 425 (N.D. Ill. 1989) ................................................. 11

*United States v. Eppolito*,
  543 F.3d 25 (2d Cir. 2008) ............................................................ 20

*United States v. Fishbein*,
  No. 21-CR-296 (PAC), 2022 WL 1188424
  (S.D.N.Y. Apr. 21, 2022) .............................................................. 17

United States v. Ganim,
  510 F.3d 134 (2d Cir. 2007) .......................................................... 22

*United States v. Hess*,
  124 U.S. 483 (1888) ...................................................................... 10

*United States v. Hoskins*,
  902 F.3d 69 (2d Cir. 2018) .............................................................. 7

*United States v. Klein*,
  476 F.3d 111 (2d Cir. 2007) .......................................................... 10

United States v. Knox,
  396 U.S. 77 (1969) ........................................................................ 19

*United States v. Kousisis*,
  145 S. Ct. 1382 (2025) .......................................................... *passim*

*United States v. Mangano*,
   128 F.4th 442 (2d Cir. 2025) ................................................................. 14, 20

*United States v. Martin*,
   411 F. Supp. 2d 370 (S.D.N.Y. 2006) ........................................................ 17

*United States v. McDonough*,
   56 F.3d 381 (2d Cir. 1995) ....................................................................... 25

*United States v. McGinnis*,
   783 F.2d 755 (8th Cir. 1986) .................................................................... 25

*United States v. Menendez*,
   23 Cr. 490 (SHS) (S.D.N.Y.) ................................................................... 18

*United States v. Menendez*,
   759 F. Supp. 3d 460 (S.D.N.Y. 2024) ...................................................... 24

*United States v. Michel*,
   2024 WL 1603362, (D.D.C. Apr. 12, 2024) ............................................ 8

*United States v. Mittelstaedt*,
   31 F.3d 1208 (2d Cir. 1994) ..................................................................... 12

*United States v. Napout*,
   963 F.3d 163 (2d Cir. 2020) ..................................................................... 14

*United States v. Peraire-Bueno*,
   No. 24-CR-293 (JGLC), 2025 WL 2062021
   (S.D.N.Y. July 23, 2025) .......................................................................... 10

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ................................................................. 12, 18

*United States v. Rabbitt*,
   No. 23-CR-320 (MAS), 2024 WL 4041912
   (D.N.J. Sept. 4, 2024) .............................................................................. 10

*United States v. Resendiz-Ponce*,
   549 U.S. 102 (2007) ................................................................................. 10

*United States v. Rivera-Ventura*,
   72 F.3d 277 (2d Cir. 1995) ....................................................................... 20

*United States v. Ruffin*,
   613 F.2d 408 (2d Cir.1979) ...................................................................... 22

iv

*United States v. Runner*,
  143 F.4th 146 (2d Cir. 2025)...................................................................... 13, 14, 15

*United States v. Rutigliano*,
  790 F.3d 389 (2d Cir. 2015)................................................................................ 20

*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003)................................................................................ 18

*United States v. Salmonese*,
  352 F.3d 608 (2d Cir. 2003)................................................................................ 27

*United States v. Sampson*,
  898 F.3d 270 (2d Cir. 2018)...................................................................... 19, 20, 24

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017)................................................................................ 20

*United States v. Stringer*,
  730 F.3d 120 (2d Cir. 2013).................................................................................. 9

United States v. Sun-Diamond,
  526 U.S. 398 (1999)........................................................................................... 23

*United States v. Tanner*,
  942 F.3d 60 (2d Cir. 2019)................................................................................. 15

*United States v. Thompson*,
  141 F. Supp. 3d 188 (E.D.N.Y. 2015)................................................................. 18

*United States v. Urlacher*,
  979 F.2d 935 (2d Cir. 1992)............................................................................... 26

*United States v. Wey*,
  No. 15-CR-611, 2017 WL 237651
  (Jan. 18, 2017 S.D.N.Y.)..................................................................................... 17

*United States v. Woodward*,
  149 F.3d 46 (1st Cir. 1998)................................................................................ 11

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016)........................................................................................... 17

*Whitfield v. United States*,
  543 U.S. 209 (2005)........................................................................................... 27

**Statutes**

18 U.S.C. § 1346 ................................................................................................. 13, 14

18 U.S.C. § 201(b)(2) ............................................................................................. 24

22 U.S.C. § 613(a)-(c) ........................................................................................... 6, 8

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in opposition to the defendants' motions to dismiss various charges in the Second Superseding Indictment ("S-2").[1] The defendants' myriad arguments all lack merit, and the motions should be denied in their entirety.

*First*, the defendant Linda Sun essentially asks the Court to reconsider its earlier ruling denying her motion to dismiss the conspiracy charge under the Foreign Agent Registration Act ("FARA") (Count One). Sun rehashes her argument that consular officials from the People's Republic of China ("PRC") are exempt from prosecution under FARA, and, therefore, they cannot conspire with Sun to violate FARA. The Court has already rejected this argument and need not address it again. In any event, Sun's argument fares no better the second time, because it once again conflates FARA's exemption from registration requirements with a grant of criminal immunity and thus relies on a body of inapposite authority concerning the affirmative legislative policy exception to the general rules of conspiracy liability.

*Second*, Sun asks the Court to dismiss the honest services wire fraud charges (Counts Eight and Nine), arguing that the charging language impermissibly omits key elements. Sun's arguments miss the mark. The Supreme Court has recently held that one of the supposed elements to which Sun points is no longer an element of honest services wire fraud, and the other purportedly missing element is already specified in the speaking portion of the Second Superseding

---

[1] Yesterday, a grand jury returned a Third Superseding Indictment ("S-3 Indictment"), which makes only minor and essentially technical edits to S-2 without adding any additional counts. Except where briefly addressed in footnote 5 below, these changes have no bearing on the arguments in the present motions, which can be construed as directed at the operative indictment however denominated. Earlier today, Sun filed a letter suggesting numerous improprieties by the government in seeking the S-3 Indictment and in representations to the Court. The government will respond to these allegations under separate cover as ordered by the Court.

Indictment.  Sun's alternative argument that the charges are time-barred is not procedurally ripe and, in any event, fails on the merits.  Additionally, Hu seeks to dismiss the honest services wire fraud charges on the basis that he is ineligible to be charged as a private citizen.  Hu can nonetheless be charged with conspiring with Sun or aiding and abetting her violation of the honest services wire fraud statute, and the authority he relies on pertains solely to liability for principals.

   *Third*, Sun seeks dismissal of the Section 666 charges (Counts Ten and Eleven), arguing that the Second Superseding Indictment fails to sufficiently allege the *quid pro quo* element.  Once again, Sun's position is unsupported by the relevant authorities; in none of the cases she cites does the Second Circuit countenance dismissal of a Section 666 charge for insufficient allegations of the *quid pro quo*.  Her argument in the alternative that the statute of limitations bars both charges fails for the same reasons as does her parallel argument as to the honest services wire fraud charges, insofar as Sun bases her argument on an incomplete pretrial proffer of the government's evidence, and also ignores the fact that the payment to Sun's family constitutes a core element of the Section 666 charges.

   *Fourth*, Sun reprises her earlier arguments from her unsuccessful motion to dismiss the money laundering conspiracy charge (Count Fourteen).  The reasons discussed in the Court's order denying the initial motion to dismiss apply here as well, and Sun's renewed motion to dismiss should be denied as procedurally premature.

<u>FACTUAL BACKGROUND</u>

   From in or about 2012 until 2023, Sun worked for the New York State ("NYS") government, in positions that included: (a) Director of Asian American Affairs and Queens Regional Representative for a then-executive head ("Politician-1"), from in or about August 2012 to February 2015; (b) Director of External Affairs of Global NY for Empire State Development, the economic development arm of the NYS government, from in or about April 2015 to February

2018; (c) Deputy Chief Diversity Officer for Politician-1 from in or about February 2018 to July 2020; (d) Superintendent for Intergovernmental Affairs and Chief Diversity Officer at the NYS Department of Financial Services from in or about July 2020 to September 2021; (e) Deputy Chief of Staff for the NYS Executive Chamber (the "Executive Chamber"), working as an advisor for a then-executive head ("Politician-2"), from in or about September 2021 until September 2022; and (f) Deputy Commissioner for Strategic Business Development for the NYS Department of Labor from in or about September 2022 until March 2023.  During the COVID-19 pandemic, SUN was a member of a team of NYS government employees responsible for procuring personal protective equipment ("PPE") from around the world.  (S-2 ¶ 1).

While working for the NYS government, including in high-ranking posts for Politician-1 and Politician-2 and in multiple state agencies, Sun acted as an undisclosed agent of the Government of the PRC and the Chinese Communist Party ("CCP").  Acting at the request of PRC government officials and CCP representatives, Sun engaged in numerous political activities in the interests of the PRC and the CCP, including blocking representatives of the Taiwanese government from having access to the NYS governor's office; changing Politician-1's and Politician-2's messaging regarding issues of importance to the PRC and the CCP; obtaining official NYS governor proclamations for PRC government representatives without proper authorization; attempting to facilitate a trip to the PRC by Politician-2; and arranging meetings for visiting delegations from the PRC government with NYS government officials.  (S-2 ¶ 14).

Additionally, Sun repeatedly violated internal rules and protocols within the NYS governor's office to provide improper benefits to PRC and CCP representatives, including by providing unauthorized invitation letters from the office of the NYS governor that were used to facilitate travel by PRC government officials into the United States for meetings with NYS

3

government officials.  Sun's unauthorized invitation letters for the PRC government delegation constituted false statements made in connection with immigration documents and induced the foreign citizens into unlawfully entering the United States.  (S-2 ¶ 15).

While taking these and other actions, Sun received substantial economic and other benefits from representatives of the PRC government and the CCP, including the facilitation of millions of dollars in transactions for the PRC-based business activities of Sun's husband, codefendant Chris Hu; travel benefits; tickets to events; promotion of a close family friend's business; employment for Sun's cousin in the PRC; and Nanjing-style salted ducks prepared by the personal chef of a high-ranking government official at the Consulate of the People's Republic of China in New York ("PRC Consulate") that were delivered to the residence of Sun's parents. Sun and Hu laundered the monetary proceeds of this scheme to purchase, among other items, real estate property in Manhasset, New York for $3.6 million, a condominium in Honolulu, Hawaii for $1.9 million, and various luxury automobiles, including a 2024 Ferrari.  Sun never disclosed any benefits she received from representatives of the PRC government and the CCP to the NYS government, as she was required to do as a NYS government employee.  (S-2 ¶ 16).

Sun never registered as a foreign agent with the Attorney General, and in fact actively concealed that she took actions at the order, request, or direction of PRC government and CCP representatives.  Thus, neither the NYS government nor the greater New York and American public had the opportunity to evaluate her conduct, considering her long-standing relationships with the PRC government and the CCP and her status as their agent.  (S-2 ¶ 17).

During the COVID-19 pandemic, Sun and Hu perpetrated a fraud on the NYS government.  Sun facilitated contracts between the NYS government and two businesses—a company (the "Cousin Company") operated by one of Sun's second cousins (the "Cousin"), and a

company (the "Associate Company") that was operated by Hu and a business associate of Hu, with whom Hu also co-owned a wine and liquor business—that resulted in the Cousin Company and the Associate Company selling millions of dollars' worth of PPE sourced in the PRC to the NYS government.  Sun, the Cousin Company, and the Associate Company failed to disclose the businesses' associations with Sun's family to the NYS government.  (S-2 ¶ 20).

In addition to directly benefiting from the profits that the Associate Company reaped from these contracts, Sun and Hu received a portion of the profits from the contracts with the Cousin Company as kickbacks.  A spreadsheet in one of Hu's electronic accounts included a column titled "me."  That column detailed the estimated profits that Hu expected he and Sun would receive from the contracts that the Associate Company and the Cousin Company had with the NYS government (including the kickback payments from the Cousin Company), which totaled $8,029,741.  (S-2 ¶ 121).

<u>ARGUMENT</u>

I.    <u>Count One Sufficiently Alleges FARA Conspiracy</u>

Sun argues that "Count One fails to state an offense to the extent that it alleges Ms. Sun conspired with PRC consular officials," (ECF No. 145 at 11) because consular officials are exempt from FARA registration and thus (Sun posits) they must be legally incapable of conspiring with anyone else to violate the FARA statute, too.

Even prior to addressing the merits, this argument fails out of the gate for two reasons.  First, Your Honor has already considered and rejected it.  Although Sun concedes (as she must) that that rejection remains the law of the case, (*id.* at 1 n.1), she nevertheless takes the opportunity of the Second Superseding Indictment to "renew" the argument, (*id.* at 11), and "amplif[y]" it, (*id.* at 12 n.11).  But the Court need not take up the identical argument again.  Second, by its own terms, Sun's argument about Count One can succeed only "to the extent" (*id.*

at 11) that Count One relies upon consular officials as unindicted coconspirators.  But Count One encompasses other coconspirators who are not consular officials.  Thus, even if the Court had not already rejected Sun's argument, and even if Sun's argument were correct (and it is not), the argument would still not result in pretrial dismissal because it would not result in all of the identified coconspirators being ineligible to support a conviction.  For either or both of these reasons, the Court should reject Sun's argument about Count One.

Moreover, if the Court were inclined to reach the merits, Sun's second bite at the apple fares no better than the first.  She begins with a false premise: "FARA expressly precludes liability for consular officials."  (*Id.* (citing 22 U.S.C. § 613(a)-(c))).  It does not.  As the government observed in response to Sun's prior motion raising this argument, Sun conflates exemption from FARA's *individual registration requirements* with a broad grant of criminal immunity.  The statutory subsections that Sun cites provide that certain persons are exempt *from registering* as foreign agents under FARA.  They say nothing whatsoever about liability under 18 U.S.C. § 371 for conspiring with another person (who is not exempt from registration) for *that person* to act as an unregistered agent.  It is black-letter law that, as a general rule, "[a] person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense."  *Salinas v. United States*, 522 U.S. 52, 64 (1997) (citation omitted).  Thus, a person who cannot violate FARA *as a principal* because he or she is exempt from registering may still be liable for conspiring with another person to violate the statute.[2]

---

[2]    To be sure, there may often be other legal, practical, and/or prudential obstacles to charging such persons under 18 U.S.C. § 371 (or 18 U.S.C. § 2), not least diplomatic immunity. But diplomatic immunity does not extend to those who *conspire with* the officials who are themselves protected by it, as Sun concedes (ECF No. 145 at 13-14), and FARA itself confers no such immunity on anyone.

As the government discussed in its opposition to Sun's prior motion, and as the Court addressed in its ruling rejecting Sun's argument, there is a narrow exception to this general rule when the statute reveals an "affirmative legislative policy to leave some type of participant in a criminal transaction unpunished." *United States v. Hoskins*, 902 F.3d 69, 80 (2d Cir. 2018). The "classic illustration" of such a policy is statutory rape, because such statutes "obviously conceptualize[] the under-age party as the victim of the crime, and not a co-participant," *id.* at 78, and thus the minor victim cannot be a coconspirator. Similarly, the continuing criminal enterprise statute is obviously intended to subject a limited group of drug "kingpins" to far more severe penalties than those imposed on lower-level drug traffickers, and thus to affirmatively exclude the latter. If the lower-level traffickers whose individual conduct does not violate the statute could conspire with their bosses to violate it, then anyone selling drugs on a street corner for Sinaloa bosses may be subject to the same penalties as El Chapo. That absurd result would obviously thwart the purpose of the statute, so the "affirmative legislative policy" exception applies to preclude conspiracy liability. *Id.* at 80 (discussing *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987)).

No such absurd result flows from applying the general rule in this case, rather than the narrow exception. On the contrary, FARA's statutory purpose is consistent with and served by the availability of conspiracy liability, and Sun's alternative construction would profoundly undermine that purpose. A close review of the § 613 exemptions from the FARA registration requirement—which Sun misconstrues as a broad grant of criminal immunity—confirms this view.

In broad terms, FARA requires agents of foreign principals to register with the Department of Justice and attaches criminal sanctions to acting as a foreign agent without such registration. In other words, FARA does not *per se* prohibit acting as a foreign agent; rather, it

prohibits acting as a *secret* foreign agent.  Thus, the persons exempt from registering include, *inter alia*, consular officers "who [are] so recognized by the Department of State" and engaged in activities that "are recognized by the Department of State as being within the scope" of their duties (§ 613(a)); other foreign officials whose identities and duties "are of public record in the Department of State" and who are engaged in activities that "are recognized by the Department of State as being within the scope" of those duties (§ 613(b)); members of the staff and employees of consular officers whose identities and duties "are of public record in the Department of State" and who are engaged in activities that "are recognized by the Department of State as being within the scope" of those duties (§ 613(c)); and certain foreign agents who are already registered under a different statute (§ 613(h)).  That is, classes of persons who have already declared their foreign agency to the United States and the American people in other specified forms, and who act openly and transparently within the scope of their acknowledged agency, need not declare their foreign agency *again* through FARA registration.  But FARA does not exempt these persons from declaring their agency altogether, nor does it authorize consular officials to act in any way that exceeds the scope of their duties as recognized by the Department of State.  The implication of Sun's argument, however, is that the surreptitious use of unregistered cutouts by consular officers to advance the interests of their foreign principals without public knowledge cannot reflect a conspiracy to violate FARA.  That absurd result would thwart FARA's purpose, which "is to prevent covert influence over U.S. policy by foreign principals, by ensuring that the public is informed of the true source or sponsor behind the information being disseminated for its consideration."  *United States v. Michel*, 2024 WL 1603362, at *13 (D.D.C. Apr. 12, 2024).  By contrast, treating consular officers (who are exempt from FARA registration) as capable of conspiring with others (who are not exempt) to violate FARA plainly furthers the statute's purpose.

8

For all these reasons, Sun's argument about Count One fails (again).  This straightforward and commonsense application of the law does not rely on any novel construction of a statute, nor any serious ambiguity, and Sun's *pro forma* invocation of the rule of lenity should also be rejected.[3]

## II.    Counts Eight and Nine Sufficiently Allege Honest Services Wire Fraud Charges

Sun argues that the honest services wire fraud charges are fatally deficient because the Second Superseding Indictment does not specifically allege the elements of materiality or fraudulent intent for Counts Eight and Nine.  Sun is wrong.

### A.    The Second Superseding Indictment Sufficiently Alleges Materiality

"An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  "'Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general

---

[3]    Sun also asks in a footnote that the Court strike ¶ 29(g) from the Second Superseding Indictment.  (ECF No. 145 at 11 n.10).  That paragraph refers to (and includes a published news photograph of) Sun attending a protest of the Taiwanese President's visit to New York City.  Sun opines that because this "concerns purely private activity protected by the First Amendment," its inclusion is improper.  (*Id.*)  Sun is wrong.  It is common for innocent (and even constitutionally protected) conduct to be relevant to criminal charges.  Neither the law nor common sense requires that one's motive for acting on behalf of a foreign government be purely (or even principally) remunerative.  Indeed, it is intuitively obvious that one's agreement to act on behalf of any particular foreign country—the PRC, Israel, Cuba, Iran—may be motivated in part by ideology.  And thus, just as a private (and constitutionally protected) love letter might be relevant to a crime of passion, so too attendance at a protest can be relevant to a crime of foreign agency.  Its inclusion in the indictment is proper.

description, with which he is charged.'" *Hamling*, 418 U.S. at 117-18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

        While materiality of a falsehood is an element of the federal fraud statutes, *see Neder v. United States*, 527 U.S. 1, 22, 25 (1999), the word "material" does not appear in any of the federal fraud statutes, including the wire fraud or the honest services fraud statutes. Addressing a defendant's complaint that an indictment did not specifically use the word "material" in a bank fraud charge, the Second Circuit wrote:

> There was no error. If materiality can be inferred to be an element of criminal fraud because of the well-understood meaning of "fraud" as a legal term, an allegation of materiality can be inferred from use of the word fraud in the indictment. Moreover, as commonly understood among both lawyers and laypersons, "fraud" refers to conduct or speech intended to mislead the putative victim into parting with money or property. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (agreeing with the Government that "the indictment at bar implicitly alleged that respondent engaged in the necessary overt act simply by alleging that he attempted to enter the United States," because "[n]ot only does the word "attempt" as used in common parlance connote action rather than mere intent, but more importantly, as used in the law for centuries, it encompasses both the overt act and intent elements" of the crime of attempted illegal reentry (internal quotation marks omitted)). The materiality of the misleading conduct or speech is therefore at the heart of the word "fraud." Conduct or speech that is immaterial—irrelevant—to a putative victim cannot be fraud. Finally, each of the counts on which appellant was convicted contained an allegation that he obtained money or credit "by means of false or fraudulent . . . representations." Again, one cannot fraudulently induce a victim to part with money or credit "by means of" immaterial representations.

*United States v. Klein*, 476 F.3d 111, 113-14 (2d Cir. 2007), *as corrected* (Mar. 8, 2007); *see United States v. Peraire-Bueno*, No. 24-CR-293 (JGLC), 2025 WL 2062021, at *8 (S.D.N.Y. July 23, 2025) ("Allegations of materiality can be inferred from the use of the word 'fraud.'"); *United States v. Brewster*, No. 19-CR-833 (SHS), 2021 WL 3423521, at *5 (S.D.N.Y. Aug. 5, 2021) (applying *Klein*'s reasoning to reject argument that wire fraud charge was deficient for failing to properly allege materiality); *see also United States v. Rabbitt*, No. CR 23-320 (MAS), 2024 WL 4041912, at *4 (D.N.J. Sept. 4, 2024) ("Rabbitt's argument is meritless because courts have held

that an indictment is not defective just because it does not use the exact word 'material' in allegations of fraud, as long as there are specific allegations of misrepresentation in the indictment."); *United States v. Capacho*, No. H-17-019, 2018 WL 1334812, at *3 (S.D. Tex. Mar. 15, 2018) ("In the Fifth Circuit, the failure to use the word 'material' in the Indictment is not fatal."); *United States v. Elliott*, 711 F. Supp. 425, 429-30 (N.D. Ill. 1989) (denying motion to dismiss wire fraud charges that did not reference materiality where, read as a whole, indictment alleged "materiality in substance").

Not only do Counts Eight and Nine both allege a "scheme and artifice to *defraud* the NYS government of its intangible right to the honest services of SUN," (S-2 ¶¶ 141, 143 (emphasis added)), but the speaking portion of the Second Superseding Indictment alleges numerous misrepresentations, most importantly Sun's concealment of her personal interest in the transactions with the Associate Company and the Cousin Company, (S-2 ¶¶ 118-19, 122, 124-25, 128-29); *see United States v. Woodward*, 149 F.3d 46, 62 (1st Cir. 1998) ("A public official has an affirmative duty to disclose material information to the public employer.  When an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's motivation behind an official act.").  The Second Superseding Indictment details acts in furtherance of the concealment scheme, including the creation and use of a fraudulent email.  (S-2 ¶¶ 124-25).  Therefore, under *Klein* and its progeny, materiality is sufficiently pled for both honest services wire fraud charges.

Entirely inapposite is the legal authority Sun relies on to argue that "materiality [cannot] be inferred."  (ECF No. 145 at 29).  None of these cases pertain to federal fraud charges,

and all of them pre-date *Klein*'s decisive ruling that materiality is necessarily encompassed in alleging a "fraud."

      To begin, *United States v. Berlin*, 472 F.2d 1002 (2d Cir. 1973) is a pre-*Klein* case which addressed the sufficiency of an indictment's allegations under 18 U.S.C. §§ 1010 and 1014, neither of which is a federal fraud statute. The Second Circuit held that the indictment had insufficiently pled the defendant's knowledge of the falsity of the alleged misstatement, where nothing in the indictment—including the speaking portion of the indictment—suggested such knowledge as to three of the dismissed charges. *Id.* at 1007-09. Here, as in *Klein*, the defendants are charged with perpetrating a "fraud," which necessarily connotes materiality.

      Similarly, *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), is another pre-*Klein* case which concerns the sufficiency of allegations under 26 U.S.C. § 7206(1)—which, again, is not a federal fraud statute. In *Pirro*, the Second Circuit found that the government had failed to properly allege a material falsehood either implicitly or explicitly in the indictment, where the making of a material falsehood was an essential element of a Section 7206(1) violation. As with *Berlin*, *Pirro* is distinguishable from *Klein*, where materiality is necessarily embodied in the use of the word "fraud."

      Finally, *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994)—another pre-*Klein* case—addressed conduct of a defendant occurring after the Supreme Court had invalidated the honest services theory of wire fraud previously read into the mail and wire fraud statutes but before Congress enacted 18 U.S.C. § 1346 (the honest services wire fraud statute). In writing that "[t]o convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature *or* that the village could have negotiated a better deal for itself if it had not been deceived," *id.* at 1217 (emphasis in original), the Second Circuit

applied the net economic harm requirement of materiality that has now been invalidated by *United States v. Kousisis*, 145 S. Ct. 1382 (2025); *see United States v. Runner*, 143 F.4th 146, 155-56 (2d Cir. 2025) ("By embracing the fraudulent-inducement theory, the Supreme Court erased the 'fine line' that our court had drawn in excluding certain inducement schemes from the mail and wire fraud statutes. . . . [W]e had said that schemes that 'do no more than cause their victims to enter into transactions they would otherwise avoid' are not criminal under the mail and wire fraud statutes."). As discussed in further detail below, Sun's argument that *Kousisis* applies solely to mail fraud and wire fraud, and not the more "amorphous" honest services wire fraud, is belied by *Kousisis*'s repetitions that its holding applies to all federal fraud statutes—a group of statutes that includes Section 1346. 145 S. Ct. at 1388, 1396; *see infra*.

In sum, Sun's argument that materiality is insufficiently pled in Counts Eight and Nine lacks merit.

B.    The Fraudulent Intent Element for Federal Fraud Statutes Has Been Abrogated

Sun unpersuasively argues at length that *Kousisis*'s abrogation of the Second Circuit's fraudulent intent requirement for federal fraud statutes somehow does not apply to the honest services wire fraud statute.

In 1988, Congress enacted the honest services wire fraud statute, 18 U.S.C. § 1346, which clarified that, for the purpose of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, the term "scheme or artifice to defraud" "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In honest-services fraud, while "the offender profit[s], the betrayed party suffer[s] no deprivation of money or property; instead, a third party, who ha[s] not been deceived, provide[s] the enrichment." *Skilling v. United States*, 561 U.S. 358, 400 (2010).

In ratifying the fraudulent inducement theory of wire fraud—which had previously been foreclosed in the Second Circuit—the *Kousisis* court necessarily abrogated the Second Circuit's previous requirement of demonstrating intent to harm the victim of a federal fraud scheme. In particular, the Supreme Court held that "a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." 145 S. Ct. at 1392; *see Runner*, 143 F.4th at 155-56 (holding that, under *Kousisis*, the Second Circuit's causation of harm component of the fraudulent intent requirement for the federal fraud statutes no longer applies).

Sun argues that the Supreme Court could not have meant to abrogate the fraudulent intent requirement for honest services wire fraud, which Sun distinguishes as a standalone species of federal fraud pertaining solely to intangible rights. Sun's argument fails.

The Second Circuit has repeatedly emphasized that honest services wire fraud is simply a category of wire fraud. "Honest services fraud is a type of mail or wire fraud in which the 'scheme or artifice to defraud' includes a scheme 'to deprive another of the intangible right of honest services.'" *United States v. Mangano*, 128 F.4th 442, 470 (2d Cir. 2025) (quoting 18 U.S.C. § 1346). "[H]onest services wire fraud . . . is not something different from wire fraud; it is a type of wire fraud that is explicitly prohibited by that statute. The statute includes a provision specific to honest services wire fraud not because it is in some essential aspect different from other wire fraud, but to clarify the application of the law of wire fraud to honest services fraud." *United States v. Napout*, 963 F.3d 163, 179-80 (2d Cir. 2020) ("Honest services wire fraud is 'include[d]' as a type of wire fraud prohibited under § 1343."). Accordingly, when the *Kousisis* court wrote that the fraudulent inducement theory applies to the "federal fraud" or the "federal fraud statutes," 145 S. Ct. at 1388, 1396, it necessarily spoke to Section 1346, which is a type of wire fraud.

14

Sun's arguments to the contrary miss the mark.

To begin, it is simply not true that the *Kousisis* court "did not address th[e] issue" of "fraudulent intent required under § 1346." (ECF No. 145 at 35). As noted above, the Supreme Court held that the fraudulent inducement theory applies to all federal fraud statutes, 145 S. Ct. at 1388, 1396, where it had repeatedly "*rejected* the argument that a fraud conviction depends on economic loss." *Id.* at 1396 (emphasis in original). Where the holding applies to all federal fraud statutes, the Second Circuit's prior requirement that fraudulent intent include intent to cause economic harm likewise evaporates for all federal fraud statutes. *See Runner*, 143 F.4th at 155-56 (holding that, under *Kousisis*, the economic harm component of the Second Circuit's fraudulent intent requirement for the mail and wire fraud statutes no longer applies). Indeed, the Second Circuit has previously held that economic harm is not a requirement for Section 1346 prosecutions: "[A] person need not suffer economic harm to have been denied the honest services of a fiduciary." *United States v. Avenatti*, 81 F.4th 171, 196 (2d Cir. 2023); *see generally United States v. Tanner*, 942 F.3d 60, 65 (2d Cir. 2019) (government not required to prove that defendant's acts "caused or were intended to cause . . . financial harm" to company owed fiduciary duty; "it needed to prove only that [company] lost its right to [fiduciary's] honest services at least in part because of [third party's] bribes and kickback").

Similarly unpersuasive is Sun's argument that Section 1346 should be distinguished from all other federal fraud statutes because it alone explicitly addresses schemes to deprive the victim of something. (*See* ECF No. 145 at 37) (arguing that *Kousisis* does not apply to Section 1346, which pertains to "intangible" rights). As discussed in further detail below, the fraudulent intent to harm embodied in the honest services wire fraud statute is reflected in the statutory language of Section 1346, which speaks to the victim's deprivation of another's honest services.

15

In other words, the deprivation of the intangible right of honest services is the alleged harm.  Here, there can be no serious dispute that the plain language of Counts Eight and Nine allege that Sun and Hu acted to deprive NYS government of Sun's honest services.

Moreover, the analysis of the *Kousisis* court is rooted in the text of the wire fraud statue; the plain language of the wire fraud statute—like that of the honest services wire fraud statute—lacks any reference to economic harm or loss.  145 S. Ct. at 1391 ("No matter how long we stare at it, the broad, generic language of § 1343 leaves us struggling to see any basis for excluding a fraudulent-inducement scheme.").  Considering the Court's text-based reasoning and its repeated statements that its holding applies to the federal fraud statutes, *id.* at 1388, 1396, Section 1346's recognition of the deprivation of the intangible right to honest services as a type of "scheme or artifice to defraud" under the wire fraud statute has no relevance to the Court's reasoning or holding.  *Id.* at 1391 n.3 ("Congress amended the statute to include schemes that seek to 'deprive another of the intangible right of honest services.'  § 1346 . . . .  That exception is irrelevant here." (citation omitted)).

There is no basis for Sun's specter of an unfettered honest services fraud statute resulting in broad criminalization of ethics violations.  To begin, any violation must include a violation of a fiduciary relationship, a *quid pro quo* arrangement including bribes or kickback schemes, and an official act.  "[A]cknowledg[ing] that Skilling's vagueness challenge ha[d] force," the Supreme Court applied a limiting construction that narrowed the statute's reach to cover only "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Skilling*, 561 U.S. at 405, 407; *see McDonnell v. United States*, 579 U.S. 550, 574 (2016) (explaining official act requirements for *quid pro quo* bribery schemes).  Moreover, *Kousisis*'s explanation that the robust materiality requirement will cabin the reach of the fraudulent

16

inducement theory of liability applies directly to the materiality requirement inherent in honest services wire fraud prosecutions: "The 'demanding' materiality requirement substantially narrows the universe of actionable misrepresentations."   145 S. Ct. at 1398 (quoting *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016)).

In summary, the causation of harm component of fraudulent intent is no longer an element of honest services wire fraud under Section 1346.  Therefore, Sun's argument that Counts Eight and Nine are insufficiently pled as to fraudulent intent must fail.

A.    The Second Superseding Indictment Sufficiently Alleges Fraudulent Intent

Irrespective of the applicability of *Kousisis* to honest services wire fraud, Counts Eight and Nine are still sufficiently pled.

Courts in this Circuit have routinely rejected arguments that federal fraud charges should be dismissed absent use of the words "fraudulent intent" in the charging instrument.  *See United States v. Fishbein*, No. 21-CR-296 (PAC), 2022 WL 1188424, at *3 (S.D.N.Y. Apr. 21, 2022) ("[T]he Indictment need not allege Fishbein had an intent to harm the Agencies."); *United States v. Wey*, No. 15-CR-611, 2017 WL 237651, at *9 (Jan. 18, 2017 S.D.N.Y.) ("The Court is aware of no authority suggesting that the Government is required to specifically allege contemplated harm in an indictment to sufficiently *state* a violation of Section 1348, and it will impose no such requirement here." (emphasis in original)); *United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (rejecting argument that indictment failed to allege "intended harm," and thus the fraudulent intent element of the offense, because "the sufficiency of the government's evidence of . . . fraudulent intent is not considered on a motion to dismiss the indictment"); *United States v. Ashley*, 905 F. Supp. 1146, 1155-56 (E.D.N.Y. 1995) (while government might need to prove at trial that defendants contemplated damage to victim in order to show fraudulent intent in support of wire fraud charge, "the indictment at issue [was] not insufficient for failure to

specifically allege fraudulent intent on the part of [d]efendants"); *United States v. Berg*, 710 F. Supp. 434, 436-37 (E.D.N.Y. 1988) (inferring proper allegation of fraudulent intent from factual allegations).

Against this backdrop of contrary authority, Sun points to no case in which a court dismissed federal fraud charges, much less a Section 1346 charge, absent sufficient allegations of fraudulent intent.  Rather, she relies solely on two cases, neither of which pertains to pretrial dismissal of federal fraud charges because of insufficient allegations of fraudulent intent.  *See Pirro*, 212 F.3d at 93 (concerning the sufficiency of allegations under 26 U.S.C. § 7206(1)); *United States v. Thompson*, 141 F. Supp. 3d 188 (E.D.N.Y. 2015) (dismissing without prejudice certain sex trafficking charges).  Sun's argument is meritless and should be denied.

More pertinently, the harm encompassed in the fraudulent intent requirement for honest services wire fraud is the harm caused by the loss of honest services.  For example, in the trial of former Senator Robert Menendez, U.S. District Judge Sidney H. Stein instructed the jury on fraudulent intent as follows:

> Specific intent to defraud means to act knowingly and with the specific intent to deceive for the purpose of depriving the public of its right to a public official's honest services.  In other words, the deceit may consist of concealing or helping another to conceal the things of value that the public official has solicited or received or the public official's implicit false pretense that he is faithfully performing his official duties, including the duty not to accept payments or things of value in exchange for performing, or promising to perform, an official act.

(*United States v. Menendez*, No. 23-CR-490 (SHS) (S.D.N.Y.) (ECF No. 583 at 38)).  Similarly, in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), the Second Circuit explicitly rejected the notion of requiring the government to prove reasonably foreseeable economic or pecuniary harm to the victim for honest services wire fraud.  Rather, it held that the "materiality" requirement "may

18

be a somewhat broader test: It may capture some cases of non-economic, yet serious, harm in the private sphere." *Id*. at 146.

Applying *Rybicki* and Judge Stein's formulation to the instant case, fraudulent intent to harm is properly alleged in the Second Superseding Indictment, which alleges in Counts Eight and Nine that the defendants schemed to deprive the NYS government of the intangible right to Sun's honest services. This deprivation scheme necessarily entails the harm requirement that Sun wrongfully asserts is missing from the charging language.

B.      Counts Eight and Nine Are Not Barred by the Statute of Limitations

Relying only on *United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018), a case in which the Second Circuit reimposed embezzlement charges that had been improperly dismissed pretrial, Sun argues that the Court should dismiss pretrial the honest services wire fraud charges as untimely. The Court should decline the invitation to resolve material issues of disputed fact at this procedural juncture.

In *Sampson*, the Second Circuit vacated pretrial dismissal of two counts of federal program embezzlement, after the district court had determined that the embezzlement occurred after the defendant had failed to timely remit escrow funds he received in his capacity as court-appointed referee, rather than when he later removed funds incrementally through withdrawals and electronic transfers. Reiterating the standard that "[i]n some circumstances . . . a party may raise and establish a statute-of-limitations defense via a Rule 12(b) motion, such as when the defense is clear from the face of the indictment," the Second Circuit noted the prohibition against "resolving" a defense that raises "dispositive evidentiary questions" until after trial. *Id.* at 279 (citing *United States v. Knox*, 396 U.S. 77, 83 & 83 n.7) (quotation marks removed). Thus, the Court reversed the district court, holding that "the civil summary judgment mechanism does not exist in federal

criminal procedure and the district court acted prematurely in addressing the statute-of-limitations issue." 898 F.3d at 279.

Here, Sun argues that the crimes alleged in Counts Eight and Nine were complete no later than June 18, 2020, "when the property at issue was allegedly obtained from New York." (ECF No. 145 at 41). This argument fails for multiple reasons.

*First*, the government has not offered a full proffer of its evidence, and all relevant facts are not "clear from the face of the indictment." *Sampson*, 898 F.3d at 279 (finding pretrial dismissal inappropriate where government had not offered full pretrial proffer of its evidence). Nothing more is needed to defeat Sun's motion to dismiss, where the grand jury has alleged that the honest services fraud schemes continued into approximately August 2020. (S-2 ¶¶ 141, 143).

*Second*, according to the allegations of the Second Superseding Indictment, Sun and her family received kickbacks "totaling approximately $2.3 million during 2020 and 2021." (S-2 ¶ 126). A critical element of honest services wire fraud is a bribery or kickback scheme. *See Skilling*, 561 U.S. at 405, 407; *Mangano*, 128 F.4th at 470. Therefore, the alleged kickback payments—the *quid* of the *quid pro quo*—occurred as late as 2021. Because "[w]ire fraud is . . . a continuing offense," *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015), and "[a] 'continuing offense' is, in general, one that involves a prolonged course of conduct[ where] its commission is not complete [and the statute of limitations does not begin to run] until the conduct has run its course," *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008) (quoting *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995)), the honest services wire fraud charges in this case are facially timely.[4]

---

[4]    Notably, in *United States v. Silver*, the Second Circuit explained that, for honest services wire fraud, the government "need not prove that an official act occurred within the statute of limitations period." 864 F.3d 102, 122 (2d Cir. 2017). Rather, the government would only have

In sum, Counts Eight and Nine are not time-barred, and the Court should deny Sun's motion to dismiss on this basis.

C.    Counts Eight and Nine Properly Charge Hu

Citing *Percocco v. United States*, 598 U.S. 319 (2023), Hu posits that he is ineligible to be charged with honest services fraud.  The Court should reject this argument.

In *Percocco*, the Supreme Court addressed the question of "whether a private citizen with influence over government decision-making can be convicted for wire fraud on the theory that he or she deprived the public of its 'intangible right of honest services.'"  *Id.* at 322.  The Court reversed the judgment of conviction.  Explaining *Percocco*, the Second Circuit wrote, "The Supreme Court explicitly did not say that a formal public position is the *only* way to assume a fiduciary duty to the public, but the Supreme Court made clear that in the absence of such a position, a fiduciary relationship should not be lightly implied from vague principles.  The same also must be true for a defendant with no explicit, contractually binding fiduciary relationship with his purported victim."  *Johnson v. United States*, 144 F.4th 133, 144 (2d Cir. 2025).

Relying on *Percocco* and *Johnson*, Hu argues that, as a private citizen who never had a fiduciary duty to the public, he cannot be charged under Section 1346.  Hu is mistaken.

As alleged, the principal of the honest services wire fraud charges is Sun, who was at all relevant times an employee of the NYS government and accordingly owed a fiduciary relationship to the NYS government.  (*See* S-2 ¶¶ 141, 143).  In bribe and kickback cases, "[t]he existence of a fiduciary relationship, under any definition of that term, [is] usually beyond dispute; examples include public official-public [and] employee-employer."  *Skilling*, 561 U.S. at 407 n.41.

---

to "prove that some aspect of the particular *quid pro quo* scheme continued into the statute of limitations."  *Id.* at 122.

The Second Superseding Indictment does not allege that Hu owed a fiduciary duty to the NYS government or the public. However, Sun did owe such a duty, and Hu is therefore properly charged as conspiring with Sun (as principal) to commit honest services wire fraud (Count Eight) and aiding and abetting Sun's substantive honest services wire fraud (Count Nine). *See Salinas*, 522 U.S. at 64 ("A person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense." (citation omitted)); *United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir. 1979) ("[A] person may be convicted as an aider and abettor under 18 U.S.C. § 2(a) even though [s]he may lack the capacity to violate the substantive criminal statute.").

That individuals who are ineligible to be charged as principals may nonetheless be charged as coconspirators or as aiders and abettors roots firmly in common sense. Given that unfaithful public servants often operate together with others who are not public employees and who facilitate their schemes, it would be perverse if the law precluded liability for coconspirators or aiders and abettors for crimes against the public that they knowingly participated in or enabled.

II.    Counts Ten and Eleven Sufficiently Allege Section 666 Charges

In arguments that mirror those lobbed against the honest services wire fraud charges, Sun seeks pretrial dismissal of the Section 666 charges (Counts Ten and Eleven). Once again, Sun's arguments fail.

A.    Counts Ten and Eleven Sufficiently Allege a *Quid Pro Quo*

Sun argues that, because the phrases "*quid pro quo*" or "in exchange for" do not appear in the charging language, the Section 666 charges are improperly pled. Sun is incorrect.

While the text of Section 666 does not require a *quid pro quo* agreement, the Supreme Court has explained that one is nonetheless required. *Snyder v. United States*, 603 U.S. 1 (2024) (holding that Section 666 bribery applies only to *quid pro quo* exchanges and not to gratuities). As defined by the Second Circuit, *quid pro quo* means "this for that" or "these for

22

those." *United States v. Ganim*, 510 F.3d 134, 148 (2d Cir. 2007). "To prove a *quid pro quo*, the government must prove that a defendant had "a specific intent to give or receive something of value in exchange for an . . . act." *United States v. Dawkins*, 999 F.3d 767, 777 n.2 (2d Cir. 2021) (emphasis omitted) (citing *United States v. Sun-Diamond*, 526 U.S. 398, 404-05 (1999)). "In *quid pro quo* bribery schemes, the *quid* is a *thing of value* that the defendant agrees to accept, the *quo* is an *act* that the defendant agrees to perform in exchange for the *quid*, and the *pro* is the link between the two: an *agreement* by the defendant to accept the *quid* in exchange for being influenced to perform the *quo*." *United States v. Adams*, 760 F. Supp. 3d 6, 15 (S.D.N.Y. 2024).

According to the Second Circuit, proof of a *quid pro quo* can be circumstantial. "An explicit *quid pro quo* . . . need not be expressly stated but may be inferred from the official's and the payor's words and actions." *United States v. Benjamin*, 95 F.4th 60, 67 (2d Cir. 2024); *see id.* at 71 ("The showing of a *quid pro quo*, assuming it is required, may be based on inference and need not involve an express statement."). In *Benjamin*, where the phrase "*quid pro quo*" did not appear in the indictment, the Second Circuit found that the references to acts "in exchange for" campaign contributions satisfied the *quid pro quo* requirement. *Id.* at 73-74.

Here, the phrases "*quid pro quo*" and "in exchange for" do not appear in the Second Superseding Indictment.[5] Their absence, however, does not mean that the *quid pro quo* requirement is insufficiently pled. Indeed, both Counts Ten and Eleven allege that Sun "did knowingly, intentionally, and corruptly solicit and demand for the benefit of SUN and HU, and accept and agree to accept, one or more things of value, to wit: United States currency" while

---

[5]    In the S-3 Indictment returned yesterday afternoon, the Section 666 charges themselves further specify the *quid pro quo* agreement, using the phrase "in exchange for" approved by *Benjamin*. Thus, Sun's argument regarding sufficiency of allegations as to the Section 666 bribery counts has now been mooted.

"intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the DOH involving things of value of $5,000 or more." (S-2 ¶¶ 145, 147(b)). Elsewhere, the Second Superseding Indictment repeatedly alleges that the payments were "kickbacks" in connection with Sun's official activities in referring the Associate Company and the Cousin Company for PPE contracts with NYS and "claiming falsely that these, too, were referrals from components of the PRC government." (S-2 ¶¶ 20, 118, 119, 126). The word "kickback" is defined in the *Meriam-Webster* dictionary as "a return of a part of a sum received often because of confidential agreement or coercion"—a definition that implies the improper agreement. *See Benjamin*, 95 F.4th at 71 ("The showing of a *quid pro quo*, assuming it is required, may be based on inference and need not involve an express statement.").

Even though the word "gratuity" never appears in the Second Superseding Indictment, Sun construes the charging language to mean that she is necessarily charged with receiving a gratuity under Section 666. (ECF No. 145 at 45-47). Specifically, Sun argues that all payments received after the official acts necessarily constitute gratuities. This very argument was rejected by the district court presiding over the recent prosecution of Senator Robert Menendez. *See United States v. Menendez*, 759 F. Supp. 3d 460, 482 (S.D.N.Y. 2024) ("Menendez contends that these cannot be bribe payments because they were received *after* the official acts and are thus, at most, gratuities. But bribes are payments that are either 'made *or agreed to* before an official act in order to influence the official with respect to a future act.' (quoting *Snyder*, 603 U.S. at 5 (emphasis in original)); *see* 18 U.S.C. § 201(b)(2) (prohibiting public officials from, *inter alia*, "agree[ing] to receive or accept anything of value . . . in return for being influenced in the performance of any official act").

24

Ultimately, as she concedes that the word "kickbacks" can encompass both bribes and gratuities, (ECF No. 145 at 45), Sun necessarily asks the Court to resolve disputed issues of fact before trial. Absent a full proffer of the government's evidence, any such determination would be premature. *See Sampson*, 898 F.3d at 279. Sun's argument thus fails.

   B.   Count Eleven Alleges One or More Offenses

Sun argues that the first object of the Section 371 conspiracy charged in Count Eleven must be dismissed because (she argues) nothing in the Second Superseding Indictment supports allegations of embezzlement, obtaining by fraud, or conversion. However, the allegations in Count Eleven amply support theories of misappropriation based on obtaining by fraud and misapplication.[6]

To begin, the Second Superseding Indictment adequately alleges that Sun, together with others, conspired to obtain NYS funds through fraud:

> [T]he defendants LINDA SUN and CHRIS HU *perpetrated a fraud* on the NYS government. SUN facilitated contracts between the NYS government and two businesses—a company (the "Cousin Company," an entity the identity of which is known to the Grand Jury) operated by one of SUN's second cousins (the "Cousin," an individual whose identity is known to the Grand Jury), and a company (the "Associate Company," an entity the identity of which is known to the Grand Jury) that was operated by HU and a business associate of HU . . . —that resulted in the Cousin Company and the Associate Company selling millions of dollars' worth of PPE sourced in the PRC to the NYS government. SUN, the Cousin Company, and the Associate Company failed to disclose the businesses' associations with SUN's family to the NYS government. In addition to directly benefiting from the profits that the Associate Company reaped from these contracts, SUN and HU received a portion of the profits from the contracts with the Cousin Company as kickbacks[.]

---

[6]   The allegations are pled conjunctively to mirror the statutory language, *see United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) ("Where there are several ways to violate a criminal statute, as there are with the mail fraud statute, '[f]ederal pleading requires . . . that an indictment charge in the conjunctive to inform the accused fully of the charges." (quoting *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir. 1986)).

(S-2 ¶ 20 (emphasis added)).  Allegations of the fraud include the falsification of emails, (S-2 ¶¶ 124-25), and Sun's pestering of accounts payable personnel for payment of the Cousin Company contracts, (S-2 ¶¶ 148(a)-(r)).  Sun's conclusory allegation that the fraudulent intent is insufficiently pled, (*see* ECF No. 145 at 48), does not alter this analysis.  In sum, the Second Superseding Indictment adequately pleads obtaining by fraud as a first object of the conspiracy charged in Count Eleven.

In addition, the Second Superseding Indictment also adequately pleads misapplication of funds as a first object of the conspiracy in Count Eleven.  Indeed, the defendant does not even attempt to argue otherwise.  Misapplication of funds under Section 666 means improper use of funds for otherwise legitimate reasons:

> Section 666(a)(1)(A) prohibits embezzling, stealing, obtaining by fraud, converting, or intentionally misapplying funds.  The first four prohibitions cover any possible taking of money for one's own use or benefit.  Intentional misapplication, in order to avoid redundancy, must mean intentional misapplication for otherwise legitimate purposes; if it were for illegitimate purposes, it would be covered by the prohibitions against embezzlement, stealing, obtaining by fraud, or conversion.

*United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992); *see United States v. Cornier-Ortiz*, 361 F.3d 29, 37 (1st Cir. 2004) ("The prohibition against intentional misapplication covers the situation presented here: payments made for what was an underlying legitimate purpose but intentionally misapplied to undermine a conflict[-]of[-]interest prohibition.").  As alleged here, the payments by the NYS government to the Associate Company and the Cousin Company were for ostensibly legitimate purposes—the purchases of PPE—but were misapplied to undermine the NYS government's prohibition on self-dealing by its employees.  (S-2 ¶¶ 115, 118-21, 123-29).  Notably, Sun does not argue in her motion to dismiss that the misapplication theory is not adequately pled.

In summary, the Second Superseding Indictment adequately pleads obtaining by fraud and misapplication as first objects as to the conspiracy charged in Count Eleven.

C.    The First Object of Count Eleven Is Not Time-Barred

Sun argues that her "embezzlement, fraud, or conversion" was complete no later than June 18, 2020, the date that the property was obtained from NYS, and that therefore the first object of Count Eleven is untimely.[7]  (ECF No. 145 at 49).

However, as Sun helpfully points out, a conspiracy is legally in existence "through the conspirators' receipt of their anticipated economic benefits."  *United States v. Salmonese*, 352 F.3d 608, 615 (2d Cir. 2003) (internal quotation marks omitted).  Here, as alleged, Sun and Hu did not obtain the funds via fraud or successfully misapply NYS funds until the Cousin Company sent the funds to Hu in the form of kickbacks.  These payments occurred in July and August 2020— the time at which the coconspirators received "their anticipated economic benefits."  *Id.* Accordingly, the first object of Count Eleven is timely.

III.    Count Fourteen Sufficiently Alleges Money Laundering Conspiracy

Finally, Sun reprises her prior argument that the indictment "deprive[s] her of sufficient notice regarding what" the money laundering conspiracy count charges her with, because (she says) it lacks "supporting allegations" that specify what particular payments are alleged to be proceeds of the charged FARA violations.  (ECF No. 145 at 50).  Sun is charged with money laundering *conspiracy*—that is, with the agreement—and not with substantive money laundering through particular transactions.  No "supporting allegations" about particular payments are

---

[7]    In a footnote, Sun writes that Count Eleven pertains solely to conduct concerning the Associate Company.  (ECF No. 145 at 50 n.26).  However, the charge pertains to conduct concerning the Cousin Company.

necessary to charge money laundering conspiracy, nor indeed need actual payments have been made to support a conviction.[8]

Sun seizes on the fact that the Second Superseding Indictment replaced one reference to her receiving economic benefits "in return for" actions that violate FARA with language that says she received these benefits "while" taking those actions to accurately account for additional evidence of benefits uncovered by the investigation since return of the first indictment in this case. But that single change does not transform the indictment into an instrument that no longer "fairly informs [Sun] of the charge against which [she] must defend, [or] . . . enables [her] to plead an acquittal or conviction in bar of future prosecutions for the same offense," *Hamling*, 418 U.S. at 117. Indeed, the Second Superseding Indictment still makes several express references to financial benefits that she received directly or indirectly "in return for" specified acts (*e.g.*, ¶¶ 29, 45, 78, 90); and even without those express references, the lengthy and detailed indictment is replete with allegations about violations of the law from which she derived substantial proceeds over a period of years. Count Fourteen incorporates those allegations and charges her with conspiring to launder the proceeds of three particular specified unlawful activities over that period—not with conducting any particular transactions—and that amply "informs [her] of the charge against which [she] must defend." *Hamling*, 418 U.S. at 117.

Accordingly, Count Fourteen is sufficiently alleged.

---

[8]    Nor do money laundering conspiracies require charging or proving any overt act. *Whitfield v. United States*, 543 U.S. 209, 214 (2005) ("Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction.").

<u>CONCLUSION</u>

For the reasons set forth above, the Court should deny the defendants' motions to dismiss.

Dated: Brooklyn, New York
        September 5, 2025

                                    Respectfully submitted,

                                    JOSEPH NOCELLA, JR.
                                    United States Attorney

                    By:      /s/ Alexander A. Solomon
                            Alexander A. Solomon
                            Robert M. Pollack
                            Andrew D. Reich
                            Amanda Shami
                            Assistant U.S. Attorneys
                            (718) 254-7000