UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- v. -

LINDA SUN,

 a/k/a "Wen Sun," "Ling Da Sun," and
 "Linda Hu," and

CHRIS HU,

      *Defendants*.

---

S3 24 Cr. 346 (BMC) (TAM)

*(Oral argument requested)*

 

# DEFENDANTS' MOTIONS *IN LIMINE*

 

| | |
|---|---|
| BRACEWELL LLP | ABELL ESKEW LANDAU LLP |
| Seth D. DuCharme | Kenneth M. Abell |
| Nicole Boeckmann | Jarrod L. Schaeffer |
| Anisa L. Adas | Scott Glicksman |
| Kimberly Kirschenbaum | |
| 31 W. 52nd Street, Ste 1900 | 256 Fifth Avenue, 5th Floor |
| New York, NY 10019 | New York, NY 10001 |
| *Counsel for Chris Hu* | *Counsel for Linda Sun* |

## **Table of Contents**

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

I.  THE  GOVERNMENT  SHOULD  BE  PRECLUDED  FROM  OFFERING
    IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE OR ARGUMENTS IN
    CONNECTION WITH FARA ............................................................................................ 3

    A.  The Court should preclude evidence or argument regarding international travel
        or activities, which cannot form the basis of a FARA violation. ........................... 3

    B.  The Court should preclude evidence or argument regarding interactions solely
        with other state government officials, which does not constitute influencing the
        "public" within the meaning of FARA. ................................................................ 6

    C.  The Court should preclude evidence or argument regarding conduct by CC-1
        and Association-1, because it was not directed, controlled, financed, or
        subsidized by a foreign principal. ....................................................................... 10

    D.  The Court should preclude evidence or argument regarding gifts or benefits
        allegedly received by Ms. Sun absent a sufficient showing of some connection
        between that benefit and a directive or request by the PRC. ................................. 13

II.  THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING AS CO-
     CONSPIRATOR  STATEMENTS  ANY  ALLEGED  STATEMENTS  BY  PRC
     CONSULAR OFFICIALS ................................................................................................ 15

    A.  Deeming excepted individuals to be co-conspirators improperly undercuts
        affirmative legislative policy choices. ................................................................ 16

    B.  Treating excepted individuals as co-conspirators under Rule 801(d)(2)(E)
        would  remove  any  distinction  between  indicted  and  unindicted
        co-conspirators. ................................................................................................ 16

    C.  The unfair prejudice from any statements the government might offer in this
        case substantially outweighs any minimal probative value they might have. ...... 17

III.  THE COURT SHOULD EXCLUDE EVIDENCE OR ARGUMENT REGARDING
      THE DEFENDANTS' WEALTH AND LUXURY ITEMS ............................................. 18

IV.  THE  GOVERNMENT  SHOULD  BE  PRECLUDED  FROM  ARGUING  OR
     SUGGESTING  THAT  MS.  SUN'S  ALLEGED  CONDUCT  CONSTITUTED
     "ESPIONAGE" OR IMPLICATED NATIONAL SECURITY ....................................... 21

V.     THE COURT SHOULD EXCLUDE CERTAIN PORTIONS OF ANTICIPATED
       TESTIMONY BY THE GOVERNMENT'S PROPOSED EXPERT WITNESS ............ 23

       A.     Portions of Professor Ku's proposed testimony are not relevant to any elements
              of the charged offenses. ...................................................................................... 25

       B.     Portions of the proposed testimony are unreliable, lack sufficient bases, and
              usurp the jury's role. ........................................................................................... 28

       C.     Unfair prejudice from portions of the proposed testimony far outweighs any
              minimal probative value. ..................................................................................... 30

CONCLUSION .................................................................................................................. 32

## Table of Authorities

**Cases**

*Am. Civ. Liberties Union v. Clapper*,
   804 F.3d 617 (2d Cir. 2015) ................................................................................ 7

*Att'y Gen. of United States v. Irish N. Aid Comm.*,
   668 F.2d 159 (2d Cir. 1982) ........................................................................... 13, 14

*Bourjaily v. United States*,
   483 U.S. 171 (1987) ..................................................................................... 15, 16

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ............................................................................. 29

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ..................................................................................... 24, 25

*Dobrova v. Holder*,
   607 F.3d 297 (2d Cir. 2010) ............................................................................... 7

*Eisenhauer v. Culinary Inst. of Am.*,
   84 F.4th 507 (2d Cir. 2023) ................................................................................ 7

*Gebardi v. United States*,
   287 U.S. 112 (1932) ........................................................................................ 16

*Guerrero v. Loiacono*,
   769 F. Supp. 3d 158 (E.D.N.Y. 2024) ................................................................. 24

*In re Executive Telecard, Ltd. Securities Litigation*,
   979 F. Supp. 1021 (S.D.N.Y. 1997) ................................................................... 29

*In re Fosamax Prods. Liab. Litig.*,
   807 F. Supp. 2d 168 (S.D.N.Y. 2011) ........................................................... 24, 29

*In re Fosamax Prods. Liab. Litig.*,
   924 F. Supp. 2d 477 (S.D.N.Y. 2013) ................................................................. 29

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   638 F. Supp. 3d 227 (E.D.N.Y. 2022) ................................................................. 29

*Jean-Laurent v. Hennessy*,
   840 F. Supp. 2d 529 (E.D.N.Y. 2011) .................................................................. 5

*Joyner v. United States*,
   547 F.2d 1199 (4th Cir. 1977) ............................................................................ 17

*Levy v. Maggiore,*
   48 F. Supp. 3d 428 (E.D.N.Y. 2014) .................................................................. 4

*Linde v. Arab Bank, PLC,*
   922 F. Supp. 2d 316 (E.D.N.Y. 2013) ............................................................... 27

*Mar-Can Transportation Co., Inc. v. Loc. 854 Pension Fund,*
   722 F. Supp. 3d 355 (S.D.N.Y. 2024) ................................................................. 7

*Microsoft Corp. v. AT&T Corp.,*
   550 U.S. 437 (2007) ........................................................................................... 3

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ........................................................................ 24, 29

*Richards v. Napolitano,*
   642 F. Supp. 2d 118 (E.D.N.Y. 2009) ................................................................ 8

*RJR Nabisco v. Eur. Cmty.,*
   579 U.S. 325 (2016) ........................................................................................... 3

*Unicolors, Inc. v. H &M Hennes & Mauritz, L.P.,*
   2017 WL 11489792 (C.D. Cal. Nov. 15, 2017) ............................................ 12, 24

*United States v. Adkins,*
   842 F.2d 210 (8th Cir. 1988) ............................................................................ 16

*United States v. Al-Moayad,*
   545 F.3d 139 (2d Cir. 2008) .................................................................. 15, 27, 30

*United States v. Avila,*
   No. 22-933, 2024 WL 413408 (2d Cir. Feb. 5, 2024) ........................................ 18

*United States v. Ayers,*
   No. 20 Cr. 239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) ................. 20

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991) ........................................................................... 29

*United States v. Blaszczak,*
   947 F.3d 19 (2d Cir. 2019), *judgment vacated on other grounds*, 141 S. Ct. 1040 (2021) ....... 17

*United States v. Bradley,*
   644 F.3d 1213 (11th Cir. 2011) ........................................................................ 20

*United States v. Campbell,*
   268 F.3d 1 (1st Cir. 2001) ................................................................................ 16

iv

*United States v. Carpenter*,
   372 F. Supp. 3d 74 (E.D.N.Y. 2019), *aff'd*, No. 21-837-CR,
   2022 WL 16960577 (2d Cir. Nov. 16, 2022) ........................................................ 19

*United States v. Craig*,
   401 F. Supp. 3d 49 (D.D.C. 2019) ...................................................................... 21

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ................................................................................ 24

*United States v. Duncan*,
   42 F.3d 97 (2d Cir. 1994) .................................................................................. 29

*United States v. Ewings*,
   936 F.2d 903 (7th Cir. 1991) ...................................................................... 18, 19, 20

*United States v. Farhane*,
   634 F.3d 127 (2d Cir. 2011) ...................................................................... 15, 18, 25

*United States v. Holmes*,
   No. 18 Cr. 02581 (EJD), 2021 WL 2044470 (N.D. Cal. May 22, 2021) ................. 19

*United States v. Jackson-Randolph*,
   282 F.3d 369 (6th Cir. 2002) ...................................................................... 18, 19

*United States v. James*,
   607 F. Supp. 3d 246 (E.D.N.Y. 2022) ............................................................. 19, 20

*United States v. Jones*,
   965 F.3d 149 (2d Cir. 2020) ............................................................................ 29

*United States v. Krulewitch*,
   145 F.2d 76 (2d Cir. 1944) .............................................................................. 5

*United States v. Lanier*,
   520 U.S. 259 (1997) ...................................................................................... 9

*United States v. Lattanzio*,
   No. 15 Cr. 446 (KM), 2018 WL 1837856 (D.N.J. Apr. 16, 2018) ............... 18, 20, 21

*United States v. McCallum*,
   584 F.3d 471 (2d Cir. 2009) ............................................................................ 6

*United States v. Mostafa*,
   16 F. Supp. 3d 236 (S.D.N.Y. 2014) ................................................................. 6

*United States v. Quinn*,
   401 F. Supp. 2d 80 (D.D.C. 2005) ................................................................... 23

*United States v. Santos*,
    553 U.S. 507 (2008) ................................................................................................ 9

*United States v. Stahl*,
    616 F.2d 30 (2d Cir. 1980) ...................................................................................... 20

*United States v. Tao*,
    No. 19-20052-JAR, 2022 WL 252019 (D. Kan. Jan. 27, 2022) ................................. 21, 22, 31

*United States v. Zhong*,
    26 F.4th 536 (2d Cir. 2022) ...................................................................................... 6

*Yates v. United States*,
    574 U.S. 528 (2015) ................................................................................................ 8

**Statutes**

18 U.S.C. § 794(a) ................................................................................................ 22

18 U.S.C. § 798(a) ................................................................................................ 21

22 U.S.C. § 611 ................................................................................................ passim

22 U.S.C. § 613 ................................................................................................ 30

22 U.S.C. § 616 ................................................................................................ 8

22 U.S.C. § 619 ................................................................................................ 3

50 U.S.C. § 851 ................................................................................................ 21

Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801 *et seq.* ................... 22

FISA Amendments Act of 2008, 50 U.S.C. § 1881a *et seq.* ........................................ 22

**Rules**

Fed. R. Evid. 104 ................................................................................................ 5, 11, 12, 15

Fed. R. Evid. 401 ................................................................................................ passim

Fed. R. Evid. 402 ................................................................................................ 2, 9

Fed. R. Evid. 403 ................................................................................................ 2, 18, 20

Fed. R. Evid. 702 ................................................................................................ 24, 28

Fed. R. Evid. 704 ................................................................................................ 31

Fed. R. Evid. 801 ..................................................................................... 15, 16, 17

Fed. R. Evid. 802 ........................................................................................... 15

**Secondary Sources**

BLACK'S LAW DICTIONARY (12th ed. 2024) ................................................... 7

MERRIAM-WEBSTER.COM ............................................................................ 7

Scope of Agency, DEP'T OF JUST. (May 2020) ("DOJ Guidance"), *available at*
    https://www.justice.gov/nsd-fara/page/file/1279836/dl (last accessed Sept. 15, 2025)............ 14

## PRELIMINARY STATEMENT

Defendants Linda Sun and Chris Hu respectfully submit these motions *in limine* to exclude certain evidence and arguments at the upcoming trial of this action. As set forth herein, the relief requested is consistent with prevailing law and necessary to prevent, among other things, juror confusion and unfair prejudice—concerns that are especially significant in this case.

Even before the defendants were formally charged, the investigation of this matter was a focus of intense media scrutiny. For reasons that are still unclear (and highly unfortunate), when agents executed the initial search warrants—more than a month before the defendants were charged—reporters were ready to descend on the defendants' residence and news stories were accompanied by footage of the search.[1] Since then, press coverage concerning this case has been unrelenting and often inaccurate.[2] Following their arraignment, the defendants were forced to wade through throngs of reporters yelling offensive comments for blocks until they were able to enter a private establishment. And subsequent court appearances have spawned additional stories in major news outlets, almost all of which paint Ms. Sun as a Chinese spy even though she is not charged (or even accused) of such conduct.

Against this backdrop, the government has sought four indictments alleging a plethora of charges premised on vague and sweeping theories. The government's charging theory under the Foreign Agents Registration Act ("FARA"), in particular, is breathtaking in its scope and a novel attempt to use a registration statute to police—and, perhaps, imprison—political appointees hired

---

[1]    *See* "FBI raids former Hochul aide's $3.5M Long Island home," N.Y. Post (July 24, 2024), *available at* https://nypost.com/2024/07/24/us-news/fbi-raids-former-hochul-aides-3-5m-long-island-home/ (last accessed Sept. 15, 2025).

[2]    *See* "Gov. Hochul on Arrest of Former Aide on Spy Charges," C-SPAN (Sept. 4, 2024), *available at* https://www.c-span.org/video/?c5131020/gov-hochul-arrest-aide-spy-charges (last accessed Sept. 15, 2025).

to provide political and policy advice whenever the government suspects them of disloyalty.  And the government's belated bribery and honest services fraud charges, which themselves suffer from a host of infirmities, were cobbled together at the eleventh hour and attempt to do precisely what the Supreme Court has prohibited:  regulate what the federal government deems to be appropriately ethical behavior by state public officials.

The defendants thus have heightened and justified concerns that certain evidence the government is expected to offer may be misleading, that the jury may become confused regarding invalid bases for criminal liability, and that jurors may erroneously assume that this case involves espionage or threats to national security.  All would deprive the defendants of the fair trial to which they are entitled.  Based on those concerns, among others, and for the reasons that follow, the defendants respectfully request that the Court grant their motions *in limine*.

## LEGAL STANDARD

"Relevant evidence is admissible" unless prohibited by another source of authority.  Fed. R. Evid. 402.  "Irrelevant evidence is not admissible."  *Id.*  Evidence is "relevant" if it has "any tendency" to make a fact "of consequence in determining the action more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a)–(b).  Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

## ARGUMENT[3]

The defendants anticipate that the government will seek to offer evidence and arguments at trial that are irrelevant to the charges in this case, risk improperly confusing or inflaming the jury, and inflict unfair prejudice that dwarfs any negligible probative value of certain evidence.

## I.    THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE OR ARGUMENTS IN CONNECTION WITH FARA

In connection with FARA, Ms. Sun has serious and justified concerns that the government may—under the banner of supposed "circumstantial evidence"—attempt to shoehorn into this trial misleading material that may impress a jury for all the wrong reasons. Ms. Sun respectfully asks the Court to curtail any such efforts and to lay down some necessary legal guidelines now, so that she is not forced during trial to try to unring improperly sounded bells.

### A.  The Court should preclude evidence or argument regarding international travel or activities, which cannot form the basis of a FARA violation.

FARA applies only to activities conducted within the United States.  *See* 22 U.S.C. §§ 611(c)(1)(i)–(iv) (applying solely to conduct occurring "within the United States"); 619 (restricting application of FARA to "the several States, the District of Columbia, the Territories, the Canal Zone, the insular possessions, and all other places now or hereafter subject to the civil or military jurisdiction of the United States"); *see also RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)) ("United States

---

[3]    This Court is familiar with the government's factual allegations from prior briefing and the defendants do not recount them again here.  To the extent particular facts or allegations are relevant to specific arguments, they are included and addressed below.  For the avoidance of doubt, the defendants expressly reserve the right to advance additional motions and arguments as they become known, including based on evidence or arguments offered by the government.

law governs domestically but does not rule the world.").[4]  Thus, as Ms. Sun noted in her first

motion to dismiss (*see* Dkt. 46 at 13–14), FARA's plain text makes clear that any activities

allegedly occurring outside the United States cannot be the basis of a FARA violation.[5]  FARA's

purposes further confirm what its language provides; as relevant here, the statute is aimed at

ensuring disclosures regarding domestic efforts to influence federal policymakers or the public.

*See id.* § 611(o) (defining "political activities").

Despite FARA's domestic focus, the third superseding indictment identifies several

instances in which Ms. Sun allegedly traveled abroad and undertook certain activities, including:

- In or about February and March 2017, arranging to attend and speak at the "China Henan International Investment & Trade Fair" in Zhengzhou, Henan Province.  (Dkt. 158 ("S-3") ¶ 80).

- In early 2018, traveling to the PRC to speak at a conference sponsored by the All-China Federation of Returned Overseas Chinese ("ACFROC"), a UFWD agency, accompanied by CC-2 and other representatives. Travel arrangements included stays in high-profile hotels, and communications regarding business introductions and economic benefits to third parties.  (S-3 ¶¶ 87–88).

- The defendant LINDA SUN traveled to Beijing, PRC on or about September 26, 2019, and returned to the United States through South Korea on or about October 17, 2019.  CC-2 paid for SUN's lodging in the PRC and coordinated her travel within the PRC.  This travel coincided with receptions in Beijing celebrating the 70th anniversary of the PRC's founding, some of which SUN attended.  (S-3 ¶ 99.)

The Court should preclude any evidence or argument regarding such activities.  There is no

allegation—nor could there be—that anything occurring during those international trips

---

[4]    Unless otherwise indicated, case text quotations omit all internal alterations, quotation marks, and citations.

[5]    The Government never responded on this subject, which Ms. Sun specifically raised and briefed.  (*See* Dkts. 46 at 13–14; 57 at 2.)  That is tantamount to a concession that conduct allegedly occurring abroad cannot sustain a FARA violation, and the Court should deem the government to have waived any argument to the contrary.  *Cf. Levy v. Maggiore*, 48 F. Supp. 3d 428, 452 (E.D.N.Y. 2014) ("Plaintiff does not respond to this argument and the Court therefore construes Plaintiff's failure to respond as an abandonment of this claim.").

constituted a violation of FARA despite it happening outside the United States.  Nor would such evidence make any material fact "more or less probable."  Fed. R. Evid. 401.  It was Ms. Sun's *job* to help New York State maintain friendly relations with the People's Republic of China ("PRC") and its diaspora.  Merely traveling to and attending events in the PRC, especially events focused on investment and trade, is hardly probative of anything nefarious.  Even the S-3 does not allege that anything untoward occurred at those alleged international affairs.[6]

Such evidence is, however, unfairly prejudicial and may "divert the jury from the facts which should control their verdict." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 537 (E.D.N.Y. 2011) (quoting *United States v. Krulewitch*, 145 F.2d 76, 80 (2d Cir. 1944)).  Most obviously, the jury may be misled into believing that international travel or attendance at high-profile events in the PRC somehow constitutes unlawful conduct under FARA—after all, the jurors may wonder, why else would the government spend time introducing evidence of such conduct if it were not wrongful?  That misleading impression would distract the jury and improperly redirect its focus from alleged activities within the United States, which could actually be relevant under FARA.

More insidiously, evidence regarding alleged international travel by Ms. Sun to the PRC may subject her to a trial by innuendo.  Introducing evidence in a criminal trial that a Chinese American woman accused of failing to register under FARA visited the PRC and attended national events may suggest, improperly, that jurors should draw conclusions about her allegiance or her guilt based purely on her association with Chinese people—even when no wrongdoing is (or could be) alleged to have occurred during such events.  Whatever the government may suggest her

---

[6]    Perhaps the government may suggest such evidence is relevant because CC-2 supposedly arranged and covered Ms. Sun's travel and lodging.  (*See, e.g.*, S-3 ¶ 88.)  As discussed more fully below, such relevance depends on a logical leap that, at a minimum, requires the government to make a preliminary showing to establish conditional relevance.  *See* Fed. R. Evid. 104(b).  But even so, that justification would not make anything about the trip itself relevant.

alleged international travel reveals about her state of mind, "[i]t is . . . improper to receive evidence ostensibly as probative of knowledge and intent when it is in reality 'propensity evidence in sheep's clothing.'" *United States v. Mostafa*, 16 F. Supp. 3d 236, 253 (S.D.N.Y. 2014) (quoting *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009)).

In sum, given FARA's purely domestic focus evidence regarding Ms. Sun's alleged activities abroad is irrelevant because it is not probative of any fact of consequence. Moreover, any potential probative value of such evidence is substantially outweighed by serious risks of unfair prejudice, confusing the issues, and misleading the jury. *Cf. United States v. Zhong*, 26 F.4th 536, 557 (2d Cir. 2022) (finding that "even if some of the testimony might have been relevant . . . to enable the jury to understand 'the unique social, political and economic factors'" at issue, it "improperly risked prejudicing the jury against [the defendant], a Chinese man who was associated with the Chinese government"). Evidence or argument regarding such matters should therefore be precluded.

### B. The Court should preclude evidence or argument regarding interactions solely with other state government officials, which does not constitute influencing the "public" within the meaning of FARA.

The Court also should preclude the government from offering evidence or argument premised on a flawed interpretation of FARA—namely, that non-public advice shared confidentially among state officials constitutes an effort to "influence . . . any section of the public within the United States."[7] 22 U.S.C. § 611(o). The government's reading is contrary to the plain language of FARA, inconsistent with general principles of statutory construction, would stretch FARA beyond its text and purpose, and threatens to mislead the jury regarding a central element

---

[7]    Ms. Sun also raised and briefed this issue in her first motion to dismiss. (*See* Dkts. 46 at 13–14; 57 at 2.) Again, the government chose not to respond. The Court should therefore deem this point conceded or, alternatively, any contrary arguments waived.

of a charged offense. As such, the Court should preclude evidence or argument concerning communications or conduct not targeted at the wider public.

"[S]tatutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010). "To identify a statute's plain meaning, [courts] afford words their ordinary, common-sense meaning and draw[] on the specific context in which that language is used." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023). Courts also "read the words in their context and with a view to their place in the overall statutory scheme." *Am. Civ. Liberties Union v. Clapper*, 804 F.3d 617, 623 (2d Cir. 2015). Where a statute's meaning is unclear, courts rely on interpretive aids such as canons of construction, the overall statutory framework, and legislative history. *See Mar-Can Transp. Co., Inc. v. Loc. 854 Pension Fund*, 722 F. Supp. 3d 355, 369 (S.D.N.Y. 2024). Ultimately, courts interpret statutes in a manner that comports with their primary purposes and avoids anomalous or unreasonable results. *See id.*

FARA defines "political activities" within the scope of the statue as follows:

> [A]ny activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party[.]

22 U.S.C. § 611(o). In short, "political activities" for purposes of FARA encompass only efforts to influence federal agencies or officials—which are not relevant here—or "any section *of the public* within the United States" regarding specified matters. *Id.* (emphasis added). The ordinary meaning of the "public" is "[o]f, relating to, or involving an entire community, state, or country." "Public," BLACK'S LAW DICTIONARY (12th ed. 2024); *accord* "Public," MERRIAM-WEBSTER.COM, *available at* https://www.merriam-webster.com/dictionary/public (last accessed Sept. 14, 2025)

(defining "public," *inter alia*, as "of, relating to, or affecting all the people or the whole area of a nation or state," "of or relating to people in general," and "accessible to or shared by all members of the community"). That is the same commonsense definition used elsewhere in FARA. *See, e.g.*, 22 U.S.C. § 616(d)(1) (requiring the Attorney General to "maintain, and make available to *the public* over the Internet" information related to FARA registrations (emphasis added)); *see also Richards v. Napolitano*, 642 F. Supp. 2d 118, 125 (E.D.N.Y. 2009) ("In understanding and applying a regulatory scheme, courts should interpret statutes to be coherent and internally consistent."). So activities believed or intended to "influence . . . the public" as used in FARA's definition means efforts to sway the broader citizenry—not political advice shared among a select group of government officials conversing in private. FARA's text itself confirms a similar distinction by specifically differentiating between "any . . . official of the Government of the United States" and "any section of the public," 22 U.S.C. § 611(o), making clear that government officials and the public are two distinct objects of potential influence.

Any interpretation that lumps government officials into "any section of the public within the United States," *id.*, would render at least part of FARA's definition superfluous—a result courts rightly avoid. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("We resist a reading of [a statutory section] that would render superfluous an entire provision passed in proximity as part of the same Act."). After all, if read the way the government suggests, "any section of the public within the United States," 22 U.S.C. § 611(o), would include federal officials just as much as state officials. Congress differentiated for a reason, however, and focusing on efforts to influence federal officials or the general public makes sense for a federal statute primarily concerned with

8

the public disclosure of propaganda-like activities targeting federal policy decisions.[8]  Accepting the government's erroneous view of FARA's scope would depart from the statute's text and purpose, and would improperly subject even the most private political and policy discussions among state officials to federal oversight whenever they concern foreign relations.

Because the relevant portion of FARA's "political activities" definition is clearly limited to efforts aimed at influencing the broader public,[9] evidence concerning non-public communications or conduct among state government officials is irrelevant and therefore "inadmissible."  Fed. R. Evid. 402.  Allowing such evidence would mislead the jury by suggesting any interactions between government officials—even private emails, calls, or meetings—fall within FARA's scope, thus risking a conviction based on alleged conduct that was not, in fact, within the statute's ambit.  The government therefore should be precluded from offering evidence or argument concerning non-public conduct.

---

[8]     Indeed, Congress enacted FARA in response to concerns about covert Nazi propaganda distributed to the general public.  *See, e.g.*, 83 Cong. Rec. 8021 (1938) (discussing "pernicious" propaganda disseminated to the public by mysterious "organizations" that purportedly "foster[ed] un-American activities").

[9]     Even if it is ambiguous whether FARA's definition includes private conversations among state officials, the Court should adopt Ms. Sun's construction of the statute.  *See, e.g.*, *United States v. Santos*, 553 U.S. 507, 514 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").  As Ms. Sun previously noted (*see* Dkt. 46 at 12), she is unaware of other cases in which the government charged a state government official under FARA and relied on the content of political or policy advice communicated to other officials as evidence of the supposed violation.  She respectfully submits that is because FARA does not reach such conduct.  But at a minimum, that "novel construction" of FARA is foreclosed here because "neither the statute nor any prior judicial decision has fairly disclosed" such private communications "to be within its scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).

### C. The Court should preclude evidence or argument regarding conduct by CC-1 and Association-1, because it was not directed, controlled, financed, or subsidized by a foreign principal.

According to the S-3, the individual referred to as CC-1 allegedly conspired with Ms. Sun to violate FARA. (*See* S-3 ¶¶ 43–90.) Specifically, the S-3 alleges that "[i]n addition to acting as an agent of PRC Consular officials, [Ms. Sun] also engaged in political activities at the request of CC-1 . . . whose activities were supervised, directed, and controlled by PRC government officials," specifically "political activities" supposedly intended to "foster[] a closer economic and political relationship between Henan Province and New York. (*Id.* ¶ 43.) CC-1 is further identified as the "president" of "Association-1," which allegedly is "a nonprofit 501(c)(3) organization closely associated with the United Front Work Department ('UFWD') and the Chinese Communist Party ('CCP')." (*Id.* ¶ 4.)

As the Court is aware, however, CC-1 was interviewed by federal agents in May 2025 and, among other things, denied having any ties to the Chinese government; stated that the purpose of Association-1 is to facilitate trade and business between New York State and Henan Province; agreed that Ms. Sun had assisted Association-1 and helped to connect New York State with Henan Province for purposes of trade, agriculture, and cultural exchange; agreed that he tried to assist the defendants with a business venture in his capacity as the president of Association-1; stated that Association-1 is supported through donations from its members; and denied that the Chinese government or anyone living in China provides financial support for Association-1. In other words, CC-1 flatly denied conclusory allegations in the S-3 suggesting that he and Association-1 are pawns of the PRC who directed or controlled Ms. Sun's actions. And there does not seem to be other persuasive evidence supporting the government's claim that the PRC directed or controlled Ms. Sun though CC-1 and Association-1.

10

Nevertheless, Ms. Sun expects that the government will attempt to argue as much at trial. In order to avoid misleading the jury through unfounded intrigue and insinuation, however, the Court should preclude any evidence or argument regarding CC-1's conduct or any involvement of Association-1 unless and until the government can proffer evidence that CC-1 was supervised or controlled by the PRC, and not acting to facilitate trade and cultural exchanges with Chinese provinces as the president of an American-based and domestically funded organization. The former might potentially be relevant to a FARA charge; the latter is not. And "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104.

Courts sometimes "may admit [] proposed evidence on the condition that the proof be introduced later," *id.*, but that is inappropriate here because doing so would be unfairly prejudicial. Unless the government can adequately establish supervision or control by the PRC, evidence or argument regarding CC-1 and Association-1 is irrelevant and has no probative value whatsoever. That is especially true in this case, given that Ms. Sun's job responsibilities included facilitating trade and cultural exchanges of this kind. All the government has indicated thus far is that it expects an expert witness to testify, *inter alia*, that "the UFWD often provides funds or other political favors to associations of overseas Chinese in the [United States] so that those organizations are more likely to support CCP goals or even help to carry out tasks overseas for the CCP." (Dkt. 102-1 at 3.) That falls far short of establishing that any "activities" allegedly undertaken by CC-1 or Association-1 "[we]re directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part" by the PRC. 22 U.S.C. § 611(c)(1). Yet that threshold showing is necessary to render evidence about CC-1 relevant, since the

government claims that Ms. Sun supposedly violated FARA by acting "at the order, request, or under the direction or control" of CC-1. *Id.*

Permitting the government to offer evidence and argument regarding CC-1 and Association-1 before establishing that their alleged conduct was supervised or controlled by the PRC would mislead the jury and unfairly shift the burden to Ms. Sun to *disprove* a fact that the government is required to prove beyond a reasonable doubt. And she would be unfairly hampered in doing so, because the government seemingly intends to rely on generalizations by an expert witness. Not every connection to the PRC—or, here, interaction with someone who has some connection to China, even if that person is functioning as the leader of a domestic organization—is evidence of a FARA violation, nor is there anything illegal about a domestic organization or its president seeking to facilitate contact, trade, cooperation, or cultural exchange with provinces in China. That is still true even when the organization or its members are Asian Americans. And there is nothing unusual—or illegal—about a political appointee tasked with assisting the Asian American community working with or assisting that domestic organization or its president. Yet that is precisely the inference the jury would be permitted to draw if the government is allowed to offer evidence and arguments about CC-1 and Association-1 without establishing some supervision or control by the PRC. *Cf. Unicolors, Inc. v. H &M Hennes & Mauritz, L.P.*, 2017 WL 11489792, at *7 (C.D. Cal. Nov. 15, 2017) (acknowledging the risk of prejudice arising from prevailing public sentiment toward China and concluding that "[a]rguments based on cultural stereotypes are improper and prejudicial"). The government should not be permitted to invite such inferences without first introducing sufficient proof "to support a finding that" such supervision or control "does exist." Fed. R. Evid. 104.

**D. The Court should preclude evidence or argument regarding gifts or benefits allegedly received by Ms. Sun absent a sufficient showing of some connection between that benefit and a directive or request by the PRC.**

Since diluting its FARA allegations over the course of successive indictments, the S-3 now alleges that "while taking" certain actions at the request of the PRC, Ms. Sun supposedly "received substantial economic and other benefits from representatives of the PRC government and the CCP." (S-3 ¶ 16.)  Those alleged benefits supposedly include travel reimbursements, event tickets, food, and dinner for Ms. Sun's family at the house of a PRC consular official.[10]  (*Id.* ¶ 107.)  And the S-3 goes to great lengths to make the alleged benefits sound extravagant and suspicious.  (*See, e.g.*, *id.* ¶ 88 (alleging that CC-2 "made travel arrangements for [Ms. Sun], including reserving a presidential suite previously used by First Lady Michelle Obama during her stay in Beijing").)  But it does not and cannot allege that any of those purported benefits were actually provided in exchange for alleged actions taken by Ms. Sun in violation of FARA.

That is the crux of the government's FARA theory:  that the PRC or its intermediary "establishe[d] a particular course of conduct to be followed" and Ms. Sun "respond[ed]" to and "compl[ied]" with that specified "course of conduct," *Att'y Gen. of United States v. Irish N. Aid Comm.* ("*INAC*"), 668 F.2d 159, 161–62 (2d Cir. 1982), in exchange for gifts like "$37" event tickets and a bunch of "salted ducks." (*Id.* ¶ 107.)  The intended implication, of course, is that Ms. Sun's actions were compensated and so it should be *assumed* that anything she did was at the

---

[10]    The S-3 also continues to allege that Mr. Hu and Ms. Sun "laundered the monetary proceeds of this [FARA] scheme to purchase, among other items, real estate property in Manhasset, New York for $3.6 million, a condominium in Honolulu, Hawaii for $1.9 million, and various luxury automobiles, including a 2024 Ferrari," but that is merely a vestige of the government's old theory. (S-3 ¶ 16.)  The government has never adduced evidence of any real connection between those assets and any FARA-related activity, and the S-3 now seeks to forfeit those same assets as proceeds of other crimes—specifically, the government's more recent charges of bribery and honest services wire fraud.

PRC's behest. But over the course of four separate indictments, the government has never identified what Ms. Sun supposedly did in return for the alleged benefits, and the S-3 sometimes strings together events separated by years in service of a strained causal narrative.

Gifts or other benefits provided to Ms. Sun or her family are only relevant insofar as they suggest she was "not acting independently," Scope of Agency, DEP'T OF JUST. (May 2020) ("DOJ Guidance"), at 3, *available at* https://www.justice.gov/nsd-fara/page/file/1279836/dl (last accessed Sept. 15, 2025), with respect to "a particular course of conduct" established by a foreign principal. *INAC*, 668 F.2d at 162. Even then, benefits are probative of an agency relationship only if they were significant enough grant the PRC a "level of power . . . over [an] agent" or impose some "obligation on the part of [an] agent to achieve the principal's request." DOJ Guidance at 3–4. Before permitting the government to offer evidence of any gifts or benefits supposedly provided to Ms. Sun, "proof must be introduced sufficient to support a finding that" a gift or benefit was related to "a particular course of conduct to be followed" by Ms. Sun on the PRC's behalf. *INAC*, 668 F.2d at 162. Only then would it be proper for the jury to consider whether it was sufficient to permit an inference that Ms. Sun acted pursuant to some directive or obligation with respect to such conduct.

Jurors otherwise would be permitted—even encouraged—to consider irrelevant evidence with no connection to activities that allegedly violated FARA. And Ms. Sun would be obligated to assume the burden of proving that a gift or benefit was *not* connected to an alleged violation of FARA, relieving the government of its burden to prove such a connection beyond a reasonable doubt. Moreover, without a legitimate basis for considering such evidence, jurors may improperly base their verdict on a dislike of public servants who receive gifts or, as discussed in more detail below, views regarding status, class, or luxury items. Accordingly, the government should be

precluded from offering evidence or argument regarding any gifts or benefits allegedly received by Ms. Sun unless and until it introduces sufficient proof "to support a finding that" a connection exists between a given gift or benefit and a particular course of conduct established by a foreign principal.  Fed. R. Evid. 104.

## II.    THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING AS CO-CONSPIRATOR STATEMENTS ANY ALLEGED STATEMENTS BY PRC CONSULAR OFFICIALS

An out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement" is hearsay.  Fed. R. Evid. 801(c).  Hearsay generally is inadmissible unless permitted by a rule, exemption, or exception.  *See* Fed. R. Evid. 802.  One exemption permits the admission of co-conspirator statements under certain conditions.  *See* Fed. R. Evid. 801(d)(2)(E). "Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule."  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  "To admit an out-of-court declaration under this rule, the district court must find by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'"  *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (quoting *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008)); *see also* Fed. R. Evid. 104.

For the reasons already discussed at length in Ms. Sun's prior motions to dismiss (*see* Dkts. 46 at 42–44; 145 at 11–18), individuals excepted from the scope of FARA by an affirmative legislative policy cannot conspire to violate FARA.  As such, their statements are not admissible as co-conspirator statements, *see* Fed. R. Evid. 801(d)(2)(E), for the simple reason that they cannot be co-conspirators.  But even if a person excepted by an affirmative legislative policy *could* be considered an unindicted co-conspirator—through, as demonstrated elsewhere, they cannot—

statements by such persons still would not be admissible pursuant to Rule 801(d)(2)(E) in this case. Accordingly, the Court should preclude any effort by the government to introduce statements by PRC consular officials as co-conspirator statements.

### A. Deeming excepted individuals to be co-conspirators improperly undercuts affirmative legislative policy choices.

Admitting statements by PRC consular officials pursuant to Rule 801(d)(2)(E) would be an impermissible end-run around *Gebardi v. United States*, 287 U.S. 112 (1932). As noted above, Rule 801(d)(2)(E) requires proof that "there was a conspiracy involving the declarant and the nonoffering party," and that a statement was made "during the course and in furtherance of the conspiracy." *Bourjaily*, 483 U.S. at 175. In other words, the government would be required to show—by a preponderance of the evidence and as a precondition to admission—the existence of a conspiracy that, by operation of the affirmative legislative policy exception, legally could *not* have existed. That unavoidable inconsistency is untenable and precludes treating PRC consular officials as co-conspirators within the meaning of Rule 801(d)(2)(E).

### B. Treating excepted individuals as co-conspirators under Rule 801(d)(2)(E) would remove any distinction between indicted and unindicted co-conspirators.

There is no basis for treating indicted and unindicted co-conspirators differently for purposes of the affirmative legislative policy exception. But even if there were, allowing the government to invoke Rule 801(d)(2)(E) for statements by excepted individuals would erase any erstwhile distinction. That is because "Rule 801(d)(2)(E) . . . says nothing about whether the coconspirator has been indicted or is unindicted, and, for the rule to be applicable, it makes no difference." *United States v. Adkins*, 842 F.2d 210, 213 (8th Cir. 1988). Indeed, longstanding precedent establishes that "Rule 801 makes no distinction between indicted and unindicted co[-]conspirators." *United States v. Campbell*, 268 F.3d 1, 4 n.1 (1st Cir. 2001); *accord United States*

16

*v. Blaszczak*, 947 F.3d 19, 45 (2d Cir. 2019), *judgment vacated on other grounds*, 141 S. Ct. 1040

(2021) (affirming admission of unindicted co-conspirator statement under Rule 801(d)(2)(E));

*Joyner v. United States*, 547 F.2d 1199, 1202 n.7 (4th Cir. 1977) (stating that Rule 801(d)(2)(E)

"applies even if the defendant was not indicted for conspiracy").

Invoking Rule 801(d)(2)(E) here thus treats supposed *unindicted* co-conspirators the same

as *indicted* co-conspirators. Permitting the government to admit such statements pursuant to Rule

801(d)(2)(E) thus would obliterate any fine distinction about co-conspirator status that the Court

has drawn.[11] (*See* Dkt. 100 at 17–18.) Because that distinction was essential to the Court's ruling,

it should not permit the government to invoke Rule 801(d)(2)(E) and disregard it.

### C. The unfair prejudice from any statements the government might offer in this case substantially outweighs any minimal probative value they might have.

Even if Rule 801(d)(2)(E) could be invoked to introduce statements by PRC consular

officials as co-conspirator statements and without undermining the Court's distinction, such

statements should still be excluded pursuant to Rule 403. None of the statements by PRC consular

officials alleged in the S-3—or likely to be introduced by the government at trial—reflect any

"order, request, or . . . direction" to Ms. Sun by such officials. 22 U.S.C. § 611(c)(1). The

government previously admitted as much. (*See* Dkt. 52 at 14 (confessing that "the government's

proof does not include recorded telephone calls in which PRC Officials direct [Ms.] Sun's actions"

and speculating that is because such officials "would not transmit taskings over unsecured phone

lines, emails, or texts").) As such, it is hard to see how any statements by PRC consular officials

could be characterized as having been "made during the course of and in furtherance of" any

---

[11]      Blanket treatment of excepted individuals under Rule 801(d)(2)(E) is also inconsistent with an affirmative legislative policy that excepts foreign officials from criminal FARA violations in part to avoid entangling such officials in domestic prosecutions under that statute.

conspiracy. *Farhane*, 634 F.3d at 161. And in any event, any probative value of such statements would be meager. On the other hand, introducing such statements as co-conspirator statements under these circumstances—especially when no one affiliated with the PRC Consulate is likely to be a witness at trial—would significantly mislead or confuse the jury. *See* Fed. R. Evid. 403.

### III. THE COURT SHOULD EXCLUDE EVIDENCE OR ARGUMENT REGARDING THE DEFENDANTS' WEALTH AND LUXURY ITEMS

The government should be precluded from introducing evidence of wealth and luxury items allegedly possessed by Mr. Hu and Ms. Sun. Although luxury items and other indicia of a defendant's wealth may be relevant to a defendant's motive, courts have repeatedly cautioned that the "[a]dmission of lifestyle evidence carries a danger of appealing to class resentments." *United States v. Lattanzio*, No. 15 Cr. 446 (KM), 2018 WL 1837856, at *14 (D.N.J. Apr. 16, 2018). "Therefore, the real issue is whether the relevance of motive is outweighed by unfair prejudice as contemplated by Fed. R. Evid. 403 and the due process clause of the Fifth Amendment." *United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002); *accord United States v. Ewings*, 936 F.2d 903, 907 (7th Cir. 1991) ("caution[ing] [] that courts should carefully balance the probative value of expenditure evidence against the factors enumerated in Rule 403"). Here, any probative value of the evidence is far outweighed by its unfairly prejudicial effect.

The relevance of any luxury items allegedly belonging to Mr. Hu and Ms. Sun is minimal. As courts in this Circuit have made clear, the government may introduce evidence of a defendant's alleged possession of luxury goods or other indicia of wealth only where it can link such items to the alleged crimes. *Compare, e.g.*, *United States v. Avila*, No. 22-933, 2024 WL 413408, at *2 (2d Cir. Feb. 5, 2024) (affirming admission of an Instagram image of a defendant holding a large amount of cash where the caption on the image made reference to "[t]rappin'" and the defendant's alleged fellow gang member testified that "trappin' means selling drugs"), *and United States v.*

18

*Carpenter*, 372 F. Supp. 3d 74, 79 (E.D.N.Y. 2019), *aff'd*, No. 21-837-CR, 2022 WL 16960577 (2d Cir. Nov. 16, 2022) (stating "evidence [is] . . . probative" where it "can be tied back to the alleged crime"), *with United States v. James*, 607 F. Supp. 3d 246, 264 (E.D.N.Y. 2022) (quoting *United States v. Holmes*, No. 18 Cr. 02581 (EJD), 2021 WL 2044470, at *4 (N.D. Cal. May 22, 2021)) ("[E]vidence of an individual's lavish spending habits, without a connection to an individual's participation in criminal activity, is irrelevant.").  Searches in this case yielded over thirty luxury items allegedly seized from Mr. Hu's and Ms. Sun's home, including multiple designer bags, articles of clothing, jewelry, and other high-end accessories.  Yet the government has not—and cannot—link a single one of those items to any particular offense.  Presenting those items to the jury would therefore have scant probative value, while unfairly bolstering the government's case by implying a connection that is—and likely will remain—unproven.

Furthermore, what minimal relevance that evidence may have is far outweighed by its unfairly prejudicial effect.  "[T]he problem with a general rule of permitting evidence of an affluent lifestyle . . . is that it ignores the real possibility that the extreme or extravagant wealth or spending was made possible by legitimate means and, if so, the introduction of such evidence would appeal solely to class prejudice."  *Jackson-Randolph*, 282 F.3d at 378; *accord Ewings*, 936 F.2d at 907 ("Such evidence will often give rise . . . to inferences about the defendant's character.").  That concern is particularly acute here, where the government has not alleged that any of the luxury items were procured through illegitimate means; rather, it seems any luxury items would merely be a proxy for an attempt to show the defendants' receipt of alleged criminal proceeds—something that the government could try to prove through other, more appropriate means, such as evidence

19

of wire transfers, cash payments, and the like.[12]  Accordingly, the introduction of such evidence would serve but one purpose in this case:  to "appeal to class prejudice." *United States v. Stahl*, 616 F.2d 30, 32–33 (2d Cir. 1980).  This would, in turn, "deprive [Mr. Hu and Ms. Sun] of a fair trial." *United States v. Bradley*, 644 F.3d 1213, 1271 (11th Cir. 2011).  Presenting evidence of luxury items to the jury thus risks biasing jurors against Mr. Hu and Ms. Sun on account of their alleged wealth, which is "improper and ha[s] no place in a court room." *Stahl*, 616 F.2d at 33.

Finally, in addition to the unduly prejudicial nature of Mr. Hu's and Ms. Sun's luxury items, the introduction of the full array of seized items at trial "w[ould] be cumulative" and gratuitous under Rule 403—a concern to which "[c]ourts must be sensitive . . . when considering whether to admit expenditure evidence." *Ewings*, 936 F.2d at 907; *see* Fed. R. Evid. 403 (providing evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence").  "This type of evidence should not be a vehicle by which the government can indiscriminately introduce highly prejudicial evidence of extrinsic acts." *Ewings*, 936 F.2d at 907.  The presentation of wealth in "a dramatic or inflammatory manner," *Lattanzio*, 2018 WL 1837856 at *15, has been routinely prohibited by courts, which instead have required that such evidence be "non-cumulative," *United States v. Ayers*, No. 20 Cr. 239 (BMC), 2024 WL 1158686, at *15 (E.D.N.Y. Mar. 18, 2024), and presented in a "dry and clinical manner, with . . . minimal descriptions,"[13] *Lattanzio*, 2018 WL 1837856 at *15; *see, e.g.*, *James*, 607 F. Supp. 3d at

---

[12]    To be sure, Mr. Hu and Ms. Sun are skeptical that the government can prove their receipt of criminal proceeds.  But that only underscores the point.  Evidence that they lived in a nice home or possessed luxury items is evidence only that they spent money—not that it came from a criminal source.  And if the government can offer only evidence of the luxury items, then it cannot prove any criminal source and should not be permitted to parade luxury items before the jury.

[13]    Even with respect to Mr. Hu's and Ms. Sun's vehicles and real properties, which the government has claimed an ability to connect to criminal proceeds, there is no need—and indeed, many reasons not—to provide details about the luxury nature of such items beyond the purchase price.  Allowing more detail would merely appeal to the improper considerations discussed above.

264 ("[T]he Court will not permit the Government to introduce [wealth] evidence carte blanche . . . . For example, the Government will not be allowed to introduce 'hundreds' of photographs of Defendant's properties and assets.").

In sum, the Court should preclude the government from introducing evidence of wealth or luxury items allegedly possessed by Mr. Hu and Ms. Sun. If it does allow such evidence, the form and content of what the government is permitted to introduce should be severely limited in order to avoid "appealing to class resentments" and biasing the jury against the defendants. *Lattanzio*, 2018 WL 1837856 at *14–15.

## IV.   THE GOVERNMENT SHOULD BE PRECLUDED FROM ARGUING OR SUGGESTING THAT MS. SUN'S ALLEGED CONDUCT CONSTITUTED "ESPIONAGE" OR IMPLICATED NATIONAL SECURITY

The S-3 alleges that Ms. Sun conspired to, and did, violate FARA. (*See* S-3 ¶¶ 131–33; 134–35.) At trial, the government should not be allowed to "color the trial with national security overtones" based on those charges. *United States v. Tao*, No. 19-20052-JAR, 2022 WL 252019, at *6 (D. Kan. Jan. 27, 2022). Putting aside Ms. Sun's denial of the government's allegations and her presumption of innocence, in all events "[f]oreign 'agents' [in the context of FARA] are not spies—what they do is legal." *United States v. Craig*, 401 F. Supp. 3d 49, 52 (D.D.C. 2019). The government thus should not be permitted to introduce evidence, argue, or otherwise imply that Ms. Sun's alleged conduct constituted "espionage" or harmed national security. That is simply incorrect, evidence in that vein would not be relevant to the charged offenses, and such arguments would be misleading and unfairly prejudicial. *See* Fed. R. Evid. 401, 403.

Ms. Sun is not charged with any offenses fairly viewed as implicating espionage. *Compare, e.g.*, 50 U.S.C. § 851 (requiring registration of anyone "who has knowledge of, or has received instruction or assignment in, the espionage, counter-espionage, or sabotage service or tactics of a government of a foreign country or of a foreign political party"); 18 U.S.C. § 798(a) (prohibiting

"knowingly and willfully communicat[ing], furnish[ing], transmit[ting], or otherwise mak[ing] available to an unauthorized person, or publish[ing], or us[ing] in any manner prejudicial to the safety or interest of the United States or for the benefit of any foreign government to the detriment of the United States any classified information"); 18 U.S.C. § 794(a) (criminalizing the provision of "any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense" with an "intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation").  Nor are any aspects of this case reflective of concerns regarding espionage or national security.  The government does not accuse Ms. Sun of working— or even knowingly communicating—with any law enforcement or foreign intelligence agents of the PRC.  The government also has confirmed that it does not possess or intend to use material common in cases that implicate national security, such as information obtained or derived from the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801 *et seq*.; the FISA Amendments Act of 2008, 50 U.S.C. § 1881a *et seq*.; or queried from Section 702 databases.  Any concerns about espionage or national security are belied by the fact that the government permitted Ms. Sun to remain employed in state government while it investigated this case.  (*See, e.g.*, Dkt. 78 (discussing search warrant activity relating to Ms. Sun from early 2022).)  And there has never been any suggestion that Ms. Sun posed a danger to the community.

Given that, any attempt to slot this case under the specter of espionage or national security would be flatly incorrect, profoundly misleading, and unfairly prejudicial.  *See Tao*, 2022 WL 252019 at *6 (granting motion *in limine* where defendant allegedly concealed his employment as a professor in the PRC because the case "[wa]s not an espionage prosecution, and the Government may not color the trial with national security overtones"); *cf. United States v. Quinn*, 401 F. Supp.

2d 80, 97–100 (D.D.C. 2005) (granting motion to strike and noting the "substantial" risk of prejudice from heightened governmental and public concerns over threats to national security). Under Rule 403, the nonexistent probative value of such rhetoric is substantially outweighed by the severe risk of unfair prejudice, jury confusion, and the danger of transforming this trial into a spy novel unmoored from the actual charges.[14]  It is essential that the jury not be exposed to the same inflammatory and misleading characterizations during trial that this Court has vowed to prevent from infecting the jury pool before trial.

## V.   THE COURT SHOULD EXCLUDE CERTAIN PORTIONS OF ANTICIPATED TESTIMONY BY THE GOVERNMENT'S PROPOSED EXPERT WITNESS

The Court should preclude certain portions of the proposed expert testimony that the government plans to elicit from Professor Julian Ku, who is expected to testify regarding the structure of the Chinese government and its relationship to certain allegations in this case.  While the defendants do not dispute Professor Ku's background as an international law scholar, much of his report consists of unjustified inferential leaps about connections between Chinese political institutions and foreign influence campaigns as they supposedly relate to this case.  Under Federal

---

[14]     Dangers of prejudice and confusion are not mere speculation; the Court need look no further than how the public has *already* misinterpreted the charges in this case.  *See, e.g.*, "Ex-Hochul, Cuomo aide accused of being Chinese spy stays free as feds push new charges in $8M PPE kickback scheme," N.Y. POST (Jun. 30, 2025), *available at* https://nypost.com/2025/06/30/us-news/ex-hochul-cuomo-aide-accused-of-being-chinese-spy-stays-free-as-feds-push-new-charges-in-8m-ppe-kickback-scheme/ (last accessed Sept. 4, 2025); "Gov. Hochul on Arrest of Former Aide on Spy Charges," C-SPAN (Sept. 4, 2024), *available at* https://www.c-span.org/video/?c5131020/gov-hochul-arrest-aide-spy-charges (last accessed Sept. 4, 2025); *see also* "Statement From Senate Republican Leader Rob Ortt Regarding Ex-top aide Linda Sun to N.Y. Governor Hochul," New York State Senate (Sept. 3, 2024), *available at* https://www.nysenate.gov/newsroom/press-releases/2024/robert-g-ortt/statement-senate-republican-leader-rob-ortt-regarding-ex (stating that "[t]he fact that a spy for a hostile nation was embedded at the highest levels of our state government under two administrations is an alarming security failure, jeopardizing both New York and the entire country") (last accessed Sept. 15, 2025).

Rules of Evidence 401, 403, and 702, those portions of his proposed testimony are irrelevant, unreliable, and unduly prejudicial. Moreover, allowing the jury to hear inflammatory testimony about other foreign interference by the PRC and espionage—which is not relevant to this case— would improperly shift the focus of the trial from the offenses charged to generalized concerns about China and foreign influence; that is unfairly prejudicial, especially in today's climate of heightened anti-China fears and rhetoric. *Cf. Unicolors, Inc.*, 2017 WL 11489792 at *7.

Expert testimony must be both relevant and reliable. Fed. R. Evid. 401, 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" can only "testify in the form of an opinion or otherwise" provided that: (*i*) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (*ii*) the testimony is based on sufficient facts or data; (*iii*) the testimony is the product of reliable principles and methods; and (*iv*) the expert has reliably applied those principles and methods in connection with his or her testimony. Fed. R. Evid. 702. The Second Circuit has emphasized that expert opinion should not be admitted if it invites the jury to render a verdict on an improper basis. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005); *see also United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003).

Moreover, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see Guerrero v. Loiacono*, 769 F. Supp. 3d 158, 168 (E.D.N.Y. 2024) (quoting *In re Fosamax Prods. Liab. Litig.*, 807 F. Supp. 2d 168, 179 (S.D.N.Y. 2011)) (explaining that helpfulness is a question of fit and asks "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). Even when a witness is qualified to provide expert testimony, the Court still

acts as a gatekeeper to ensure that testimony fits the facts at issue and actually assists the jury in determining a disputed material fact. *See Daubert*, 509 U.S. at 597; *Farhane*, 634 F.3d at 158.

### A. Portions of Professor Ku's proposed testimony are not relevant to any elements of the charged offenses.

Much of Professor Ku's anticipated testimony is a primer on the internal workings of the CCP, including detailed descriptions of the Chinese constitution, the hierarchy of the Politburo, and the PRC's policies toward Taiwan. (*See, e.g.*, Dkt. 102-1 ("Ku Rep.") ¶¶ 5–47, 61–67.) None of those topics relate to any elements of the charged offenses (*compare* S-3 ¶¶ 131–56), nor does Professor Ku's thoughts on those matters make any "fact . . . of consequence in determining the action" any "more or less probable." Fed. R. Evid. 401. The following portions of Professor Ku's anticipated testimony are especially problematic:

- **Speculative Assertions About the UWFD and Supposedly Related Organizations.** Professor Ku asserts that the UFWD "has longstanding relationships with overseas Chinese associations including the two organizations (Henan Chinese Associates U.S.A. and U.S. Federation of Chinese-American Entrepreneurs) referred to in the Superseding Indictment." (Ku Rep. ¶ 10.) He further claims that the UFWD partnered with organizations such as the CPPCC, Hong Kong and Macao Affairs Office, Taiwan Affairs Office, OCAO, and ACFROC to organize events for overseas Chinese. (*Id.* ¶ 57.) These claims are highly speculative and unfairly prejudicial, because there is nothing untoward about international relationships among organizations and such relationships do not necessarily equate to control by the PRC.

- **Irrelevant Political Assertions Regarding Taiwan.** Professor Ku emphasizes that "the PRC's claim to Taiwan is a fundamental national policy enshrined in its constitution and laws" and that PRC officials "aggressively protest any kind of official U.S. contact with officials of Taiwan's government, even legislative or state government officials in the United States." (Ku Rep. ¶ 11.) He concludes that this opposition would extend to New York State officials contacting TECO or TECRO. (Ku Rep. ¶ 67.) Those geopolitical musings, as they relate to New York officials, are mere conjecture and are unrelated to any specific element of the charged offenses. Nor are they particularly insightful in this case, since even the S-3 notes that Ms. Sun did not oppose staff engaging with TECO representatives (*see* S-3 ¶ 29(p)), and did so herself with a colleague (*see id.* ¶ 29(i) (alleging that Ms. Sun "and her office's Director of Asian American Affairs met with [a] TECO representative on or about August 20, 2019")). In any event, the issue at trial is whether Ms. Sun actually engaged in

a particular course of conduct at the PRC's direction or request, not what the PRC *might* want in hypothetical situations.

- **Improper Linking of Co-Conspirators to CCP Influence.** Professor Ku highlights that CC-2 is supposedly "the head of a U.S.-based association of Chinese entrepreneurs and a member of the CPPCC," explaining that "members of the CPPCC are not typically Party members but are often selected for their support of the CCP's policies and interests." (Ku Rep. ¶ 37.) He further asserts that "such membership . . . requires approval and support from the CCP," and notes that CC-2 "led a delegation . . . received in China by CCP officials and the Henan Overseas Chinese Affairs Office." (*Id.* ¶ 59.) Similarly, Professor Ku describes CC-1 as head of a "hometown association" and implies that role connects him to the UFWD's influence operations. (*Id.* ¶ 56.) There is no indication, however, that Professor Ku actually has knowledge of any facts justifying his surmise—and no obvious way in which he could have learned about conduct that, if it were as the government alleges, evaded even government eavesdropping methods. (*See* Dkt. 52 at 14.) Ultimately, this portion of Professor Ku's report seeks to suggest that, in fact, CC-1 and CC-2 were actually working on behalf of the PRC. But he has no apparent basis for knowing that and scholarly observations about broader trends do not substitute for facts in a particular case. Offering abstract "expert" testimony about alleged co-conspirators in this case is inadmissible and unfairly prejudicial.

- **Speculative "Espionage" and Volunteer Assertions.** Professor Ku references a Canadian Federal Court finding that the OCAO engages in "espionage and intelligence gathering," suggesting that PRC consulates "encourage[]" overseas volunteers to participate in consular work intertwined with United Front operations. (Ku Rep. ¶ 51.) This testimony is irrelevant because Ms. Sun is not charged with espionage or threatening national security, and there is no evidence linking her to covert intelligence activity. The findings of a Canadian court on unrelated issues are completely irrelevant to these proceedings, and impermissibly threaten to supplant jurors' own assessments of the facts with an observation that carries the imprimatur of a judicial determination.

- **Unrelated Examples of CCP Events and Delegations.** Professor Ku describes interactions such as the 2017 Hebei Hometown Association visit to New York, which he claims are "normal and quite similar to the meetings between the Henan Chinese Associates U.S.A. . . . and the UFWD entities in Henan Province alleged in paragraph 42 of the Superseding Indictment," and the ACFROC gala that "brought leading overseas Chinese supporters like the Defendant back to China for the festivities." (Ku Rep. ¶¶ 55, 57.) Those passages are highly speculative and irrelevant; they attempt to link routine cultural and professional events to nefarious CCP influence operations without any evidence that Ms. Sun (or anyone else involved in this case) actually engaged in any unlawful activity. In casting Ms. Sun's participation in such events as indicative of CCP-directed conduct, the report impermissibly seeks to paint Ms. Sun as endorsing (and responsible for) other purported actions of an

organization rather than properly focusing on her actual conduct.[15]  Allowing this testimony would risk confusing the jury and unfairly suggesting that, so long as China is involved, any ordinary participation in community or international events demonstrates criminal intent or alignment with CCP objectives.

- **Speculative Conclusions About Organizations and Their Missions.** Professor Ku repeatedly asserts that organizations like the U.S. Federation of Chinese-American Entrepreneurs are "of interest" to the UFWD due to their overseas Chinese professional membership. (Ku Rep. ¶ 59.) Those conclusions lack a factual basis and do not relate to Ms. Sun's intent or knowledge, amounting to impermissible speculation. *See Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 324 (E.D.N.Y. 2013) (opinions purporting to address an organization's state of mind, intent, or motives of a government or person is not relevant expert evidence). And again, the issue at trial is whether Ms. Sun actually engaged in a particular course of conduct at the PRC's direction or request, not what the PRC's broader interests might be.

Professor Ku also seeks to offer broad background testimony about the CCP, the UFWD, and alleged influence operations targeting overseas Chinese communities and U.S. state and local governments.  (*See* Ku Rep. ¶¶ 37, 45–49.)  But testimony about how the CCP allegedly recruits spies or conducts global intelligence operations is far afield from the facts of this case, highly inflammatory, and does not bear on any of the charged offenses.  (*See, e.g.*, *id.* ¶¶ 8–9, 51, 56.) And courts routinely exclude expert testimony that concerns unrelated bad acts of others and risks confusing the jury about a defendant's own conduct.  *See*, *e.g.*, *Linde*, 922 F. Supp. 2d at 324 (granting, in part, a motion to exclude expert testimony as inadmissible opinions as to the state of mind of charitable organization that had a relationship with Hamas); *see also Al-Moayad*, 545 F.3d at 160–61 (explaining "the highly charged and emotional nature of [] testimony and its minimal evidentiary value" invited the jury to convict on an improper basis).

---

[15]     As noted above, this testimony is also irrelevant and unfairly prejudicial because activities abroad cannot form the basis of a FARA violation.

At bottom, Professor Ku's anticipated testimony implies that Ms. Sun is part of a sweeping and long-running foreign plot through generalizations and without any actual evidence tying her to any foreign influence campaigns. While the defendants agree that Professor Ku can properly provide some context about the PRC, its structure, and its organizations, his anticipated testimony goes much too far.

### B. Portions of the proposed testimony are unreliable, lack sufficient bases, and usurp the jury's role.

Even if marginally relevant, portions of Professor Ku's testimony are not based on reliable principles or methods as applied to the facts of this case. Fed. R. Evid. 702(d). Professor Ku seemingly relies on generalized descriptions of CCP strategy, UFWD activities, and Chinese political organization, summarizing information that anyone could obtain from media reports or government white papers rather than specialized expertise. (*See* Ku Rep. ¶¶ 5–7, 12–44, 68–70.) Nothing in his anticipated testimony suggests that Professor Ku has analyzed evidence specific to Ms. Sun or the alleged actions of relevant organizations identified in the S-3. Yet while Professor Ku expressly states that he "express[es] no opinion . . . on the merits of the case against the Defendants" (*id.* ¶ 4), he repeatedly references allegations involving Ms. Sun and others—such as the delivery of salted ducks, Ms. Sun's visits to China, and her participation in certain events—and deems them consistent with his theory of CCP influence. (*Id.* ¶¶ 53, 56–57.) In doing so, Professor Ku attempts to have it both ways: disavowing any personal opinion on the defendants' guilt while validating the government's unproven narrative under the guise of neutral expertise.

A number of Professor Ku's so-called conclusions are wholly unfounded. His assertion that certain "funds or other political favors" often reflect CCP direction, for instance is pure speculation not expert analysis. (Ku Rep. at ¶ 10.) He is offering his *belief*—not any conclusion grounded in rigorous analysis. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

*Litig.*, 638 F. Supp. 3d 227, 242 (E.D.N.Y. 2022) (quoting *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020)) ("Expert testimony should be excluded if it is 'speculative or conjectural.'"). Even crediting that view, concluding that certain funds or political favors reflected CCP direction in other contexts is barely disguised propensity evidence that says nothing about Ms. Sun or her conduct in this case. By suggesting that such benefits showed foreign agency in other instances, Professor Ku also suggests that they prove that Ms. Sun chose to enter into such a relationship here. *Contra* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.") His proffered testimony thus "usurps . . . the role of the jury in applying that law to the facts before it,'" *Nimely*, 414 F.3d at 397 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)), and "by definition does not 'aid the jury in making a decision'" but rather "attempts to substitute the expert's judgment for the jury's," *id.* (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

Professor Ku's anticipated testimony is also unreliable because he utterly fails to account for alternative, non-geopolitical explanations. Courts in this Circuit have explained that an expert's failure to account for alternative explanations may render his or her opinion inadmissible. *See, e.g.*, *In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 493 (S.D.N.Y. 2013) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."). In *Fosamax*, the court precluded a portion of a physician's report because the expert "did not have enough information" to definitively support his conclusion. *Id.* Similarly, in *In re Executive Telecard, Ltd. Securities Litigation*, 979 F. Supp. 1021 (S.D.N.Y. 1997), the court excluded a damages expert

who "fail[ed] adequately to distinguish between fraud-related and non-fraud-related company-specific influences." *Id.* at 1025–26.

Professor Ku's narrative, which seemingly is not informed by any actual evidence, suffers from similar deficiencies. His narrative about wider CCP and UFWD influence operations, drawn from secondary reporting, paints with a broad brush and fails entirely to consider other plausible explanations for the conduct alleged in this case. And that is hardly a surprise given that one of his few primary sources of information was the government's self-serving press release about this case. (*See* Ku Rep. ¶ 4.) Permitting the jury to hear such generalizations from a supposed expert would be unfairly prejudicial, especially since even where alleged activities are consistent with some foreign prerogative they do not violate FARA if they did "not serv[e] predominantly a foreign interest." 22 U.S.C. § 613(d)(2).

### C. Unfair prejudice from portions of the proposed testimony far outweighs any minimal probative value.

Even putting all that aside, the referenced portions of Professor Ku's testimony should be excluded under Rule 403 because its inflammatory content would mislead the jury and unfairly prejudice the defense. Courts have repeatedly recognized the extraordinary prejudice of evidence invoking controversial topics, such as espionage, hostile foreign governments, or terrorism. *See Al-Moayad*, 545 F.3d at 160. Those concerns are already significant here. And they would be exacerbated by Professor Ku's unnuanced treatment of issues intertwined with essential elements of the charged offenses.

For example, Professor Ku's report links Ms. Sun and others to the CCP based solely on their associations with individuals and organizations he claims are CCP-affiliated. (*See* Ku Rep. ¶¶ 37, 56, 59.) Such testimony invites the jury to infer guilt by association rather than decide factually whether Ms. Sun violated FARA based on the actual evidence presented. Similarly,

30

Professor Ku's report mischaracterizes common cultural practices as improper influence efforts. He claims, for instance, that sending salted ducks to Ms. Sun's parents is "another example of using gifts to build goodwill and influence." (Ku Rep. ¶ 53.)  There is no apparent basis for that conclusion other than Professor Ku's belief, and such an assertion trends dangerously close to cultural stereotyping.  *See, e.g.*, *Tao*, 2022 WL 252019 at *6 (excluding expert testimony as inadmissible because it "risks misleading the jury" and "poses a significant risk of stoking Sinophobia").[16]  It certainly crosses the line into offering an unfounded and unreliable opinion about cherry-picked allegations from the S-3.

In sum, Professor Ku's speculative narrative is unfairly prejudicial and risks distracting the jury from the evidence—or absence of evidence—regarding Ms. Sun's actual conduct, filling key gaps with generalities and implying criminal intent based on mere participation in cultural or professional organizations.  *Contra* Fed. R. Evid. 704(b).  Large tranches of Professor Ku's anticipated testimony are simply a vehicle for the government to smuggle in whitepaper assertions, a narrative about CCP espionage and global influence operations, and generalizations about how Chinese people and those interacting with them are likely to act.  Accordingly, Ms. Sun respectfully requests that the Court preclude the irrelevant, inadmissible, and unfairly prejudicial portions of Professor Ku's anticipated testimony by precluding evidence of Paragraphs 4, 10, 11, 37, 48, 49, 51, 53, 55–57, 59, and 67 of his report.

---

[16]    This risk is especially acute given the ongoing climate of heightened anti-China rhetoric. *See, e.g.*, "COVID-19 Pandemic and Anti-Asian Racism & Violence in the 21st Century," J. COMMUNITY PSYCHOL. (2022), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9676106 (last accessed Sept. 15, 2025).

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that the Court grant their motions *in limine*.

Dated: September 15, 2025
       New York, New York

Respectfully submitted,

ABELL ESKEW LANDAU LLP

/s/ *Jarrod L. Schaeffer*

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman

(646) 970-7341 / -7339 / -7338

kabell@aellaw.com
jschaeffer@aellaw.com
sglicksman@aellaw.com

*Counsel for Linda Sun*

BRACEWELL LLP

/s/ *Seth D. DuCharme*

Seth D. DuCharme
Nicole Boeckmann
Anisa L. Adas
Kimberly Kirschenbaum

(212) 508-6165 / -6103
(212) 938-6403
(201) 220-7652

seth.ducharme@bracewell.com
nicole.boeckmann@bracewell.com
anissa.adas@bracewell.com
kim.kirschenbaum@bracewell.com

*Counsel for Chris Hu*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on September 15, 2025, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve notification of the filing to all registered parties of record.

/s/ *Jarrod L. Schaeffer*

Jarrod L. Schaeffer