

JARROD L. SCHAEFFER
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

November 17, 2025

**By ECF**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

>   Re:   *United States v. Linda Sun, a/k/a "Wen Sun," "Ling Da Sun," and "Linda Hu," and Chris Hu*, S4 24 Cr. 346 (BMC) (TAM)

Your Honor:

We represent Linda Sun in the above-referenced matter and respectfully submit this letter on behalf of both defendants regarding the government's intention this week to call one or more witnesses who will testify pursuant to grants of immunity or agreements foreclosing prosecution.

Despite its intent to call such witnesses, the government has refused to grant immunity to an important defense witness—the person named in the indictment as CC-1—who was interviewed by federal agents in May 2025 and provided powerful exculpatory information that the government was later compelled to produce to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The government's tactical use of immunity is unfairly prejudicial to the defense and, if permitted, will prevent the defense from offering highly relevant, material, and exculpatory information.

Accordingly, the defense respectfully requests that the Court (*i*) preclude the government from calling any witnesses testifying pursuant to a grant of immunity or non-prosecution agreement unless CC-1 is granted immunity or (*ii*) receive into evidence—over any objection by the government—the report documenting the May 2025 interview of CC-1, which sets forth the exculpatory information that would be the subject of his testimony.

## BACKGROUND

As the Court is aware, on August 18, 2025,[1] the government disclosed to the defense a report that documented an interview of CC-1 (the "*Brady* Interview"), who was questioned by U.S.

---

[1]   As the defense noted with concern at the time, though the report was produced on August 18, 2025, it documented an interview that actually had been conducted on May 6, 2025. Given the highly case-specific questions asked of CC-1, it is difficult to credit that the prosecution did not request or know about the interview.

Customs and Border Patrol ("CBP") agents upon returning to the United States from an overseas trip. During that interview, CC-1 was asked a number of case-specific questions about Ms. Sun, Mr. Hu, and the allegations in this case. In response, CC-1 gave answers that are directly contrary to the governments' allegations. The defense previously provided a copy of this report to the Court. (*See* Dkt. 152 at 3 & n.4.) Among other things, in response to questioning by federal agents, CC-1:

- Denied assisting any Chinese government officials, except with logistics of visits by such officials to the United States in his capacity as the president of a U.S.-based organization (identified as "Association-1");

- Denied having any personal relationship with anyone in the Henan provincial government or Zhengzhou municipal government;

- Agreed that, in his capacity as Association-1's president, CC-1 attempted to assist Ms. Sun and Mr. Hu with opening a lobster business in Henan Province, but denied that effort was successful;

- Denied any personal relationship with the individual identified as "CC-2";

- Denied knowledge of any personal relationship between Ms. Sun and CC-2;

- Stated that the purpose of Association-1 is to facilitate trade and business between New York State and Henan Province;

- Agreed that Ms. Sun had assisted Association-1 and helped to connect New York State with Henan Province for purposes of trade, agriculture, and cultural exchange, but denied that Ms. Sun had ever helped him personally;

- Stated that Association-1 is supported through donations from its members, and denied that New York City, New York State, the Chinese government, or anyone living in China provided financial support for Association-1;

- Denied meeting with any representatives from the Chinese government since 2020; and

- Denied having any ties to the Chinese government.

As even the government belatedly recognized, this information was clearly exculpatory. The *Brady* Interview report also suggested a surprising possibility: that despite extensive allegations concerning CC-1, the government never actually questioned CC-1 about this case and such allegations merely reflected the government's *own* interpretation of communications between various people it had never interviewed and never planned to call as witnesses at trial. When the defense received the government's witness list and material pursuant to 18 U.S.C. § 3500, that possibility was confirmed. The government did, indeed, charge this case and name CC-1 as a co-conspirator without taking traditional investigative steps. And despite his prominent role in the

indictment, the government also chose not to charge CC-1 with any crimes or pursue any investigation of his conduct.

Based on his late-in-the-game interview by CBP agents, it now strongly appears CC-1's that testimony would be powerful evidence refuting the government's allegations. Because he has been identified (though not charged) as a co-conspirator, however, CC-1 understandably would have concerns about testifying at trial if called as a witness by Ms. Sun.

On November 5, 2025, the defense provided the government with a list of individuals who might ultimately become potential defense witnesses, in a good faith attempt to identify and resolve issues that may arise as to those individuals. One of them was CC-1, as the defense noted it expected that CC-1 would seek to invoke his Fifth Amendment privilege if called to testify. The defense asked whether, if necessary, the government would grant CC-1 immunity pursuant to 18 U.S.C. §§ 6002–03 in order to ensure that the defense has the benefit of his testimony. The government stated that it would not.

On November 7, 2025, Ms. Sun served CC-1 with a trial subpoena. Counsel for CC-1 then confirmed that, if called as a witness, CC-1 would assert his Fifth Amendment privilege against testifying. The defense informed the government of the intended assertion that same day.

After the jury was selected, the defense flagged this issue for the Court. (*See* Tr. dated Nov. 10, 2025 ("11/10 Tr.") at 31:5–25.) When asked whether it would now grant immunity, the government responded that it believed CC-1's statements "[we]re directly contradicted by the electronic communications [it is] going to offer into evidence" and "strongly doubt[e]d that even if CC-1 were granted immunity that he could testify without fear of committing perjury that the substance of what he said at the border was actually correct." (*Id.* at 32:14–17.) The government represented that it would "confer internally" regarding immunity (*id.* at 32:9), but its position has not changed.

## DISCUSSION

"[T]he ability to give immunity to one witness but not another is a potentially powerful tool for a prosecutor, particularly in light of the prosecutor's ability to create incentives for witnesses to invoke the privilege against self-incrimination." *United States v. Ebbers*, 458 F.3d 110, 118–19 (2d Cir. 2006). In appropriate cases, "a court may order the prosecution to choose between forgoing the testimony of an immunized government witness or granting use immunity to potential defense witnesses." *Id.* "In an extreme case," the Court may even find "that the absence of the non-immunized witness caused the government's evidence to fall short of proof beyond a reasonable doubt." *Id.*

The Second Circuit "appl[ies] a three-part test for determining whether there are exceptional circumstances warranting a directive that the government grant immunity to a defense witness." *United States v. Diaz*, 176 F.3d 52, 115 (2d Cir. 1999). To obtain such an order, a defendant must show that (*i*) "the government, through its own overreaching, has forced the witness to invoke the Fifth Amendment or . . . engaged in discriminatory use of grants of immunity to gain a tactical advantage," (*ii*) "the witness' testimony must be material, exculpatory[,] and not

cumulative," and (*iii*) there is "no other source to obtain the evidence." *Id.* All of those prongs are satisfied here.

*First*, the government's overreach has prompted CC-1 to invoke the Fifth Amendment. Although CC-1 has not been charged with any crimes, the government has named CC-1 as a co-conspirator, seized his electronic devices, and entered evidence concerning CC-1 at trial. Such actions clearly have caused CC-1 to be concerned about his own criminal exposure, removing him as a potential witness that Ms. Sun might call as a witness at trial. And just in case CC-1 were to reconsider invoking his Fifth Amendment rights, the government has made veiled threats suggesting that it would view any testimony contrary to the government's preferred narrative to be perjurious.[2] (*See* 11/10 Tr. at 32:14–17.)

The government also has dispensed immunity in a discriminatory manner to gain a tactical advantage over the defense. For purposes of this prong, "a discriminatory grant of immunity" may be shown by "a decision to confer immunity on some witnesses and not on others." *Ebbers*, 458 F.3d at 119 (quoting *United States v. Dolah*, 245 F.3d 98, 105–06 (2d Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004)). That is certainly the case here. The government has already granted immunity to the Relative in order to obtain testimony that it views as favorable, and it has entered into a non-prosecution with another witness. At the same time, the government has refused to grant immunity to CC-1, seemingly because it does not view his anticipated testimony—previewed by his *Brady* Interview—as helpful to the prosecution. Worse, even with respect to the witness for which it *has* granted immunity, the government has sought to sharply limit any cross-examination because it views any "opportunity to present immunized testimony beyond the scope of the [government's] direct examination" as "exploitation of the grant of immunity . . . ."[3] (Dkt. 273 at 9.)

Thus, it is painfully clear that the government has caused CC-1 to invoke the Fifth Amendment through overreach, and that it is also exercising its unilateral power to grant immunity

---

[2]   Those threats do nothing to change the calculus here. For one thing, a self-serving belief that any testimony harmful to the government's case constitutes perjury does not make it so. And even accepting the government's shaky premise, CC-1 would *already* be in jeopardy for making purportedly false statements to federal agents in the course of their duties. *See, e.g.*, 18 U.S.C. § 1001. Moreover, while typically "[t]he [g]overnment may reasonably refuse to grant immunity where a witness is a potential target of criminal prosecution," *United States v. Rosen*, 716 F.3d 691, 704 (2d Cir. 2013), here CC-1 was never charged, never interviewed about his alleged conduct, and never approached by the government. Clearly, the government has no genuine interest in pursuing CC-1 as a potential target for criminal prosecution. And the mere fact that it *could* cannot be enough to foreclose a directive to confer immunity, because that would be true in almost *every* case where a witness has potential criminal exposure—yet it is the very fact of such exposure that makes immunity necessary in the first place.

[3]   If there were any doubt about the government's overreach here, it even went so far as to suggest that routine cross-examination may amount to a *crime* by defense counsel. (*See* Dkt. 273 at 9 (suggesting that "cross-examination . . . beyond the scope of the direct examination" would be an effort to "exploit[] of the grant of immunity to potentially obstruct justice").) That irresponsible accusation is unfounded and a transparent attempt to chill zealous advocacy.

for its own tactical benefit—both by securing immunity only for its own witnesses and by leveraging immunity when granted to try to muzzle the defense.

*Second*, the testimony of CC-1 is material, exculpatory, and not cumulative. CC-1 figures prominently in the indictment and is alleged to have been a primary participant in the charged conspiracy. The government has already offered evidence regarding CC-1. And the government intends to rely at trial—as it did in the indictment—on its interpretation of alleged communications between CC-1 and Ms. Sun to suggest the existence of a criminal scheme. Testimony by CC-1 consistent with his statements in the *Brady* Interview, which denied such a scheme, obviously would be highly material and exculpatory. Unlike other cases, here the *Brady* Interview report provides a clear window into CC-1's expected testimony. *Compare United States v. Todaro*, 744 F.2d 5, 9 (2d Cir. 1984) (rejecting "claim for defense witness immunity" because, *inter alia*, [t]here is no indication of what the witnesses could be expected to testify about at trial"). And since CC-1 himself is the only likely source of such testimony, it would not be cumulative.

*Third*, with one exception, there is no other way to obtain the evidence that would be provided by CC-1's testimony. Only CC-1 could testify to the statements that he made to CBP, because only he can adopt his own statements and others may not have personal knowledge of the matters discussed. If CC-1 cannot be called as a witness by the defense, then all but one avenue for obtaining the information would be exhausted.

The only other potential source of the exculpatory information embodied in the *Brady* Interview is the report of that interview. Arguably, that report constitutes "[a] record or statement of a public office" that "sets out . . . against the government in a criminal case, factual findings from a legally authorized investigation" without "circumstances indicat[ing] a lack of trustworthiness." Fed. R. Evid. 803(8). But the defense anticipates that the government would oppose the admission of the *Brady* Interview report pursuant to that exception. Similarly, since the government is expected to other statements by CC-1 into evidence pursuant to Rule 801(d)(2)(E), the report arguably is admissible because "[t]he court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it." Fed. R. Evid. 806. But the government is likely to object to that as well. And the *Brady* Interview report, which was prepared by CBP agents under controlled circumstances, arguably "is supported by sufficient guarantees of trustworthiness . . . after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(1)–(2). But the government probably would object to that, too.

Should the Court admit the *Brady* Interview report over the objection of the government on those or any other basis, then the defense concedes that the third prong of the Second Circuit's test for an immunity directive would not be satisfied.[4] In the absence of such an order or the government's agreement, however—neither of which is currently extant—the defense has satisfied all three prongs of the Second Circuit's test. As such, the defense is entitled to relief in order to

---

[4] The defense further concedes that, should the government stipulate to the admission of the *Brady* Interview report, then the test also would not be satisfied and this motion would be moot.

ensure that the jury has the benefit of highly material and directly exculpatory information that currently is quarantined due to the government's overreach and unilateral tactical decisions.

## **CONCLUSION**

For the foregoing reasons, the defense respectfully requests that the Court (*i*) preclude the government from calling any witnesses testifying pursuant to a grant of immunity or non-prosecution agreement unless CC-1 is granted immunity or (*ii*) receive into evidence the report documenting the May 2025 interview of CC-1, which sets forth the exculpatory information that would be the subject of his testimony.

We thank the Court for its attention to this matter.

Respectfully submitted,

*Jarrod L. Schaeffer*

Jarrod L. Schaeffer

ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7339
jschaeffer@aellaw.com

cc:     Counsel of Record (via ECF)